## Brett Feldman, et al Plaintiff vs. CWGL HOLDINGS LLC, et al Defendant

**Broward County Case Number:** CACE22013915
**State Reporting Number:** 062022CA013915AXXXCE
**Court Type:** Civil
**Case Type:** Contract and Indebtedness
**Incident Date:** N/A
**Filing Date:** 09/16/2022
**Court Location:** Central Courthouse
**Case Status:** Pending
**Magistrate Id / Name:** N/A
**Judge ID / Name:** Bidwill, Martin J.

### Party(ies)

Total: 5

| Party Type | Party Name | Address | Attorneys / Address ★ Denotes Lead Attorney |
|---|---|---|---|
| Plaintiff | **Feldman, Brett** | | ★ Grant, Joey Michael<br>Retained<br>Bar ID: 137758<br>Lorium PLLC<br>197 S Federal Hwy Ste 200<br>Boca Raton, FL 33432<br>**Status: Active** |
| Plaintiff | **Solomon, Bryan** | | ★ Grant, Joey Michael<br>Retained<br>Bar ID: 137758<br>Lorium PLLC<br>197 S Federal Hwy Ste 200<br>Boca Raton, FL 33432<br>**Status: Active** |

| Party Type | Party Name | ❓ Address | ❓ Attorneys / Address ★ Denotes Lead Attorney |
|---|---|---|---|
| Defendant | **CWGL HOLDINGS LLC** | | ★ McCardle, Patrick Colin Retained Bar ID: 99042 Cole, Scott & Kissane, PA 110 Tower, Suite 2700 110 SE 6th Street Fort Lauderdale, FL 33301 **Status: Active** |
| | | | Levine, Justin Retained Bar ID: 106463 Cole, Scott & Kissane PA 222 Lakeview Avenue Ste 120 West Palm Beach, FL 33401 **Status: Active** |
| | | | Martin, Eric Alexander Retained Bar ID: 1019248 COLE, SCOTT & KISSANE, P.A 222 Lakeview Avenue, Suite 500 West Palm Beach, FL 33401 **Status: Active** |

| Party Type | Party Name | ❓ Address | ❓ Attorneys / Address |
| --- | --- | --- | --- |
| | | | ★ Denotes Lead Attorney |
| Defendant | **Wechter, Claudia** | | ★ McCardle, Patrick Colin |
| | | | Retained |
| | | | Bar ID: 99042 |
| | | | Cole, Scott & Kissane, PA |
| | | | 110 Tower, Suite 2700 |
| | | | 110 SE 6th Street |
| | | | Fort Lauderdale, FL 33301 |
| | | | **Status: Active** |
| | | | |
| | | | Levine, Justin |
| | | | Retained |
| | | | Bar ID: 106463 |
| | | | Cole, Scott & Kissane PA |
| | | | 222 Lakeview Avenue Ste 120 |
| | | | West Palm Beach, FL 33401 |
| | | | **Status: Active** |
| | | | |
| | | | Martin, Eric Alexander |
| | | | Retained |
| | | | Bar ID: 1019248 |
| | | | COLE, SCOTT & KISSANE, P.A |
| | | | 222 Lakeview Avenue, Suite 500 |
| | | | West Palm Beach, FL 33401 |
| | | | **Status: Active** |

| Party Type | Party Name | ❓ Address | 👤 Attorneys / Address ⭐ Denotes Lead Attorney |
|---|---|---|---|

Defendant     **Loffredo, Gary**

⭐ McCardle, Patrick Colin
Retained
Bar ID: 99042
Cole, Scott & Kissane, PA
110 Tower, Suite 2700
110 SE 6th Street
Fort Lauderdale, FL 33301
**Status: Active**

Levine, Justin
Retained
Bar ID: 106463
Cole, Scott & Kissane PA
222 Lakeview Avenue Ste 120
West Palm Beach, FL 33401
**Status: Active**

Martin, Eric Alexander
Retained
Bar ID: 1019248
COLE, SCOTT & KISSANE, P.A
222 Lakeview Avenue, Suite 500
West Palm Beach, FL 33401
**Status: Active**

---

**−** Disposition(s)            Total: 0

Date            Statistical Closure(s)

Date            Disposition(s)            View / Pages

---

**−** Collection(s)            Total: 0

**There is no Collection information available for this case.**

---

**−** Event(s) & Document(s)            Total: 99

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 10/31/2024 | **Suggestion of Bankruptcy** | Case No. 24-21355-SMG Party: *Defendant* CWGL HOLDINGS LLC | /9 |
| 08/27/2024 | **Agreed Order** | AGREED CONFIDENTIALITY ORDER | /14 |
| 08/26/2024 | **Uniform Order Setting Pretrial Deadline** | CALENDAR CALL: 07-29-2025 at 9:30 AM | /7 |
| 08/07/2024 | **Notice of Taking Deposition Duces Tecum** | | /32 |
| 08/07/2024 | **Re-Notice of Taking Deposition** | | /32 |
| 07/26/2024 | **Case Management Order** | CASE MANAGEMENT CONFRENCE: 8/26/2024 @ 8:45 AM | /2 |
| 06/13/2024 | **4th DCA Order** | ORDERED that the December 7,2023 petition for writ of certiorari is denied | /1 |
| 05/17/2024 | **4th DCA Order** | 4D23-2965/ ORDERED that Petitioners' May 16, 2024 motion for extension of time is granted | /1 |
| 04/25/2024 | **Case Management Order** | CASE MANAGEMENT CONFRENCE: 8/12/2024 @ 8:45 AM | /2 |
| 04/15/2024 | **4th DCA Order** | 4D23-2965; KH/ ORDERED that Respondents' April 10, 2024 motion for extension of time is granted, a d the time for filing a response is extended twenty (20) days from the date of this order | /1 |
| 03/22/2024 | **Agreed Order** | AGREED ORDER GRANTING PLAINTIFFS MOTION TO EXTEND DEADLINES FOR CONTINUANCE OF TRIAL | /2 |

| Date | Description | Additional Text | View / Pages |
|---|---|---|---|
| 03/13/2024 | **4th DCA Order** | 4D23-2965// ORDERED that Respondents shall file a response to the petition within twenty (20) days o der. Petitioners may file a reply within ten (10) days thereafter | /1 |
| 03/11/2024 | **Motion for Extension of Time** | PLAINTIFFS MOTION TO EXTEND DEADLINES AND FOR CONTINUANCE OF TRIAL Pursuant to Fla. R. Civ. P. 1.09 (b) and other applicable Florida law, Plaintiff, Bryan Party: *Plaintiff* Feldman, Brett | /2 |
| 02/26/2024 | **Notice of Cancellation** | | /2 |
| 02/26/2024 | **Order Granting in Part and Denying in Part** | MOTION TO COMPEL BETTER RESPONSES TO INTERROGATORIES | /2 |
| 02/26/2024 | **Order Granting in Part and Denying in Part** | MOTION TO COMPEL BETTER RESPONSES TO INTERROGATORIES | /2 |
| 02/26/2024 | **Order Granting in Part and Denying in Part** | Motion to Compel Better Responses | /3 |
| 02/21/2024 | **Response to Motion** | | /3 |
| 02/15/2024 | **4th DCA Order** | 4D23-2965/ ORDERED that, having considered Petitioners' February 13, 2024 status report, the stay f this proceeding is lifted. | /1 |
| 02/15/2024 | **4th DCA Order** | 4D23-2965/ ORDERED that, having considered Petitioners' February 13, 2024 status report, the stay f this proceeding is lifted. | /1 |
| 02/05/2024 | **Order Denying Motion** | for Reconsideration | /2 |
| 01/10/2024 | **Response to Request for Production** | | /6 |

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 01/10/2024 | **Response to Request for Production** | | /6 |
| 01/10/2024 | **Response to Motion** | | /20 |
| 12/28/2023 | **Witness List** | | /3 |
| 12/22/2023 | **Witness List** | | /2 |
| 12/21/2023 | **Order** | NON-DISPOSITION | /2 |
| 12/21/2023 | **Motion for Enlargement of Time** | Party: *Plaintiff* Feldman, Brett *Plaintiff* Solomon, Bryan | /2 |
| 12/21/2023 | **Response** | DUCES TECUM WITHOUT DEPOSITION | /2 |
| 12/15/2023 | **4th DCA Order** | 4D23-2965; KH/ ORDERED that this case is stayed pending a ruling on the pending motion for reconsideration. | /1 |
| 12/14/2023 | **Notice of Filing** | | /3 |
| 12/08/2023 | **Acknowledgment** | 4D2023-2965 / CERTIORARI | /2 |
| 12/08/2023 | **Response to Request for Admissions** | Party: *Plaintiff* Feldman, Brett | /2 |
| 12/08/2023 | **Response to Request for Admissions** | Party: *Plaintiff* Solomon, Bryan | /3 |
| 12/08/2023 | **Motion for Extension of Time** | TO RESPOND TO DEFENDANT'S DISCOVERY REQUESTS Party: *Plaintiff* Feldman, Brett *Plaintiff* Solomon, Bryan | /2 |
| 12/08/2023 | **Acknowledgment** | 4D23-2965 CERTIORARI | /2 |

Case 25-01015-SMG    Doc 1-1    Filed 01/21/25    Page 8 of 214

| Date | Description | Additional Text | View / Pages |
|---|---|---|---|
| 12/08/2023 | **4th DCA Order** | 4D23-2965/ The $300.00 filing fee or affidavit of indigency in conformance with sections 57.081 and 57.085, Florida Statutes (2021), did not accompany the petition as required in Florida Rule of Appe late Procedure 9.100(b). | 📄 /2 |
| 12/07/2023 | **Motion for Enlargement of Time** | DEFENDANTS MOTION FOR ENLARGEMENT OF TIME TO PRODUCE DOCUMENTS PURSUANT TO THE NOVEMBER 7, 2023 ORD R ON PLAINTIFFS RENEWED MOTION TO COMPEL DISCOVERY Party: *Defendant* CWGL HOLDINGS LLC *Defendant* Wechter, Claudia *Defendant* Loffredo, Gary | 📄 /3 |
| 12/06/2023 | **Certificate of No Objection** | | 📄 /2 |
| 11/21/2023 | **Notice of Hearing** | | 📄 /2 |
| 11/21/2023 | **Notice of Hearing** | | 📄 /2 |
| 11/15/2023 | **Motion** | | 📄 /141 |
| 11/15/2023 | **Motion to Compel** | DEFENDANT CWGL HOLDINGS, LLC S MOTION TO COMPEL BETTER RESPONSES TO DEFENDANTS FIRST SETS OF INTERR GATORIES AND TO OVERRULE OBJECTIONS Party: *Defendant* Loffredo, Gary | 📄 /21 |

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 11/15/2023 | **Motion to Compel** | DEFENDANT CWGL HOLDINGS, LLC S MOTION TO COMPEL BETTER RESPONSES TO DEFENDANTS FIRST SETS OF INTERR GATORIES AND TO OVERRULE OBJECTIONS Party: *Defendant* Wechter, Claudia | /21 |
| 11/15/2023 | **Motion to Compel** | BETTER RESPONSES TO DEFENDANTS' FIRST SETS OF INTERROGATORIES AND TO OVERRULE OBJECTIONS Party: *Defendant* CWGL HOLDINGS LLC | /29 |
| 11/08/2023 | **Request for Admissions** | | /6 |
| 11/08/2023 | **Request for Admissions** | | /7 |
| 11/08/2023 | **Request for Production** | | /10 |
| 11/08/2023 | **Request for Production** | | /10 |
| 11/08/2023 | **Notice of Production From Non-Party** | | /2 |
| 11/08/2023 | **Notice of Appearance** | Party: *Defendant* CWGL HOLDINGS LLC *Defendant* Wechter, Claudia *Defendant* Loffredo, Gary | /2 |
| 11/08/2023 | **Notice of Appearance** | Party: *Defendant* CWGL HOLDINGS LLC *Defendant* Wechter, Claudia *Defendant* Loffredo, Gary | /2 |
| 11/07/2023 | **Order Compelling Discovery** | | /2 |
| 09/07/2023 | **Hearing Proceedings** | | /1 |

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 08/23/2023 | **Notice of Taking Deposition** | | /2 |
| 07/14/2023 | **Notice of Service of Answers to Interrogatories** | | /1 |
| 07/13/2023 | **Notice of Cancellation** | | /2 |
| 07/13/2023 . | **Notice of Cancellation** | | /2 |
| 06/28/2023 | **Notice of Cancellation** | | /2 |
| 06/28/2023 | **Notice of Cancellation** | | /2 |
| 06/28/2023 | **Re-Notice of Taking Deposition** | | /2 |
| 06/28/2023 | **Re-Notice of Taking Deposition** | | /2 |
| 06/21/2023 | **Notice of Hearing** | | /2 |
| 05/31/2023 | **Notice of Hearing** | | /2 |
| 05/31/2023 | **Motion to Compel** | DISCOVERY<br>Party: *Plaintiff* Feldman, Brett<br>*Plaintiff* Solomon, Bryan | /10 |
| 05/28/2023 | **Order Compelling Discovery** | | /2 |
| 05/23/2023 | **Notice of Service of Interrogs** | | /5 |
| 05/23/2023 | **Notice of Service of Interrogs** | | /5 |
| 05/23/2023 | **Notice of Service of Interrogs** | | /5 |
| 05/23/2023 | **Notice of Service of Interrogs** | | /5 |
| 05/23/2023 | **Notice of Service of Interrogs** | | /6 |
| 05/23/2023 | **Notice of Service of Interrogs** | | /6 |

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 05/15/2023 | **Notice of Taking Deposition** | | /2 |
| 05/15/2023 | **Notice of Taking Deposition** | | /2 |
| 05/09/2023 | **Uniform Order Setting Pretrial Deadline** | CALENDAR CALL: 04-26-2024 at 9:30 am rm 16175 or Zoom | /7 |
| 04/25/2023 | **Notice of Hearing** | | /2 |
| 04/24/2023 | **Notice of Hearing** | | /2 |
| 04/11/2023 | **Motion to Compel Discovery** | Party: *Plaintiff* Feldman, Brett *Plaintiff* Solomon, Bryan | /10 |
| 01/18/2023 | **Answer & Affirmative Defenses** | COUNTER-DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO COUNTERCLAIM Party: *Plaintiff* Feldman, Brett *Plaintiff* Solomon, Bryan | /13 |
| 12/31/2022 | **Response to Request to Produce** | | /6 |
| 12/31/2022 | **Notice of Service of Answers to Interrogatories** | | /2 |
| 12/27/2022 | **Answer and Counterclaim** | Party: *Defendant* CWGL HOLDINGS LLC | /106 |
| 12/27/2022 | **Answer & Affirmative Defenses** | Party: *Defendant* Wechter, Claudia | /6 |
| 12/27/2022 | **Answer & Affirmative Defenses** | Party: *Defendant* Loffredo, Gary | /6 |
| 11/30/2022 | **Order Denying Motion to Dismiss** | | /2 |
| 11/01/2022 | **Notice of Hearing** | | /2 |

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 11/01/2022 | **Notice of Service of Interrogs** | | /1 |
| 11/01/2022 | **Request to Produce** | | /5 |
| 10/18/2022 | **Notice of Appearance** | Party: *Defendant* CWGL HOLDINGS LLC *Defendant* Wechter, Claudia *Defendant* Loffredo, Gary | /2 |
| 10/18/2022 | **Motion to Dismiss** | PLAINTIFFS' AMENDED COMPLAINT FOR FAILURE TO COMPLY WITH CONDITIONS PRECEDENT Party: *Defendant* CWGL HOLDINGS LLC *Defendant* Wechter, Claudia *Defendant* Loffredo, Gary | /5 |
| 10/18/2022 | **Notice of Filing Designation of Emailing Addresses** | Party: *Defendant* CWGL HOLDINGS LLC *Defendant* Wechter, Claudia *Defendant* Loffredo, Gary | /2 |
| 10/17/2022 | **Case Management Order** | 05-08-2023 | /2 |
| 09/19/2022 | **Amended Complaint** | Party: *Plaintiff* Feldman, Brett *Plaintiff* Solomon, Bryan | /82 |
| 09/19/2022 | eSummons Issuance - On Amended | Claudia Wechter | /3 |
| 09/19/2022 | eSummons Issuance - On Amended | Gary Loffredo | /3 |
| 09/19/2022 | eSummons Issuance - On Amended | CWGL Holdings, LLC | /1 |
| 09/16/2022 | **Per AOSC20-23 Amd12, Case is determined General** | | |
| 09/16/2022 | **Civil Cover Sheet** | Amount: $100,001.00 | /3 |
| 09/16/2022 | **Complaint (eFiled)** | | /81 |

**–** Hearing(s)

Total: 0

**There is no Disposition information available for this case.**

**–** Related Case(s)

Total: 0

**There is no related case information available for this case.**

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

Case No. CACE 22-013915

BRETT FELDMAN, individually, and
BRYAN SOLOMON, individually,

        Plaintiff,

vs.

CWGL HOLDINGS, LLC, a Florida limited
liability company, CLAUDIA WECHTER,
individually, and GARY LOFFREDO,
individually,

        Defendants.

_____/

## AMENDED COMPLAINT

Plaintiffs, Brett Feldman and Bryan Solomon ("Plaintiffs"), sues Defendant, CWGL

Holdings, LLC, Claudia Wechter and Gary Loffredo ("Defendants"), and avers:

## JURISDICTION, PARTIES AND VENUE

1.    This is an action seeking damages and equitable relief in excess of $30,000.00,

exclusive of interest, fees and costs, within the jurisdiction of this Court.

2.    Plaintiff Brett Feldman ("Feldman") is a resident of Palm Beach County, Florida,

over eighteen (18) years of age and otherwise *sui juris*.

3.    Plaintiff Bryan Solomon ("Solomon") is a resident of Palm Beach County,

Florida, over eighteen (18) years of age and otherwise *sui juris*.

4.    Defendant, CWGL Holdings, LLC ("CWGL") is a Florida Limited Liability

Company duly organized under the laws of the State of Florida with its principal place of

business in Broward County, Florida.

5.     Defendant, Claudia Wechter ("Wechter") is a resident of Palm Beach County, Florida, over eighteen (18) years of age and otherwise *sui juris* Wechter is a member of CWGL.

6.     Defendant, Gary Loffredo ("Loffredo") is a resident of Palm Beach County, Florida, over eighteen (18) years of age and otherwise *sui juris*. Loffredo is a member of CWGL.

7.     Venue is proper in Broward County, Florida because it is where the CWGL is located and where the business dealings occurred that are the subject of this litigation.

8.     All conditions precedent to bringing this action have occurred, have been performed, are futile, or have been waived.

## GENERAL ALLEGATIONS

9.     CWGL is in the business of owning, managing and performing administrative services in support of various senior assisted living service providers owned and operated by CWGL or its affiliates. CWGL conducts its business mainly from its business offices in Fort Lauderdale, FL.

10.    Both Feldman and Solomon possessed substantial experience and expertise in connection with marketing, sales, sales training, customer account and human resource management, with a background and focus directly related to CWGL's business. Prior to May, 2017, Feldman and Solomon worked for CWGL as at-will employees.

11.    On or about May 1, 2017, Solomon and CWGL entered in an Employment Agreement "(Solomon Agreement") whereby CWGL retained Solomon to assist CWGL in expanding its business and profitability and also to appoint Solomon as Vice President for Sales. A copy of the Agreement is attached hereto as Plaintiffs' **Exhibit "A."**

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC*
Case No. CACE 22-013915
Amended Complaint

12.     The Solomon Agreement set forth the initial 5-year term of the agreement from May 1, 2017 through April 30, 2022, but also a compensation structure that included both a base salary and incentives based on certain performance goals, as more fully set forth in Section 5 of the Solomon Agreement.

13.     On or about May 1, 2017, Feldman and CWGL also entered in an Employment Agreement ("Feldman Agreement") whereby CWGL retained Feldman to assist CWGL in expanding its business and profitability and also to appoint Feldman as Vice President for Business Development.  A copy of the Agreement is attached hereto as Plaintiffs' **Exhibit "B."**

14.     The Feldman Agreement set forth the initial 5-year term of the agreement from May 1, 2017 through December 31, 2022, but also a compensation structure that included both a base salary and incentives based on certain performance goals, as more fully set forth in Section 5 of the Feldman Agreement.

15.     In addition to the compensation structure set forth in Section 5 of the agreements, pursuant to Section 7 of both agreements, both Solomon and Feldman were entitled to receive equity in CWGL as further compensation for their work for CWGL.

16.     In connection with Section 7 of the Solomon Agreement and the Feldman Agreement, on May 1, 2017, CWGL and Solomon and Feldman executed a Second Amended and Restated Operating Agreement of CWGL Holdings, LLC ("Second Amended Operating Agreement).  A copy of the Second Amended Operating Agreement is attached hereto as Plaintiffs' **Exhibit "C."**

17.     Based on the Second Amended Operating Agreement and other related agreements, both Solomon and Feldman became members of CWGL with Solomon owning a 5% and Feldman owning a 4.5% Class B membership interest in CWGL.

3

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC*
Case No. CACE 22-013915
Amended Complaint

18.    Plaintiffs successfully performed services pursuant to the Agreements as requested. Ultimately, after nearly five years of service to CWGL, CWGL elected not to renew Solomon's agreement beyond its initial term. However, CWGL prematurely breached Feldman's agreement in April, 2022, likely believing that Feldman's contract expired at the same time as Solomon's contract.

19.    Of course, pursuant to the express terms of the Solomon Agreement and the Feldman Agreement, both Plaintiffs were entitled to compensation through the date of termination. Moreover, Plaintiffs were entitled to receive incentive bonuses, commissions and other compensation referenced in the agreements.

20.    Notwithstanding the foregoing, CWGL has failed and refused to compensate Solomon as agreed, in accordance with the terms and conditions of the Solomon Agreement. More particularly, CWGL has violated the Solomon Agreement, including but not limited to, as follows:

   a.    CWGL has failed and refused to remit and pay to Solomon commissions, including additional amounts to cover tax liabilities. As a direct result, Solomon has suffered compensatory damages of $180,000.00 or more.

   b.    CWGL has failed and refused to remit and pay to Solomon the annual gross bonus of 1% for any of the 5 years Solomon was employed. As a direct result, Solomon has suffered compensatory damages of approximately $190,000.

   c.    CWGL has failed and refused to remit and pay to Solomon the 2% override for other sales people. As a direct result, Solomon has suffered compensatory damages of approximately $75,000.00.

4

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC*
Case No. CACE 22-013915
Amended Complaint

21.     Notwithstanding the foregoing, CWGL has failed and refused to compensate Feldman as agreed, in accordance with the terms and conditions of the Feldman Agreement. More particularly, CWGL has violated the Feldman Agreement, including but not limited to, as follows:

      a.     CWGL terminated the Feldman Agreement prematurely. Feldman's contract expired on December 31, 2022. As a direct result, Feldman has suffered compensatory damages of $100,000.00.

      b.     CWGL has failed and refused to remit and pay to Feldman commissions, including additional amounts to cover tax liabilities and commissions that Feldman would have earned if CWGL did not prematurely terminate the agreement. As a direct result, Feldman has suffered compensatory damages of $240,000.00 or more.

      c.     CWGL has failed and refused to remit and pay to Feldman the annual gross bonuses due under the Feldman Agreement. As a direct result, Feldman has suffered compensatory damages of approximately $170,000.

22.     Plaintiffs have incurred other losses as well in connection with CWGL's breach of the Agreements.

23.     In addition, both Solomon and Feldman were entitled to receive distributions as equity holders in CWGL, but CWGL, controlled by Wechter and Loffredo as controlling members, have failed and refused to pay any distributions to Solomon or Feldman. Despite Plaintiffs' demand over the course of several years for access to financial records, CWGL, Wechter and Loffredo have failed to produce any relevant financial documents, in particular, those documents that would evidence distributions to Wechter and Loffredo as members of CWGL.

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC*
Case No. CACE 22-013915
Amended Complaint

24.    Section 13(q) of the Solomon Agreement and Feldman Agreement provide for payment of attorneys' fees and court costs in the enforcement or collection thereunder. Plaintiffs have retained the undersigned counsel and are obligated to pay them a reasonable fee for the prosecution of this action.

## COUNT I
## BREACH OF SOLOMON CONTRACT

25.    Solomon incorporates and re-alleges paragraphs 1 through 24 above as if fully set forth herein.

26.    Solomon and CWGL entered into the written and binding Solomon Agreement.

27.    CWGL breached the terms of the agreement by failing to remit and pay to Solomon all compensation and bonuses and incentives due under the Solomon Agreement, which violates the terms and conditions of the Solomon Agreement and constitutes a breach of contract.

28.    CWGL refuses to pay Solomon compensation due under Solomon's Agreement, despite Solomon's demands.

29.    CWGL's failure and refusal to pay Solomon under the clear terms of the Solomon Agreement constitutes a breach of contract.

30.    As a direct and proximate result of CWGL's breach of contract, Solomon has suffered compensatory damages that is now due and owing.

WHEREFORE, Plaintiff, Bryan Solomon, demands judgment against Defendant, CWGL Holdings, LLC, for its damages, reasonable attorneys' fees and costs, plus prejudgment costs incurred in connection with this action and such other and further relief as this Court considers appropriate.

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC*
Case No. CACE 22-013915
Amended Complaint

## COUNT II
## BREACH OF FELDMAN CONTRACT

31.     Feldman incorporates and re-alleges paragraphs 1 through 24 above as if fully set forth herein.

32.     Feldman and CWGL entered into the written and binding Feldman Agreement.

33.     CWGL breached the terms of the agreement by failing to remit and pay to Feldman all compensation and bonuses and incentives due under the Feldman Agreement, which violates the terms and conditions of the Feldman Agreement and constitutes a breach of contract.

34.     CWGL refuses to pay Feldman compensation due under Feldman's Agreement, despite Feldman's demands.

35.     CWGL's failure and refusal to pay Feldman under the clear terms of the Feldman Agreement constitutes a breach of contract.

36.     As a direct and proximate result of CWGL's breach of contract, Feldman has suffered compensatory damages that is now due and owing.

WHEREFORE, Plaintiff, Brett Feldman, demands judgment against Defendant, CWGL Holdings, LLC, for its damages, reasonable attorneys' fees and costs, plus prejudgment costs incurred in connection with this action and such other and further relief as this Court considers appropriate.

## COUNT III – BREACH OF FIDUCIARY DUTY

37.     Plaintiffs incorporates and re-alleges paragraphs 1 through 24 above as if fully set forth herein.

38.     Wechter and Loffredo owed fiduciary duties of care, good faith, and fair dealing to Solomon and Feldman, as members of CWGL.

39.    Wechter and Loffredo have breached the terms of the Second Amended Operating by failing to remit and pay to Solomon and Feldman all distributions and other equity payments due under the Second Amended Operating Agreement, which violates the terms and conditions of the Second Amended Operating Agreement and constitutes a breach of contract.

40.    In addition, Wechter and Loffredo have breached their fiduciary duties to Solomon and Feldman in a number of ways:

    i.    To prevent Solomon and Feldman from receiving equity distributions, Wechter and Loffredo would allegedly loan money from CWGL, only to then forgive such loans, thus impacting any distributions for Solomon and Feldman;

    ii.    Wechter and Loffredo would use CWGL corporate funds to pay for personal expenses, thus decreasing CWGL's profitability;

    iii.    Wechter and Loffredo would intentionally withhold K-1s from Solomon and Feldman, until such time as Wechter and Loffredo would sufficiently manipulate the financials of CWGL to their own needs, thus causing Solomon and Feldman to apply for extensions for the individual tax returns and pay interest to the IRS;

    iv.    Wechter and Loffredo applied for a $2.3M PPP loan claiming that CWGL had 472 employees and fabricated that CWGL had incurred substantial losses, which was not the case, all in an effort to qualify for more money than CWGL possibly could have, and then Wechter and Loffredo failed to use the PPP loan money for company expenses, instead using a large portion of the money to purchase personal real estate.

41.    As a direct and proximate result of Wechter's and Loffredo's breach of their fiduciary duties and misconduct, Solomon and Feldman have suffered damages.

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC*
Case No. CACE 22-013915
Amended Complaint

WHEREFORE, Plaintiffs, Bryan Solomon and Brett Feldman, respectfully requests that judgment be entered against Defendants, Claudia Wechter and Gary Loffredo, and in favor of Plaintiffs, Bryan Solomon and Brett Feldman, including but not limited to an award of their damages, prejudgment interest, attorneys' fees and costs incurred in connection with this action as set forth in Section 14.12, and for any other relief the Court deems just and proper.

Dated this 21st day of September, 2022.

Respectfully submitted,

**LORIUM PLLC**
*Counsel for Plaintiffs*
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: 561.361.1000
Facsimile: 561.672.7581
Email: jgrant@loriumlaw.com

By: ___/s/ Joe M. Grant_____
            JOE M. GRANT
            Florida Bar No. 137758



## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into effective as of May 1, 2017 ("Effective Date"), by and between (a) CWGL Holdings, LLC, a Florida limited liability company (the "Company"), and the Company's wholly-owned operating subsidiaries identified in Exhibit A hereto (collectively, the "Subsidiaries"), and (b) Brett Feldman ("Employee").

### Preliminary Statement

A.      The Company is in the business of owning, managing and performing administrative services in support of various senior assisted living service providers owned and operated by the Company or Affiliates (the "Business"). The Company conducts the Business (and directs the related businesses conducted by the Subsidiaries) mainly from its principal place of business in Fort Lauderdale, Florida.  As used herein, the Company's "Affiliates" shall mean each of the Subsidiaries, and all other entities in which the Company or any of its members (individually or collectively) own more than a majority ownership interest.

B.      Employee possesses substantial experience and expertise in connection with marketing, sales, sales training, customer account and human resource management and general business matters, with a background and focus relevant to the Business. Employee has worked with the Company on an at-will basis. The Company, seeking to expand its Business and grow profitability, wishes now to expand Employee's role and responsibilities by appointing him as a Vice President for business development ("VP") for the Company and each Subsidiary. Employee desires to accept such position with the Company and each Subsidiary pursuant to the terms and conditions of this Agreement.

C.      Through its years in business, the Company and its Affiliates (including without limitation the Subsidiaries) have developed confidential information and valuable trade secrets, and an established customer base, and a proprietary information systems and risk management platform, and related know-how, as well as substantial goodwill. In his employment with the Company, Employee has become familiar, and as VP Employee will become familiar, with the highly proprietary methodology and systems of the Company and its Affiliates as well as other confidential information and trade secrets that have contributed to the success and growth of and prospects for the Company and Business.

NOW, THEREFORE, in consideration of the foregoing recitals, and the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Company and Employee, each intending legally to be bound, agree as follows:

1.      Recitals. The foregoing recitals are true and correct in every respect and are incorporated by reference herein.

2.      Employment. The Company hereby employs the Employee as a Vice President of the Company and the Subsidiaries, with primary responsibility for sales and marketing. Employee hereby accepts such employment with the Company and the Subsidiaries, upon the terms and

conditions set forth in this Agreement. This Agreement shall be deemed Employee's employment agreement for the Company and each Subsidiary, and shall be identified and treated as such for all purposes in the books and records of the Company and each Subsidiary. Unless otherwise specified herein, references to the Company shall mean the Company and each Subsidiary, respectively.

3. _Term_. The term of Executive's employment with the Company under this Agreement shall commence effective as of May 1, 2017 and shall continue for a five year term ending December 31, 2022 ("Initial Term"). The Initial Term shall automatically renew for successive one year extension terms (each, a "Renewal Term"), unless either party elects to terminate the Agreement by providing the other party with written notice of such election at least one hundred twenty days prior to the end of the end of the then-current Term. As used herein, the "Term" refers to the five-year Initial Term and each one-year Renewal Term.

4. _Duties and Devotion of Efforts_.

   (a)    _Duties_. As VP, Employee shall be primarily responsible for business development, marketing and sales for the Company, and for identifying strategic growth opportunities for the Company. Without limiting the foregoing, Employee shall be responsible for identifying potential customers, solidifying the Company's presence in new markets, designing, supervising, implementing and achieving sales strategies, and for training and supervising the Company's sales force, all subject to direction from the Managers, as communicated by the Managers quarterly or otherwise in their reasonable discretion. In furtherance of the foregoing, Employee shall perform such specific duties, focusing on such specific objectives, as are identified quarterly or from time to time by the Managers, and otherwise as are commensurate with such position. Employee shall abide by and perform in accordance with any and all lawful managerial directives given by the Managers from time to time. Employee acknowledges that the Managers as of the Effective Date are Gary R. Loffredo and Claudia Wechter.

   (b)    _Devotion of Effort_. Employee agrees to devote his best full-time efforts and attention to the Company's business and affairs in a manner which will further the business interests of the Company. Employee shall diligently perform his duties hereunder and all services as may be reasonably assigned to him by the Managers. Employee agrees that he shall not during the Term devote his time, attention and energies to any other business activities that would substantially impede his discharge of responsibilities to the Company, without the prior written consent of the Managers, although the Employee shall be allowed to engage in charitable activities and community or business affairs unrelated to the Company and its Business, and manage his personal investments and affairs; provided that such activities do not materially interfere with the proper performance of his duties and responsibilities hereunder. Employee agrees to faithfully observe and abide by all rules, policies, procedures and regulations of the Company which are in force from time to time.

5. _Compensation and Benefits_.

   (a)    _Base Salary_. During the Initial Term, Employee shall receive a base salary of $110,000.00 per annum ("Base Salary"); subject to increase (but not decrease) year-by-year, in the same percentage as the CPI increases over base year 2017. As used herein, "CPI" means the unadjusted Consumer Price Index for all Urban Consumers, All Items (1982-84 = 100) published by

the Bureau of Labor Statistics of the United States Department of Labor. The Base Salary shall be paid to Executive, net of applicable withholdings and payroll taxes in accordance with the Company's normal payroll practices. The Base Salary for any Renewal Term shall be equal to the Base Salary as in effect at the end of the immediately preceding annual period, unless otherwise agreed by the Managers and Employee. Base Salary as in effect from time to tome will be subject to the CPI-based annual increases during Renewal Terms, unless the Managers determine otherwise. Notwithstanding CPI and CPI-based annual increases in Base Salary, if applicable in a given year, after the Initial Term the Manager retain discretion to limit Employee's Base Salary to result in reasonably equivalent salary levels among the Company's executive officers, including Employee.

(b)    Monthly Incentive Compensation. During the Term, Employee shall be entitled to incentive compensation calculated on a monthly basis beginning May 1, 2017 (each, a "Measurement Month") and payable within the following month in accordance with the Company's regular payroll practices, equal to an amount for each Measurement Month based on 1% of the gross revenues derived in such Measurement Month solely from the Company's and its Subsidiaries' workers' compensation-funded and group health businesses; such gross revenues to be calculated by the Company for each Measurement Month in accordance with the Company's regular accounting methodologies and functions.

(c)    Annual Incentive Compensation. During the Term, Employee shall be entitled to earn additional incentive compensation ("Annual Bonus"), calculated and payable annually within 60 days after each calendar year end, based on year-by-year growth in the Company's and Subsidiaries' annual revenues attributable to the workers' compensation and group health business lines ("Subject Revenues"), if, in the calendar year just ended (the "Measurement Year"), the Company's and Subsidiaries' annual Subject Revenues exceeded the Subject Revenues in the preceding calendar year ("Comparison Year") by at least 15%. The Annual Bonus for any Measurement Year will be based on a percentage of the annual growth in Subject Revenues, comparing the Measurement Year to the Comparison Year ("Annual Growth"); provided that such Annual Growth as measured by Subject Revenues in the Measurement Year is at least 15% in excess of the Subject Revenues for the Comparison Year. Assuming such Annual Growth, the Annual Bonus will be calculated as follows:

(i)    If the Annual Growth is at least 15% but less than 20%, the Annual Bonus will be 1.5% of the Subject Revenues in the Measurement Year;

(ii)    If the Annual Growth is at least 20% but less than 25%, the Annual Bonus will be 2% of the Subject Revenues in the Measurement Year;

(iii)    If the Annual Growth is at least 25% but less than 30%, the Annual Bonus will be 2.5% of the Subject Revenues in the Measurement Year;

(iv)    If the Annual Growth is at least 30% but less than 35%, the Annual Bonus will be 3% of the Subject Revenues in the Measurement Year;

(v)    If the Annual Growth is at least 35% but less than 40%, the Annual Bonus will be 3.5% of the Subject Revenues in the Measurement Year; or



(vi)     If the Annual Growth is 40% or greater, the Annual Bonus will be 4% of the Subject Revenues in the Measurement Year.

(d)     Attributions of Revenues; Calculations.  Revenues deriving from the Company's or Subsidiaries' workers' compensation and/or group health business lines will be booked, accounted for and calculated by the Company consistent with its regular accounting and employee benefits practices, and absent manifest error, the Company's regular accounting treatment will be definitive.

(e)     Incentive Compensation Generally; Adjustments. The incentive compensation entitlements provided for above, if earned by Employee, shall be paid to Employee net of applicable withholdings and payroll taxes in accordance with the Company's normal payroll practices, within thirty days after each month-end (for monthly compensation) or within sixty days after each year-end (for annual compensation).  Employee acknowledges that the Company may account for revenues in its books on an accrual basis. The incentive compensation provided for herein will be calculated on the basis of revenue assumptions for purposes of timing of payments, but Employee's actual entitlement to all such incentive compensation will be adjusted to reflect actual collections, taking into account write-offs, write-downs or other uncollectible amounts; recognizing that collected revenues lag booked sales and corresponding revenue book entries. Employee acknowledges that all incentive compensation calculated as provided above will be paid to him as provided herein initially assuming full collection of all revenues booked as such when new sales are booked, and that the Company will be entitled to offset and reduce later-month compensation payments based on actual as opposed to collected revenue assumptions.  Within 120 days of each fiscal year end, the Company will provide Employee with a "true-up" report, summarizing all incentive compensation payments made during the preceding year, the sales and revenue assumptions on which such payments were calculated and made, and actual earnings posted to date in respect of such sales, and offsets and adjustments made or needed to be made to correlate incentive compensation to actual cash receipts.

(f)     Other Benefit Plans. During the Term, Employee shall be entitled to participate in all other benefit plans or programs maintained from time to time by the Company for the benefit of its senior employees in accordance with the eligibility provisions and other terms thereof, including medical and health benefits, dependent care coverage, and retirement plans as in effect for senior level employees from time to time.

(g)     Vacation.  In addition to holidays established by the Managers as Company holidays, during the Term, Employee shall be entitled to receive three weeks' vacation annually, or additional vacation time (if applicable) as the Company affords, if at all, to its senior executives pursuant to the Company's regular benefits policies as in effect from time to time. Unused vacation time will not accrue from year to year.

(h)     Business Expenses. During the Term, the Company shall reimburse Employee for (or, in the Company's sole discretion, shall pay directly) all reasonable business expenses incurred by Employee in the course of performing his duties and responsibilities under this Agreement which are consistent with the Company's policies in effect from time to time with respect

4



to car allowance, travel, entertainment and other business expenses; provided that such expenses shall have been approved by the Company, and are supported by adequate documentation.

(i)    Automobile Allowance.  The Company will pay Employee an automobile allowance of Five Hundred Dollars ($500) per month for each month Employee is employed by the Company pursuant to this Agreement.

6.    Withholding. All payments required to be made by the Company hereunder to Employee shall be subject to the withholding of such amounts relating to taxes and other governmental assessments as the Company may reasonably determine it should withhold pursuant to any applicable law, rule or regulation.

7.    Class B Equity; Vesting. As partial further consideration for Employee's services to the Company, as of the Effective Date, the Company has granted and issued to Employee, as of the Effective Date, a 2.5% Class B membership interest in the Company, and the Company has further granted to Employee the right to acquire up to an additional 2.5% Class B membership interest in the Company, subject to the following conditions ("Employee's Class B Interest"). Employee's Class B Interest over and above the initial 2.5% grant shall vest and be issued to Employee at the rate of .5% on December 31 each year beginning December 31, 2018 and ending on December 31, 2022. Employee must be employed by the Company on December 31 of each such year in order to achieve the annual incremental vesting set forth above. Any unvested entitlements will lapse and become null and void when Employee's employment with the Company ends. *If employee is terminated w/o cause after July 1 during term the .5% for given year will be considered vested.*

(a)    Each issuance of Employee's Class B Interest (including the initial grant effective as of the Effective Date) shall be subject to satisfaction of the following conditions precedent, as determined by the Managers: (i) Employee shall have signed a counterpart of the Company's operating agreement as then in effect, in form and substance prescribed by the Managers ("Operating Agreement"); (ii) the Operating Agreement and execution formalities shall be reasonably acceptable to the Managers; (iii) Employee will execute and deliver an investor questionnaire and letter agreement, among other things acknowledging income tax effects of the issuance of the Class B interests in respect of which he becomes vested (if any) and providing for payment of any tax withholding obligation relating thereto; (iv) Employee will be employed by the Company at each vesting anniversary, in good standing at the time of each vesting; and (v) no cause shall then exist for termination of this Agreement.

(b)    Each incremental grant and vesting shall comprise Class B member interests of the Company representing the then current vesting percentage on a fully-diluted basis. The rights, privileges and limitations associated with Class B interests are described in the Operating Agreement. Each grant and vesting shall, subject to satisfaction of each of the conditions precedent expressed above, be effectuated for no additional consideration; it being acknowledged that Executive's performance hereunder is recognized by the Company and its Managers (the Class A members) as constituting reasonably equivalent value to the Company for the issuance of the specific Class B member interests becoming vested pursuant hereto (if any). Effective immediately if Employee is no longer employed, all Class B interest vesting rights not previously vested and granted will automatically lapse and become null and void.

(c)      Employee acknowledges that Class B member interests, and issuance of any and all Class B interests to Employee, have not been and will not be registered under any applicable federal or state securities laws, and that the vesting and issuance of Class B interests are and will be made in reliance upon exemptions therefrom, which exemptions depend upon, among other things, the bona fide nature of the investment intent of Employee and accuracy of certain of the Executive's statements, representations and warranties as expressed herein and in the questionnaire to be completed by Executive. Employee represents that he is an "accredited investor," as that term is defined in Section 2(15) of the Securities Act of 1933, as amended (the "Securities Act"), and in Rule 501 of Regulation D promulgated thereunder. As a condition to the issuance of Class B interests, Employee must complete the investor questionnaire in the form provided by the Company and represent that the information contained therein as to Employee is true, correct and complete as of the date of issuance of all member interests granted pursuant hereto.

(d)      Employee agrees that the vesting rights are personal as to Employee and are not assignable.  Employee acknowledges and agrees that the rights and obligations of all owners of the Company, including relative to transfers of membership interests, are governed by the Operating Agreement.

(e)      Employee represents and warrants that he has determined to accept the Class B interests issued pursuant hereto based on his own independent investigation, and not in reliance upon any representation, warranty or statement of the Company or its owners, or the Managers or any of their affiliates.

(f)      Employee agrees that the vesting rights hereunder are for his own account (and not as a nominee or agent for another person or entity), for investment purposes and not with a view to distribute or sell any member interests issued in connection herewith, and Employee has no present intention of selling or otherwise distributing any member interests issued in connection herewith. Employee has such knowledge and experience in financial, business and private, illiquid investment matters that he is capable of evaluating the merits and risks of an investment in the Company.

(g)      Employee acknowledges and understands that, subject to the provisions of the Operating Agreement relating to permitted transfers of membership interests: (i) Class B interests must be held and not sold until member interests in the Company are registered under the federal securities laws and any applicable securities laws of any state or other jurisdiction, unless an exemption from such registration is proven to the Managers' satisfaction to be available; (ii) the Company is under no obligation to so register any member interests, has no plan or intention to register any member interests, and Employee may be required to hold the member interests granted to him indefinitely; (iii) if a certificate evidencing member interests is issued by the Company, the certificate may in the sole discretion of the Company include an imprinted legend describing the foregoing limitations and/or as provided in the Operating Agreement or under applicable law regarding restrictions on the resale, encumbrance and/or transferability of equity interests or options; and (iv) there is not now any public or other market for equity interests or options and no such market is expected to develop or be or become available; and Employee has no right to withdraw from the Company or have his member interests redeemed or repurchased by the Company except as



provided in the Operating Agreement; and accordingly, it may not be possible for Employee to sell or liquidate his investment in the Company.

(h)    Employee has been advised that he should consult with his own legal, tax, accounting, investment and financial advisors in connection with the acquisition of any of the Class B membership interests. Employee has relied on his own advisors, and in particular, but without limiting the generality of the foregoing, his own investment, legal and tax advisors, and he is not relying on the Company, its Owners, the Board, Company counsel, or any agents, for information about the legal, tax, accounting, investment and economic considerations of or relating to an investment in the Company.

8.    <u>Change in Control; Compliance with Securities Laws</u>. Notwithstanding any other provision of this Agreement to the contrary, if a "Change of Control" affecting the Company occurs during the Term in which the seller(s)' consideration includes shares of stock, membership interests, or any other equity interests or securities of the third-party buyer or otherwise (collectively, "<u>Securities</u>"), the same shall be included in the benefits payable or distributable to Employee only if the Company and the third-party buyer determine, in their sole discretion, that the transfer or distribution of Securities to Employee is in full compliance with all applicable federal and state securities laws. Employee hereby covenants and agrees to cooperate in good faith, at the Company's request and expense, as may be necessary or convenient in evaluating such compliance. As used herein, "<u>Change of Control</u>" with regard to the Company shall mean  (a) the sale by the Company of all or substantially all of its assets and business to a person or entity other than an Affiliate; (b) the sale of fifty-one percent (51%) or more of the capital stock interests of the Company to a person or entity other than an Affiliate; (c) the occurrence of any event (whether in one or more transactions) that results in a transfer of control of the Company to Persons other than Claudia Wechter or Gary R. Loffredo; or (d) the liquidation of the Company.  For purposes of this definition, "control of the Company" shall mean the power, direct or indirect, (x) to vote 50% or more of the equity interests having ordinary voting power for the election of Managers or (y) to direct or cause the direction of the management and policies of the Company by contract or otherwise.

9.    <u>Termination of Employment</u>.

(a)    <u>Termination by the Company "For Cause."</u> Employee's employment with the Company may be terminated immediately by the Company "for cause" upon written notification to Employee, upon the occurrence of any of the following events, as determined by the Managers:

(i)    Employee materially breaches any provision(s) of this Agreement, or otherwise fails to perform any provision(s) of this Agreement, and such breach or failure continues uncured (but only if such breach or failure is reasonably capable of being cured) for a period of ten (10) business days after written notice specifying the nature of the alleged breach or failure thereof is given by the Company to Employee; or

(ii)    Employee engages in any act of fraud, misappropriation, self-dealing, discrimination, gross negligence, embezzlement or willful misconduct with respect to the Company, including without limitation, the intentional misappropriation of funds or property (including intellectual property) of the Company, or conduct that adversely affects the Company's or its



Members' or Affiliates' reputation, business or assets or the ability of the Employee to perform his responsibilities; or

(iii)    Employee is convicted of, or pleads guilty or no contest to, any crime punishable as a felony or any act in violation of the Company human resource standards as in effect from time to time; or

(iv)    Employee's reporting to work or attending work functions impaired by alcohol use, use of illegal drugs or unauthorized prescription drugs (it being understood that work-related functions sometimes involve social drinking in moderation); or his use of or testing positive for such substances while at work or scheduled to be at work; or his possession, sale or distribution of illegal drugs or unauthorized prescription drugs (whether or not at the workplace); or

(v)    Employee's appropriation for himself or his family members or any of their respective affiliates, of a corporate opportunity of the Company or any of its Affiliates without the prior written consent of the Board (which consent may be withheld by the Board in its sole and absolute discretion); or

(vi)    Employee becomes insolvent in the absence of a reasonably demonstrated plan for rehabilitation or recovery; or

(vii)    Employee engages in conduct relating to the Company or its business (or the business of its subsidiaries) which is not authorized, approved or ratified by the Managers, or which is contrary to the Manager's expressed directions, and which adversely affects or would reasonably be likely to adversely affect the Company, its business or other members, including, without limitation, if a governmental action, investigation or sanctions are imposed on the Company or subsidiary or any member; or

(viii)    Employee violates any of the restrictive covenants set forth in Section 10 of this Agreement.

(b)    <u>Termination of Employment "Without Cause."</u>  The Company may terminate Employee's employment hereunder at any time "without cause" by giving written notice to Employee at least sixty (60) days prior to the proposed date of termination.

(c)    <u>Voluntary Termination of Employment by Executive</u>.  Employee may voluntarily terminate his employment with the Company hereunder at any time by giving written notice to the Company at least sixty (60) days prior to the proposed date of termination.

(d)    <u>Death or Disability</u>.  The employment relationship between the Company and Employee shall automatically terminate upon his death or disability (disability, for this purpose, being deemed to result in the Company's discretion, if as a result of mental or physical incapacity or illness Employee fails to perform his duties and responsibilities provided for herein for a consecutive period of more than ninety (90) days in any 12-month period).



(e)     <u>Effect of Termination of Employment</u>. Upon termination of the Employee's employment with the Company for any reason at any time, Employee shall be entitled to receive any accrued but unpaid Base Salary payable to him through the date of termination of his employment with the Company in accordance with the Company's normal payroll practices and procedures. In addition, in the event of a termination of the Employee's employment by the Company "without cause" pursuant to Section 9(b) hereof, or on account of death or disability, Employee (or his estate) shall be entitled to severance pay ("<u>Severance Pay</u>") in an amount equal to the portion of his Base Salary correlating to 60 days beginning on the day on which his separation becomes effective (prorated based on a year of 365 days). No such Severance Pay will be payable if Employee terminates his employment voluntarily, as provided under Section 9 (c).

(f)     <u>Payments upon Termination</u>. Payments to Employee under this Section following termination (other than Severance Pay), shall be payable within 30 business days after Employee's termination becomes effective. Severance Pay will be paid in accordance with the Company's regular payroll practices. In all cases, applicable withholding and payroll taxes will be withheld. Employee shall also be entitled to receive payment for any unused vacation within the year in which termination occurs (based on Base Salary and prorated through the date of termination). If termination of employment hereunder occurs for any reason, in addition to the prorated Base Salary and Severance Pay as specified above, and prorated compensation for unused vacation time, Employee will be entitled to health insurance and unemployment benefits provided for under law, and no others.

10.    <u>Restrictive Covenants</u>.

(a)     <u>Proprietary and Confidential Information</u>. Employee hereby acknowledges that as a result of his employment relationship with, Employee has been provided access to, and has become familiar with, certain trade secrets and other proprietary and confidential information of the Company and its Affiliates, including, without limitation, business and corporate strategies, business plans, product strategies, unique methodology and systems, product cost and pricing information, customer lists, vendor lists, lead lists, lead conversion, lead formation sales reports, operating plans, marketing strategies and plans, methods, financial information, contracts, agreements, computer programs, manuals, and any other confidential information pertaining to the financial condition, business affairs or business prospects of the Company or any Affiliates (collectively, the "<u>Confidential Trade Secret Information</u>"). The Confidential Trade Secret Information has great value to the Company and significantly affects the successful conduct of its Business and goodwill. Employee hereby further acknowledges that the Company has expended substantial time, money and effort to develop and maintain this Confidential Trade Secret Information and that the Company will continue to develop and maintain this Confidential Trade Secret Information in connection with the successful conduct of its Business. Accordingly, Employee shall not use, reveal, report, publish, copy, transcribe, transfer or otherwise disclose or make available to any person, corporation or other entity any of the Confidential Trade Secret Information, directly or indirectly, during the term of this Agreement or thereafter, except as required in the course of employment with the Company or as may be required by law. All Confidential Trade Secret Information relating to the Company's Business, whether prepared by Employee or otherwise, coming into Executive's possession, whether or not contributed or developed in whole or in part by Executive, shall remain the exclusive property



of the Company and shall not be removed from the Company's premises under any circumstances without the prior written consent of the Board, and then, under restrictions as the Board may impose.

(b)    <u>Non-Competition Agreement</u>. During Employee's employment with the Company during the Initial Term, and, if Employee is terminated prior to the end of the Initial Term for cause or by Employee voluntarily, of his own volition, for one year after the end of the Initial Term ("<u>Non-Competition Period</u>"), Employee will not directly or indirectly own a majority interest in, operate, manage, consult with, control, participate in the management or control of, be employed by, be associated with or maintain or continue any interest whatsoever in any person or entity engaged in business substantially similar to the Company's Business within the Counties in Florida within which Employee was, during his employment, actively working.  This subsection will be null and void if Employee remains employed by the Company during the entire Initial Term, or if Employee is terminated by the Company during the Initial Term without cause.

(c)    <u>Non-Solicitation of Customers and Accounts</u>. During Employee's employment with the Company and for one (1) year thereafter ("<u>Non-Solicitation Period</u>"), Employee will not directly or indirectly or in concert with others, call upon, solicit, service, or sell any of the services that comprise the Business to any customers of the Company or an affiliate, on Employee's own behalf, on behalf of a Company customer or on behalf of a competitor of the Company.  This restriction shall apply to any customer of the Company or an affiliate that was a customer at any time during Employee's last two (2) years of employment with the Company as well as any prospective customer of the Company with whom Employee had any contact during Executive's last year of employment with the Company. "Solicit" shall mean to call upon, or lend any assistance in any way to, any person or entity for the purpose of encouraging, enticing, or persuading any person or entity to do business with any person or entity in competition with the Company. Solicitation shall also include a general or specific advertisement wherein Employee is advertising in any way the fact that Employee is engaged in direct or indirect competition with the Company. This prohibition expressly precludes Employee, during the Non-Solicitation Period, from conducting business similar to the Company's Business with any customer of the Company, even if the customer first contacts Executive.

(d)    <u>Non-Interference With Other Executives or Representatives</u>. During Employee's employment with the Company and for two years thereafter ("<u>Non-Interference Period</u>"), Employee will not, either directly or indirectly or in concert with others, seek to influence any employees, agents or representatives of the Company to leave the Company. "Seek to influence" includes discussion with an employee, agent or representative, about the possibility of the employee, agent or representative leaving the Company, even when the issue of leaving the Company is first raised by the Company employee, agent or representative.

(e)    <u>Return of Documents</u>. Employee acknowledges that all files, records, documents, notes, memoranda, costing and account information, and other similar items which Employee prepares, uses, or comes into contact with during Employee's employment with the Company, are and shall remain the sole and exclusive property of the Company, whether in hard copy or electronic format.  Employee agrees not to remove from the Company's premises the original or any reproduction of any such information, nor the information contained therein, including any computers or software programs without the prior consent of the Company. All such



material information and property in Employee's possession or control shall be immediately turned over to the Company at its corporate headquarters, currently located at 3313 West Commercial Boulevard, Fort Lauderdale, Florida.

(f)    <u>Legitimate Business Interests</u>. Employee acknowledges that the restrictive covenants set forth in this Section 10, including the Non-Competition Period, Non-Solicitation Period and Non-Interference Period ("<u>Restrictive Covenants</u>"), and the Restricted Areas, are reasonable in time and scope and are necessary to protect the legitimate business interests of the Company; including but not limited to, the protection of trade secrets and valuable confidential business information of the Company, and substantial relationships with specific prospective and existing customers of the Company, and goodwill associated with the Company, and the extraordinary and specialized training that Employee will receive or has received from the Company.

(g)    <u>Right to Injunction</u>. Employee agrees that any violation or breach of the Restrictive Covenants set forth in this Section 10 would cause irreparable harm to the Company and that such harm cannot be adequately compensated by money damages. Accordingly, any such violation or breach may be enjoined by any court of competent jurisdiction, without causing or affecting claims for damages incurred by the Company in connection with such violation or breach. In no event shall a delay by the Company of its right to seek immediate relief under this Agreement constitute a waiver of any rights set forth herein, and in no case shall a waiver by the Company of its right to seek relief under this Agreement constitute a waiver of any other or further violation of this Agreement. The parties hereto agree and confirm that all restrictions in this Agreement are reasonable and valid. In addition, in the event of an alleged breach or violation of any Restrictive Covenant, the applicable restrictive period (i.e., the Non-Competition Period, Non-Solicitation Period or Non-Interference Period) shall be tolled until such breach or violation has been duly cured.

(h)    <u>Third-Party Beneficiary</u>. All members and affiliates of the Company (including without limitation affiliates and/or subsidiaries as identified in the Operating Agreement) are third-party beneficiaries of this Agreement, and the restrictive covenants set forth in this Section 10 and the remedies hereunder inuring to the Company are intended to benefit all such members and Affiliates and may be enforced by all such members and affiliates or subsidiaries.

(i)    <u>Severability</u>. In the event a court of competent jurisdiction determines any portion of the Restrictive Covenants to be unreasonable so as to make such portion unenforceable, then in such instance, the unenforceable portion or portions shall be deleted herefrom and the court shall substitute such terms as it deems reasonable, consistent with the intent hereof, so as to make the provisions hereof as fully enforceable as if the substituted terms had been incorporated in full.

(j)    <u>Survival After Termination or Expiration of Agreement; Assignment</u>. Notwithstanding anything to the contrary in this Agreement, the Restrictive Covenants shall survive the termination or expiration of this Agreement. It is the express intention of the parties hereto that upon the expiration or other termination of this Agreement for any reason, the following shall apply: (i) if Employee fails to continue to provide employment services for and on behalf of the Company following the expiration or termination of this Agreement, the applicable restrictive period (i.e., the Confidentiality Period, Non-Competition Period, Non-Solicitation Period or Non-Interference Period) referred to in Sections 10(a), (b), (c) or (d), above, shall commence immediately following



said expiration or termination of this Agreement; and (ii) if the employment services of the Employee are retained by the Company (i.e., the Employee continues to provide employment services for and on behalf of the Company) after the expiration or termination of this Agreement, without formal contract, it is hereby mutually agreed that the terms of this Section 10 shall continue to govern the relations between the Company and Employee, in which case the applicable restrictive period (i.e., the Confidentiality Period, Non-Competition Period, Non-Solicitation Period or Non-Interference Period) referred to in Sections 11(a), (b), (c) or (d), above, shall commence immediately following the cessation of Employee's employment services to the Company. In the event this Agreement is assigned or otherwise transferred by the Company to its assignee or successor, the assignee or successor shall be expressly authorized to enforce all restrictions set forth in this Section 10.

11.    <u>Determinations of the Managers Deemed Conclusive</u>.  All determinations which under this Agreement are required or permitted to be made by the Managers shall be deemed conclusive as to Employee and his heirs or beneficiaries, unless clear and convincing evidence can be shown so as to make the Manager's determinations wholly arbitrary and capricious. All benefit of doubt shall be resolved in favor of sustaining the determinations of the Managers.

12.    <u>Non-Disparagement</u>. During Employee's employment with the Company, whether or not under this Agreement, and thereafter, Employee will not, directly or indirectly, make any disparaging statements or other negative remarks, written or oral, about the Company, its members and Managers, its subsidiaries or any of their respective practices, Affiliates, directors, officers, employees, owners, managers, members, partners, agents, attorneys or representatives that would be reasonably likely to cast disrepute on or damage the Company or its Managers or their respective Affiliates, or for the hoped-for competitive advantage of Employee or a third person or the competitive disadvantage of the Company or its Affiliates. This Section 12 shall not, however, prohibit Employee from testifying truthfully as a witness in any court proceeding or governmental investigation.

13.    <u>Miscellaneous Provisions</u>.

(a)    <u>Florida Law</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without regard to conflicts of law or principles thereof.

(b)    <u>Exclusive Venue</u>. The Parties agree that (i) any claim of whatever character arising under or in any way relating to this Agreement shall be brought exclusively in a federal or state court of competent jurisdiction in Broward County in the State of Florida and (ii) that any claim described in the foregoing clause that is filed in any other court shall be conclusively deemed as violating the expressed intent of the parties in this mandatory forum selection clause.  Employee hereby expressly waives, to the fullest extent permitted by law, any objection that Employee may now or hereafter have to the laying of venue of any such litigation brought in any such court referred to above, including, without limitation, (a) any defense claiming lack of jurisdiction in any action brought in such court, and (b) any claim that any such litigation has been brought in an inconvenient forum.



(c)     Representation: No Presumption.  The Parties recognize and understand that this Agreement has been prepared by Berger Singerman LLP, as counsel for the Company, as a result of negotiations between the Company and Employee.  Employee hereby recognizes and confirms that he was given every opportunity to have this Agreement reviewed by his own counsel.  No presumption shall be made as to the interpretation of any provision hereof on account of this Agreement having been prepared by counsel for the Company. The Parties have been advised that inherent or possible conflicts of interest based on competing interests or concerns may exist between or among the Company and its Managers, and Employee, and that the Parties and the Company's Managers have been advised to, and have had full opportunity to, seek advice of their own independent counsel.  Employee further acknowledges and agrees that nothing contained in or implied from this Agreement, nor the fact that this Agreement was prepared by Berger Singerman, LLP, shall in any manner prevent such counsel, and any partner or attorney associated with such counsel, from ever representing the Company or either of its Managers, or another Affiliate, or any person, in any dispute, matter or transaction whatsoever.

(d)     Headings.  The Section headings contained herein are for reference purposes only and shall not in any way affect the meaning and interpretation of this Agreement.

(e)     Binding Effect.  This Agreement shall be legally binding upon and shall operate for the benefit of the respective Parties, their respective heirs, personal and legal representatives, transferees, successors and assigns.

(f)     Entire Agreement.  This Agreement contains the entire agreement of the parties hereto with respect to the subject matter addressed herein, and all prior understandings and agreements, whether written or oral, between and among the parties hereto relating to the subject matter of this Agreement are merged in this Agreement.  Each party specifically acknowledges, represents and warrants that they have not been induced to sign this Agreement by any belief that the other will waive or modify the provisions of this Agreement in the future.

(g)     Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

(h)     Counterparts.  This Agreement may be signed and executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

(i)     Transferability.  Employee hereby agrees and consents that the rights and obligations of the Company hereunder may be transferred or assigned and will be binding on the Company's successors and assigns.  Employee may not transfer or assign his rights or obligations under this Agreement without the express written consent of the Managers.

(j)     Modification.  This Agreement may only be modified in writing and signed by each of the parties hereto.



(k)     Plural and Gender.  Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

(l)     Survival.  All representations and other relevant provisions herein, including but not limited to the provisions set forth in Sections 8, 9, 10, 11, 12 and 13, and this Section 14, of this Agreement, shall survive in accordance with their respective terms, and thereby continue in full force and effect pursuant to their respective terms, upon termination of this Agreement.

(m)     No Waiver of Breach.  The waiver or inaction by either party hereto of a breach of any condition of this Agreement by the other party shall not be construed as a waiver of any subsequent breach by such party, nor shall it constitute a waiver of that party's rights, actual or inherent.  The failure of any party hereto in any instance to insist upon a strict performance of the terms of this Agreement or to exercise any option herein shall not be construed as a waiver or a relinquishment in the future of such term or option, but that the same shall continue in full force and effect.

(n)     Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (i) when personally delivered or sent by telecopy or electronic mail (with hard copy to follow) or (ii) one day after being sent by reputable overnight express courier (charges prepaid), or (iii) five days following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, demands and communications to be the parties shall be sent to the addresses indicated in Schedule 1 hereto.

(o)     Successors and Assigns.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and Employee and his heirs, personal representatives, successors and assigns, except that Employee may not assign his rights or delegate his duties or obligations hereunder without the prior written consent of the Company.

(p)     Dispute Resolution; Waiver of Jury Trial. If a dispute arises and the Managers and Employee are unable to reach agreement consensually within 20 days despite good faith efforts to do so, the dispute may be submitted to mediation if requested in writing by any party.  The mediation shall take place in a mutually agreed location, and absent agreement, in Broward County, Florida. The mediation shall be conducted before a single mediator who shall be agreed upon by the parties. If the parties cannot agree on a mediator, Employee and the Managers shall each select a mediator and such mediators together shall select a neutral third mediator, who shall conduct the mediation. The parties shall equally bear the fees and expenses of the mediator. The mediation process shall consist of at least two sessions, conducted in good faith. If as a result of the mediation process, the parties cannot resolve the dispute, any party may pursue dispute resolution procedures under law. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS OR EVENTS CONTEMPLATED HEREBY OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO.  THE PARTIES HERETO EACH AGREE THAT ANY



AND ALL SUCH CLAIMS AND CAUSES OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. EACH OF THE PARTIES HERETO FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY SUCH LEGAL PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.

(q)    <u>Attorneys' Fees and Costs</u>. Should it become necessary for either Party to institute any legal action to enforce any of the provisions of this Agreement, the prevailing Party shall be entitled to an award of reasonable attorneys' fees and costs through all appellate levels.

(r)    <u>Offset</u>. The Company shall have the right to set-off (reduce), on a dollar-for-dollar basis, against any and all compensation payments due to Employee hereunder for any overpayments based on assumed revenues as adjusted to take into account actual collections, and based on damages, liabilities or costs incurred by the Company as a result of Employee's breach of any of the restrictive covenants herein, in addition to any other remedies that may be available to the Company at law or in equity. Nothing herein, including acceptance of a payment with an offset, shall not constitute a waiver of any defense that Employee may have in connection with such offset.

IN WITNESS WHEREOF, the Company and Employee, respectively, have executed and delivered this Agreement as of the date first above written.

CWGL HOLDINGS, LLC

By: _____
    Gary R. Loffredo, co-Manager

By: _____
    Claudia Wechter, co-Manager

Brett Feldman



EXHIBIT "B"

*Final 6/23/2017*

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into effective as of May 1, 2017 ("Effective Date"), by and between CWGL Holdings, LLC, a Florida limited liability company (the "Company") and Bryan Solomon ("Employee").

### Preliminary Statement

A.      The Company is in the business of owning, managing and performing administrative services in support of various senior assisted living service providers owned and operated by the Company or Affiliates (the "Business"). The Company conducts the Business mainly from its principal place of business in Fort Lauderdale, Florida.

B.      Employee possesses substantial experience and expertise in connection with marketing, sales, sales training, customer account and human resource management and general business matters, with a background and focus relevant to the Business. Employee has worked with the Company on an at-will basis. The Company, seeking to expand its Business and grow profitability, wishes now to expand Employee's role and responsibilities by appointing him as a Vice President for sales ("VP"). Employee desires to accept such position with the Company pursuant to the terms and conditions of this Agreement.

C.      Through its years in business, the Company and its Affiliates have developed confidential information and valuable trade secrets, and an established customer base, and a proprietary information systems and risk management platform, and related know-how, as well as substantial goodwill. In his employment with the Company, Employee has become familiar, and as VP Employee will become familiar, with the highly proprietary methodology and systems of the Company and its Affiliates as well as other confidential information and trade secrets that have contributed to the success and growth of and prospects for the Company and Business.

NOW, THEREFORE, in consideration of the foregoing recitals, and the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Company and Employee, each intending legally to be bound, agree as follows:

1.      Recitals. The foregoing recitals are true and correct in every respect and are incorporated by reference herein.

2.      Employment. The Company hereby employs the Employee as a Vice President with primary responsibility for sales and marketing. Employee hereby accepts such employment with the Company, upon the terms and conditions set forth in this Agreement.

3.      Term. The term of Executive's employment with the Company under this Agreement shall commence effective as of May 1, 2017 and shall continue for a five year term ending April 30, 2022 ("Initial Term"). The Initial Term shall automatically renew for successive one year extension terms (each, a "Renewal Term"), unless either party elects to terminate the Agreement by providing the other party with written notice of such election at least one hundred twenty days prior to the end

of the end of the then-current Term.  As used herein, the "Term" refers to the five-year Initial Term and each one-year Renewal Term.

4.      Duties and Devotion of Efforts.

(a)      Duties.  As VP, Employee shall be primarily responsible for marketing and sales responsibilities for the Company and for training, supervising and leading a team of sales account representatives identified from time to time by the Managers and Employee as Employee's direct reporting sales team (as identified from time to time, "Employee's Sales Team"). Without limiting the foregoing, Employee shall be responsible for designing, supervising, implementing and achieving sales strategies as approved by the Managers, taking into account Manager-approved budgets, staffing decisions and objectives, as communicated by the Managers quarterly or otherwise in their reasonable discretion. In furtherance of the foregoing, Employee shall perform such specific duties, focusing on such specific objectives, as are identified quarterly or from time to time by the Managers, and otherwise as are commensurate with such position.  Employee shall abide by and perform in accordance with any and all lawful managerial directives given by the Managers from time to time.  Employee shall also be responsible for servicing existing accounts of the Company as well as accounts of the Company established and maintained through his own efforts as well as the efforts of Employee's Sales Team. Employee acknowledges that the Managers as of the Effective Date are Gary R. Loffredo and Claudia Wechter.

(b)      Devotion of Effort.  Employee agrees to devote his best full-time efforts and attention to the Company's business and affairs in a manner which will further the business interests of the Company. Employee shall diligently perform his duties hereunder and all services as may be reasonably assigned to him by the Managers. Employee agrees that he shall not during the Term devote his time, attention and energies to any other business activities that would substantially impede his discharge of responsibilities to the Company, without the prior written consent of the Managers, although the Employee shall be allowed to engage in charitable activities and community or business affairs unrelated to the Company and its Business, and manage his personal investments and affairs; provided that such activities do not materially interfere with the proper performance of his duties and responsibilities hereunder.  Employee agrees to faithfully observe and abide by all rules, policies, procedures and regulations of the Company which are in force from time to time.

5.      Compensation and Benefits.

(a)      Base Salary.  During the Initial Term, Employee shall receive a base salary of $65,000 per annum ("Base Salary"); subject to increase (but not decrease) year-by-year, in the same percentage as the CPI increases over base year 2017.  As used herein, "CPI" means the unadjusted Consumer Price Index for all Urban Consumers, All Items (1982-84 = 100) published by the Bureau of Labor Statistics of the United States Department of Labor.  The Base Salary shall be paid to Executive, net of applicable withholdings and payroll taxes in accordance with the Company's normal payroll practices. The Base Salary for any Renewal Term shall be equal to the Base Salary as in effect at the end of the immediately preceding annual period, unless otherwise agreed by the Managers and Employee.  Base Salary as in effect from time to time will be subject to the CPI-based annual increases during Renewal Terms, unless the Managers determine otherwise. Notwithstanding CPI and CPI-based annual increases in Base Salary, if applicable in a given year, after the Initial

Term the Managers retain discretion to limit Employee's Base Salary to result in reasonably equivalent salary levels among the Company's executive officers, including Employee.

(b)   Monthly Incentive Compensation – Senior Nannies. During the Term, Employee shall be entitled to incentive compensation calculated on a monthly basis (each, a "Measurement Month") and payable within the following month in accordance with the Company's regular payroll practices, based on the gross revenues derived from the Senior Nannies private duty business in each Measurement Month (beginning May 2017), multiplied by (i) 5% if the Sales Margin for such month is less than 32.9%, or (ii) 6% if the Sales Margin for such month is equal to or greater than 32.9%. As used herein, "Sales Margin" shall mean the average hourly charge attributed to Senior Nannies' customers in the measurement month, minus the average hourly rate paid to Senior Nannies' aides in such month, with the result divided by the average hourly charge used in calculating Sales Margin.

(c)   Monthly Incentive Compensation - Senior Advantages. During the Term, Employee shall be entitled to additional incentive compensation, calculated on a monthly basis for each Measurement Month and payable within the following month in accordance with the Company's regular payroll practices, based on forty-five percent (45%) of new Senior Advantage placement revenues deriving from new sales booked as such by the Company in each Measurement Month, generated in each Measurement Month by Employee himself (and not by Employee's Sales Team).

(d)   Monthly Override. During the Term, Employee shall be entitled to additional incentive compensation, calculated on a monthly basis for each Measurement Month and payable in the following month pursuant to the Company's regular payroll practices, based on two percent (2%) of that portion of monthly revenues booked in each Measurement Month (beginning May 2017), based on new Senior Nannies private duty revenues (i.e. new sales) generated in such Measurement Month by Employee's Sales Team (excluding Employee).

(e)   Annual Bonus. During the Term, Employee shall be entitled to earn additional incentive compensation, calculated and payable annually within 60 days after each calendar year end, based on year-by-year growth in self-generated revenues, if in the calendar year just ended (the "Measurement Year") the Company's annual revenues from new sales originated by Employee himself, and not by Employee's Sales Team or others (i.e., self-generated revenue) exceeded by at least twelve percent (12%) the Company's annual revenues originated by Employee himself in the year immediately preceding the Measurement Year ("Comparison Year"). Such annual growth of at least twelve percent (12%) in self-generated revenues by Employee himself, comparing the Comparison Year to the Measurement Year, is referred to as the "Revenue Growth Benchmark" for the Measurement Year. For each Measurement Year beginning with year-end 2017 in which the Revenue Growth Benchmark is satisfied, Employee will be entitled to additional annual incentive compensation equal to one percent (1%) of the portion of the Company's annual revenues booked as such for the Measurement Year that were originated by Employee himself. If for any Measurement Year, the Revenue Growth Benchmark is not satisfied, then no such annual incentive compensation will be earned for such Measurement Year.

(f)   Attributions of Revenue Origination; Calculations. Revenues based on new

sales or otherwise attributed by the Company as self-generated by Employee, or as generated by Employee's Sales Team, or as generated by others, will be booked, accounted for and calculated by the Company consistent with its regular accounting and employee benefits practices, and absent manifest error, the Company's regular accounting treatment will be definitive.

(g)  Incentive Compensation Generally; Adjustments. The incentive compensation entitlements provided for above, if earned by Employee, shall be paid to Employee net of applicable withholdings and payroll taxes in accordance with the Company's normal payroll practices, within thirty days after each month-end (for monthly compensation) or within sixty days after each year-end (for annual compensation). Employee acknowledges that the Company may account for revenues in its books on an accrual basis. The incentive compensation provided for herein will be calculated on the basis of revenue assumptions for purposes of timing of payments, but Employee's actual entitlement to all such incentive compensation will be adjusted to reflect actual collections, taking into account write-offs, write-downs or other uncollectible amounts; recognizing that collected revenues lag booked sales and corresponding revenue book entries. Employee acknowledges that all incentive compensation calculated as provided above will be paid to him as provided herein initially assuming full collection of all revenues booked as such when new sales are booked, and that the Company will be entitled to offset and reduce later-month compensation payments based on actual as opposed to collected revenue assumptions. Within 120 days of each fiscal year end, the Company will provide Employee with a "true-up" report, summarizing all incentive compensation payments made during the preceding year, the sales and revenue assumptions on which such payments were calculated and made, and actual earnings posted to date in respect of such sales, and offsets and adjustments made or needed to be made to correlate incentive compensation to actual cash receipts.

(h)  Other Benefit Plans. During the Term, Employee shall be entitled to participate in all other benefit plans or programs maintained from time to time by the Company for the benefit of its senior employees in accordance with the eligibility provisions and other terms thereof, including medical and health benefits, dependent care coverage, and retirement plans as in effect for senior level employees from time to time.

(i)  Vacation. In addition to holidays established by the Managers as Company holidays, during the Term, Employee shall be entitled to receive four weeks' vacation annually, or additional vacation time (if applicable) as the Company affords, if at all, to its senior executives. Unused vacation time will not accrue from year to year.

(j)  Business Expenses. During the Term, the Company shall reimburse Employee for (or, in the Company's sole discretion, shall pay directly) all reasonable business expenses incurred by Employee in the course of performing his duties and responsibilities under this Agreement which are consistent with the Company's policies in effect from time to time with respect to car allowance, travel, entertainment and other business expenses; provided that such expenses shall have been approved by the Company, and are supported by adequate documentation.

(k)  Automobile Allowance. The Company will pay Employee an automobile allowance of Eight Hundred Fifty Dollars ($850) per month for each month Employee is employed by the Company pursuant to this Agreement.



6.   _Withholding_. All payments required to be made by the Company hereunder to Employee shall be subject to the withholding of such amounts relating to taxes and other governmental assessments as the Company may reasonably determine it should withhold pursuant to any applicable law, rule or regulation.

7.   _Class B Equity: Vesting_. As partial further consideration for Employee's services to the Company, as of the Effective Date, the Company has granted and issued to Employee, as of the Effective Date, a 2.5% Class B membership interest in the Company, and the Company has further granted to Employee the right to acquire up to an additional 2.5% Class B membership interest in the Company, subject to the following conditions ("_Employee's Class B Interest_"). Employee's Class B Interest over and above the initial 2.5% grant shall vest and be issued to Employee at the rate of .5% on December 31 each year beginning December 31, 2018 and ending on December 31, 2022.

(a)   Each issuance of Employee's Class B Interest (including the initial grant effective as of the Effective Date) shall be subject to satisfaction of the following conditions precedent, as determined by the Managers: (i) Employee shall have signed a counterpart of the Company's operating agreement as then in effect, in form and substance prescribed by the Managers ("_Operating Agreement_"); (ii) the Operating Agreement and execution formalities shall be reasonably acceptable to the Managers; (iii) Employee will execute and deliver an investor questionnaire and letter agreement, among other things acknowledging income tax effects of the issuance of the Class B interests in respect of which he becomes vested (if any) and providing for payment of any tax withholding obligation relating thereto; (iv) Employee will be employed by the Company at each vesting anniversary, in good standing at the time of each vesting; and (v) no cause shall then exist for termination of this Agreement.

(b)   Each incremental grant and vesting shall comprise Class B member interests of the Company representing the then current vesting percentage on a fully-diluted basis. The rights, privileges and limitations associated with Class B interests are described in the Operating Agreement. Each grant and vesting shall, subject to satisfaction of each of the conditions precedent expressed above, be effectuated for no additional consideration; it being acknowledged that Executive's performance hereunder is recognized by the Company and its Managers (the Class A members) as constituting reasonably equivalent value to the Company for the issuance of the specific Class B member interests becoming vested pursuant hereto (if any). Effective immediately if Employee is no longer employed, all Class B interest vesting rights not previously vested and granted will automatically lapse and become null and void.

(c)   Employee acknowledges that Class B member interests, and issuance of any and all Class B interests to Employee, have not been and will not be registered under any applicable federal or state securities laws, and that the vesting and issuance of Class B interests are and will be made in reliance upon exemptions therefrom, which exemptions depend upon, among other things, the bona fide nature of the investment intent of Employee and accuracy of certain of the Executive's statements, representations and warranties as expressed herein and in the questionnaire to be completed by Executive. Employee represents that he is an "accredited investor," as that term is defined in Section 2(15) of the Securities Act of 1933, as amended (the "_Securities Act_"), and in Rule 501 of Regulation D promulgated thereunder. As a condition to the issuance of Class B interests, Employee must complete the investor questionnaire in the form provided by the Company



and represent that the information contained therein as to Employee is true, correct and complete as of the date of issuance of all member interests granted pursuant hereto.

(d)     Employee agrees that the vesting rights are personal as to Employee and are not assignable. Employee acknowledges and agrees that the rights and obligations of all owners of the Company, including relative to transfers of membership interests, are governed by the Operating Agreement.

(e)     Employee represents and warrants that he has determined to accept the member interests issued pursuant hereto based on his own independent investigation, and not in reliance upon any representation, warranty or statement of the Company or its owners, or the Managers or any of their affiliates.

(f)     Employee agrees that the vesting rights hereunder are for his own account (and not as a nominee or agent for another person or entity), for investment purposes and not with a view to distribute or sell any member interests issued in connection herewith, and Employee has no present intention of selling or otherwise distributing any member interests issued in connection herewith. Employee has such knowledge and experience in financial, business and private, illiquid investment matters that he is capable of evaluating the merits and risks of an investment in the Company.

(g)     Employee acknowledges and understands that, subject to the provisions of the Operating Agreement relating to permitted transfers of membership interests: (i) Class B interests must be held and not sold until member interests in the Company are registered under the federal securities laws and any applicable securities laws of any state or other jurisdiction, unless an exemption from such registration is proven to the Managers' satisfaction to be available; (ii) the Company is under no obligation to so register any member interests, has no plan or intention to register any member interests, and Employee may be required to hold the member interests granted to him indefinitely; (iii) if a certificate evidencing member interests is issued by the Company, the certificate may in the sole discretion of the Company include an imprinted legend describing the foregoing limitations and/or as provided in the Operating Agreement or under applicable law regarding restrictions on the resale, encumbrance and/or transferability of equity interests or options; and (iv) there is not now any public or other market for equity interests or options and no such market is expected to develop or be or become available; and Employee has no right to withdraw from the Company or have his member interests redeemed or repurchased by the Company except as provided in the Operating Agreement; and accordingly, it may not be possible for Employee to sell or liquidate his investment in the Company.

(h)     Employee has been advised that he should consult with his own legal, tax, accounting, investment and financial advisors in connection with the acquisition of any of the Class B membership interests. Employee has relied on his own advisors, and in particular, but without limiting the generality of the foregoing, his own investment, legal and tax advisors, and he is not relying on the Company, its Owners, the Board, Company counsel, or any agents, for information about the legal, tax, accounting, investment and economic considerations of or relating to an investment in the Company.



8.    <u>Change in Control: Compliance with Securities Laws</u>. Notwithstanding any other provision of this Agreement to the contrary, if a "Change of Control" affecting the Company occurs during the Term in which the seller(s)' consideration includes shares of stock, membership interests, or any other equity interests or securities of the third-party buyer or otherwise (collectively, "<u>Securities</u>"), the same shall be included in the benefits payable or distributable to Employee only if the Company and the third-party buyer determine, in their sole discretion, that the transfer or distribution of Securities to Employee is in full compliance with all applicable federal and state securities laws. Employee hereby covenants and agrees to cooperate in good faith, at the Company's request and expense, as may be necessary or convenient in evaluating such compliance. As used herein, "<u>Change of Control</u>" with regard to the Company shall mean (a) the sale by the Company of all or substantially all of its assets and business to a person or entity other than an Affiliate; (b) the sale of fifty-one percent (51%) or more of the capital stock interests of the Company to a person or entity other than an Affiliate; (c) the occurrence of any event (whether in one or more transactions) that results in a transfer of control of the Company to Persons other than Claudia Wechter or Gary R. Loffredo; or (d) the liquidation of the Company. For purposes of this definition, "control of the Company" shall mean the power, direct or indirect, (x) to vote 50% or more of the equity interests having ordinary voting power for the election of Managers or (y) to direct or cause the direction of the management and policies of the Company by contract or otherwise.

9.    <u>Termination of Employment</u>.

(a)    <u>Termination by the Company "For Cause."</u> Employee's employment with the Company may be terminated immediately by the Company "for cause" upon written notification to Employee, upon the occurrence of any of the following events, as determined by the Managers:

(i)    Employee materially breaches any provision(s) of this Agreement, or otherwise fails to perform any provision(s) of this Agreement, and such breach or failure continues uncured (but only if such breach or failure is reasonably capable of being cured) for a period of ten (10) business days after written notice specifying the nature of the alleged breach or failure thereof is given by the Company to Employee; or

(ii)    Employee engages in any act of fraud, gross negligence, embezzlement or willful misconduct with respect to the Company or that adversely affects the Company's or its Affiliates' reputation, business or assets or the ability of the Employee to perform his responsibilities; or

(iii)    Employee is convicted of, or pleads guilty or no contest to, any crime punishable as a felony or any other crime involving moral turpitude; or

(iv)    Employee's reporting to work under the influence of alcohol, illegal drugs or unauthorized prescription drugs; or his use of or testing positive for such substances while at work or scheduled to be at work; or his possession, sale or distribution of illegal drugs or unauthorized prescription drugs (whether or not at the workplace); or

(v)    Employee's appropriation for himself or his family members or any of their respective affiliates, of a corporate opportunity of the Company or any of its Affiliates without

7787520-5
6/14/17 9:23 AM

7

the prior written consent of the Board (which consent may be withheld by the Board in its sole and absolute discretion); or

(vi)   Employee becomes insolvent in the absence of a reasonably demonstrated plan for rehabilitation or recovery; or

(vii)   Employee engages in conduct relating to the Company or its business (or the business of its subsidiaries) which is not authorized, approved or ratified by the Managers, or which is contrary to the Manager's expressed directions, and which adversely affects or would reasonably be likely to adversely affect the Company, its business or other members, including, without limitation, if a governmental action, investigation or sanctions are imposed on the Company or subsidiary or any member; or

(viii)   Employee violates any of the restrictive covenants set forth in Section 10 of this Agreement.

(b)   Termination of Employment "Without Cause." The Company may terminate Employee's employment hereunder at any time "without cause" by giving written notice to Employee at least ninety (90) days prior to the proposed date of termination.

(c)   Voluntary Termination of Employment by Executive. Employee may voluntarily terminate his employment with the Company hereunder at any time by giving written notice to the Company at least ninety (90) days prior to the proposed date of termination.

(d)   Death or Disability. The employment relationship between the Company and Employee shall automatically terminate upon his death or disability (disability, for this purpose, being deemed to result in the Company's discretion, if as a result of mental or physical incapacity or illness Employee fails to perform his duties and responsibilities provided for herein for a consecutive period of more than one hundred twenty (120) days in any 12-month period). *Docron*

(e)   Effect of Termination of Employment: Severance Pay. Upon termination of the Employee's employment with the Company for any reason at any time, Employee shall be entitled to receive any accrued but unpaid Base Salary payable to him through the date of termination of his employment with the Company in accordance with the Company's normal payroll practices and procedures. In addition, in the event of a termination of the Employee's employment by the Company "without cause" pursuant to Section 9(b) hereof, or on account of death or disability, Employee (or his estate) shall be entitled to his accrued monthly and annual (if not previously paid) incentive compensation payable to Employee prorated thorough the effective date of termination, and Employee will be entitled to severance pay ("Severance Pay") in an amount equal to (i) the portion of his Base Salary correlating to 90 days beginning on the day on which his separation becomes effective (prorated based on a year of 365 days); plus (ii) the incentive compensation amount deriving from Senior Nannies' monthly revenues that would have been payable to Employee under Section 5 (b) or Section 5 (d), whichever is greater for the month in which termination occurs and for the following two months. No such Severance Pay will be payable if Employee terminates his employment voluntarily, as provided under Section 9 (c).



(f)    Payments upon Termination. Payments to Employee under this Section following termination (other than Severance Pay), shall be payable within 30 business days after Employee's termination becomes effective. Severance Pay will be paid in installments each month in which such a payment becomes due, in accordance with the Company's regular payroll practices. In all cases, applicable withholding and payroll taxes will be withheld. Employee shall also be entitled to receive payment for any unused vacation within the year in which termination occurs (based on Base Salary and prorated through the date of termination). If termination of employment hereunder occurs for any reason, in addition to the prorated Base Salary and incentive compensation specified above, and Severance Pay as specified above, and prorated compensation for unused vacation time, Employee will be entitled to health insurance and unemployment benefits provided for under law, and no others.

10.    Restrictive Covenants.

(a)    Proprietary and Confidential Information. Employee hereby acknowledges that as a result of his employment relationship with, Employee has been provided access to, and has become familiar with, certain trade secrets and other proprietary and confidential information of the Company and its Affiliates, including, without limitation, business and corporate strategies, business plans, product strategies, unique methodology and systems, product cost and pricing information, customer lists, vendor lists, lead lists, lead conversion, lead formation sales reports, operating plans, marketing strategies and plans, methods, financial information, contracts, agreements, computer programs, manuals, and any other confidential information pertaining to the financial condition, business affairs or business prospects of the Company or any Affiliates (collectively, the "Confidential Trade Secret Information"). The Confidential Trade Secret Information has great value to the Company and significantly affects the successful conduct of its Business and goodwill. Employee hereby further acknowledges that the Company has expended substantial time, money and effort to develop and maintain this Confidential Trade Secret Information and that the Company will continue to develop and maintain this Confidential Trade Secret Information in connection with the successful conduct of its Business. Accordingly, Employee shall not use, reveal, report, publish, copy, transcribe, transfer or otherwise disclose or make available to any person, corporation or other entity any of the Confidential Trade Secret Information, directly or indirectly, during the term of this Agreement or thereafter, except as required in the course of employment with the Company or as may be required by law.  All Confidential Trade Secret Information relating to the Company's Business, whether prepared by Employee or otherwise, coming into Executive's possession, whether or not contributed or developed in whole or in part by Executive, shall remain the exclusive property of the Company and shall not be removed from the Company's premises under any circumstances without the prior written consent of the Board, and then, under restrictions as the Board may impose.

(b)    Non-Competition Agreement. During Employee's employment with the Company during the Initial Term, and, if Employee is terminated prior to the end of the Initial Term for cause or by Employee voluntarily, of his own volition, for six months' after the end of the Initial Term ("Non-Competition Period"), Employee will not directly or indirectly own a majority interest in, operate, manage, consult with, control, participate in the management or control of, be employed by, be associated with or maintain or continue any interest whatsoever in any person or entity engaged in business substantially similar to the Company's Business within the Counties in Florida within which Employee was, during his employment, actively working. This subsection will be null



and void if Employee remains employed by the Company during the entire Initial Term, or if Employee is terminated by the Company during the Initial Term without cause.

(c)      Non-Solicitation of Customers and Accounts. During Employee's employment with the Company and for two (2) years thereafter ("Non-Solicitation Period"), Employee will not directly or indirectly or in concert with others, call upon, solicit, service, or sell any of the services that comprise the Business to any customers of the Company or an affiliate, on Employee's own behalf, on behalf of a Company customer or on behalf of a competitor of the Company. This restriction shall apply to any customer of the Company or an affiliate that was a customer at any time during Employee's last two (2) years of employment with the Company as well as any prospective customer of the Company with whom Employee had any contact during Executive's last year of employment with the Company. "Solicit" shall mean to call upon, or lend any assistance in any way to, any person or entity for the purpose of encouraging, enticing, or persuading any person or entity to do business with any person or entity in competition with the Company. Solicitation shall also include a general or specific advertisement wherein Employee is advertising in any way the fact that Employee is engaged in direct or indirect competition with the Company. This prohibition expressly precludes Employee, during the Non-Solicitation Period, from conducting business similar to the Company's Business with any customer of the Company, even if the customer first contacts Executive.

(d)      Non-Interference With Other Executives or Representatives. During Employee's employment with the Company and for two years' thereafter ("Non-Interference Period"), Employee will not, either directly or indirectly or in concert with others, seek to influence any employees, agents or representatives of the Company to leave the Company. "Seek to influence" includes discussion with an employee, agent or representative, about the possibility of the employee, agent or representative leaving the Company, even when the issue of leaving the Company is first raised by the Company employee, agent or representative.

(e)      Return of Documents. Employee acknowledges that all files, records, documents, notes, memoranda, costing and account information, and other similar items which Employee prepares, uses, or comes into contact with during Employee's employment with the Company, are and shall remain the sole and exclusive property of the Company, whether in hard copy or electronic format. Employee agrees not to remove from the Company's premises the original or any reproduction of any such information, nor the information contained therein, including any computers or software programs without the prior consent of the Company. All such material information and property in Employee's possession or control shall be immediately turned over to the Company at its corporate headquarters, currently located at 3313 West Commercial Boulevard, Fort Lauderdale, Florida.

(f)      Legitimate Business Interests. Employee acknowledges that the restrictive covenants set forth in this Section 10, including the Non-Competition Period, Non-Solicitation Period and Non-Interference Period ("Restrictive Covenants"), and the Restricted Areas, are reasonable in time and scope and are necessary to protect the legitimate business interests of the Company; including but not limited to, the protection of trade secrets and valuable confidential business information of the Company, and substantial relationships with specific prospective and



existing customers of the Company, and goodwill associated with the Company, and the extraordinary and specialized training that Employee will receive or has received from the Company.

(g)     Right to Injunction. Employee agrees that any violation or breach of the Restrictive Covenants set forth in this Section 10 would cause irreparable harm to the Company and that such harm cannot be adequately compensated by money damages. Accordingly, any such violation or breach may be enjoined by any court of competent jurisdiction, without causing or affecting claims for damages incurred by the Company in connection with such violation or breach. In no event shall a delay by the Company of its right to seek immediate relief under this Agreement constitute a waiver of any rights set forth herein, and in no case shall a waiver by the Company of its right to seek relief under this Agreement constitute a waiver of any other or further violation of this Agreement. The parties hereto agree and confirm that all restrictions in this Agreement are reasonable and valid. In addition, in the event of an alleged breach or violation of any Restrictive Covenant, the applicable restrictive period (i.e., the Non-Competition Period, Non-Solicitation Period or Non-Interference Period) shall be tolled until such breach or violation has been duly cured.

(h)     Third-Party Beneficiary. All members and affiliates of the Company (including without limitation affiliates and/or subsidiaries as identified in the Operating Agreement) are third-party beneficiaries of this Agreement, and the restrictive covenants set forth in this Section 10 and the remedies hereunder inuring to the Company are intended to benefit all such members and Affiliates and may be enforced by all such members and affiliates or subsidiaries.

(i)     Severability. In the event a court of competent jurisdiction determines any portion of the Restrictive Covenants to be unreasonable so as to make such portion unenforceable, then in such instance, the unenforceable portion or portions shall be deleted herefrom and the court shall substitute such terms as it deems reasonable, consistent with the intent hereof, so as to make the provisions hereof as fully enforceable as if the substituted terms had been incorporated in full.

(j)     Survival After Termination or Expiration of Agreement; Assignment. Notwithstanding anything to the contrary in this Agreement, the Restrictive Covenants shall survive the termination or expiration of this Agreement. It is the express intention of the parties hereto that upon the expiration or other termination of this Agreement for any reason, the following shall apply: (i) if Employee fails to continue to provide employment services for and on behalf of the Company following the expiration or termination of this Agreement, the applicable restrictive period (i.e., the Confidentiality Period, Non-Competition Period, Non-Solicitation Period or Non-Interference Period) referred to in Sections 10(a), (b), (c) or (d), above, shall commence immediately following said expiration or termination of this Agreement; and (ii) if the employment services of the Employee are retained by the Company (i.e., the Employee continues to provide employment services for and on behalf of the Company) after the expiration or termination of this Agreement, without formal contract, it is hereby mutually agreed that the terms of this Section 10 shall continue to govern the relations between the Company and Employee, in which case the applicable restrictive period (i.e., the Confidentiality Period, Non-Competition Period, Non-Solicitation Period or Non-Interference Period) referred to in Sections 11(a), (b), (c) or (d), above, shall commence immediately following the cessation of Employee's employment services to the Company. In the event this Agreement is assigned or otherwise transferred by the Company to its assignee or successor, the



assignee or successor shall be expressly authorized to enforce all restrictions set forth in this Section 10.

11.  Determinations of the Managers Deemed Conclusive.  All determinations which under this Agreement are required or permitted to be made by the Managers shall be deemed conclusive as to Employee and his heirs or beneficiaries, unless clear and convincing evidence can be shown so as to make the Manager's determinations wholly arbitrary and capricious. All benefit of doubt shall be resolved in favor of sustaining the determinations of the Managers.

12.  Non-Disparagement. During Employee's employment with the Company, whether or not under this Agreement, and thereafter, Employee will not, directly or indirectly, make any disparaging statements or other negative remarks, written or oral, about the Company, its members and Managers, its subsidiaries or any of their respective practices, Affiliates, directors, officers, employees, owners, managers, members, partners, agents, attorneys or representatives that would be reasonably likely to cast disrepute on or damage the Company or its Managers or their respective Affiliates, or for the hoped-for competitive advantage of Employee or a third person or the competitive disadvantage of the Company or its Affiliates. This Section 12 shall not, however, prohibit Employee from testifying truthfully as a witness in any court proceeding or governmental investigation.

13.  Miscellaneous Provisions.

(a)  Florida Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without regard to conflicts of law or principles thereof.

(b)  Exclusive Venue. The Parties agree that (i) any claim of whatever character arising under or in any way relating to this Agreement shall be brought exclusively in a federal or state court of competent jurisdiction in Broward County in the State of Florida and (ii) that any claim described in the foregoing clause that is filed in any other court shall be conclusively deemed as violating the expressed intent of the parties in this mandatory forum selection clause. Employee hereby expressly waives, to the fullest extent permitted by law, any objection that Employee may now or hereafter have to the laying of venue of any such litigation brought in any such court referred to above, including, without limitation, (a) any defense claiming lack of jurisdiction in any action brought in such court, and (b) any claim that any such litigation has been brought in an inconvenient forum.

(c)  Representation; No Presumption. The Parties recognize and understand that this Agreement has been prepared by Berger Singerman LLP, as counsel for the Company, as a result of negotiations between the Company and Employee. Employee hereby recognizes and confirms that he was given every opportunity to have this Agreement reviewed by his own counsel.  No presumption shall be made as to the interpretation of any provision hereof on account of this Agreement having been prepared by counsel for the Company. The Parties have been advised that inherent or possible conflicts of interest based on competing interests or concerns may exist between or among the Company and its Managers, and Employee, and that the Parties and the Company's Managers have been advised to, and have had full opportunity to, seek advice of their own

independent counsel. Employee further acknowledges and agrees that nothing contained in or implied from this Agreement, nor the fact that this Agreement was prepared by Berger Singerman, LLP, shall in any manner prevent such counsel, and any partner or attorney associated with such counsel, from ever representing the Company or either of its Managers, or another Affiliate, or any person, in any dispute, matter or transaction whatsoever.

(d) <u>Headings</u>. The Section headings contained herein are for reference purposes only and shall not in any way affect the meaning and interpretation of this Agreement.

(e) <u>Binding Effect</u>. This Agreement shall be legally binding upon and shall operate for the benefit of the respective Parties, their respective heirs, personal and legal representatives, transferees, successors and assigns.

(f) <u>Entire Agreement</u>. This Agreement contains the entire agreement of the parties hereto with respect to the subject matter addressed herein, and all prior understandings and agreements, whether written or oral, between and among the parties hereto relating to the subject matter of this Agreement are merged in this Agreement. Each party specifically acknowledges, represents and warrants that they have not been induced to sign this Agreement by any belief that the other will waive or modify the provisions of this Agreement in the future.

(g) <u>Severability</u>. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

(h) <u>Counterparts</u>. This Agreement may be signed and executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

(i) <u>Transferability</u>. Employee hereby agrees and consents that the rights and obligations of the Company hereunder may be transferred or assigned and will be binding on the Company's successors and assigns. Employee may not transfer or assign his rights or obligations under this Agreement without the express written consent of the Managers.

(j) <u>Modification</u>. This Agreement may only be modified in writing and signed by each of the parties hereto.

(k) <u>Plural and Gender</u>. Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

(l) <u>Survival</u>. All representations and other relevant provisions herein, including but not limited to the provisions set forth in Sections 8, 9, 10, 11, 12 and 13, and this Section 14, of this Agreement, shall survive in accordance with their respective terms, and thereby continue in full force and effect pursuant to their respective terms, upon termination of this Agreement.

(m) <u>No Waiver of Breach</u>. The waiver or inaction by either party hereto of a breach of any condition of this Agreement by the other party shall not be construed as a waiver of

any subsequent breach by such party, nor shall it constitute a waiver of that party's rights, actual or inherent. The failure of any party hereto in any instance to insist upon a strict performance of the terms of this Agreement or to exercise any option herein shall not be construed as a waiver or a relinquishment in the future of such term or option, but that the same shall continue in full force and effect.

(n)    Notices. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (i) when personally delivered or sent by telecopy or electronic mail (with hard copy to follow) or (ii) one day after being sent by reputable overnight express courier (charges prepaid), or (iii) five days following mailing by certified or registered mail, postage prepaid and return receipt requested. Unless another address is specified in writing, notices, demands and communications to be the parties shall be sent to the addresses indicated in Schedule 1 hereto.

(o)    Successors and Assigns. Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and Employee and his heirs, personal representatives, successors and assigns, except that Employee may not assign his rights or delegate his duties or obligations hereunder without the prior written consent of the Company.

(p)    Dispute Resolution; Waiver of Jury Trial. If a dispute arises and the Managers and Employee are unable to reach agreement consensually within 20 days despite good faith efforts to do so, the dispute may be submitted to mediation if requested in writing by any party. The mediation shall take place in a mutually agreed location, and absent agreement, in Broward County, Florida. The mediation shall be conducted before a single mediator who shall be agreed upon by the parties. If the parties cannot agree on a mediator, Employee and the Managers shall each select a mediator and such mediators together shall select a neutral third mediator, who shall conduct the mediation. The parties shall equally bear the fees and expenses of the mediator. The mediation process shall consist of at least two sessions, conducted in good faith. If as a result of the mediation process, the parties cannot resolve the dispute, any party may pursue dispute resolution procedures under law. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS OR EVENTS CONTEMPLATED HEREBY OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO. THE PARTIES HERETO EACH AGREE THAT ANY AND ALL SUCH CLAIMS AND CAUSES OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. EACH OF THE PARTIES HERETO FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY SUCH LEGAL PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.

(q)    Attorneys' Fees and Costs. Should it become necessary for either Party to institute any legal action to enforce any of the provisions of this Agreement, the prevailing Party shall be entitled to an award of reasonable attorneys' fees and costs through all appellate levels.



(r)    Offset. The Company shall have the right to set-off (reduce), on a dollar-for-dollar basis, against any and all compensation payments due to Employee hereunder for any overpayments based on assumed revenues as adjusted to take into account actual collections, and based on damages, liabilities or costs incurred by the Company as a result of Employee's breach of any of the restrictive covenants herein, in addition to any other remedies that may be available to the Company at law or in equity.  Nothing herein, including acceptance of a payment with an offset, shall not constitute a waiver of any defense that Employee may have in connection with such offset.

IN WITNESS WHEREOF, the Company and Employee, respectively, have executed and delivered this Agreement as of the date first above written.

CWGL HOLDINGS, LLC

By: _____
      Gary R. Loffredo, co-Manager

By: _____
      Claudia Wechter, co-Manager

_____
Bryan Solomon

Date: 6/22/2017





SECOND AMENDED AND RESTATED OPERATING AGREEMENT
Of
CWGL HOLDINGS, LLC

THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT ("Agreement") of CWGL HOLDINGS, LLC (the "Company"), is made and entered into effective as of May 1, 2017 ("Effective Date"), by and among the Company and the Members listed on Exhibit A attached hereto. This Agreement amends, restates, and replaces in its entirety the Prior Operating Agreements as defined below.

<u>Preliminary Statements</u>

A.     The Company was formed on August 15, 2014, pursuant to Articles of Organization ("Articles") filed with the Florida Department of State. The sole Members at inception were the Founding Members, Claudia Wechter and Gary R. Loffredo.

B.     Prior to the Effective Date of this Agreement, the Company and the Founding Members adopted an Operating Agreement of the Company bearing a date of August 13, 2014 ("Initial Operating Agreement"), as amended and restated in its entirety pursuant to that certain Amended and Restated Operating Agreement of the Company dated November 14, 2015 ("First Amended Operating Agreement"; and with the Initial Operating Agreement, collectively, the "Prior Operating Agreements").

C.     As of the Effective Date of this Agreement, two Class B Members (Bryan Solomon and Brett Feldman) have been admitted as Members of the Company, subject to the terms and conditions of this Agreement, along with the Founding Members who are the sole Class A Members.

D.     The Members and the Company now desire to amend and restate the First Amended Operating Agreement in its entirety, in order to provide for Class B Member Interests, to reflect the admission of the Class B Members, and to provide for the ongoing governance of the Company and other matters affecting the Member Interests and the Company.

E.     This Agreement amends, restates, replaces and supersedes each of the Prior Operating Agreements, effective as of the Effective Date.

ARTICLE I
INTRODUCTION; DEFINED TERMS, ETC.

1.1     <u>Recitals</u>.  The recitals set forth as preliminary statements each are true and correct and are incorporated by reference into this Agreement.

1.2     <u>Defined Terms</u>.  The following capitalized terms shall have the meanings as set forth in this Section 1.2. Capitalized terms defined in the introductory paragraph or recitals or elsewhere in this Agreement shall have the meanings assigned to them at the place first defined.

"Act" means the Florida Revised Limited Liability Company Act, Chapter 605 of Florida Statutes, as may be amended from time to time.

"Affiliate" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

"Agreement" means this Operating Agreement, as may be amended or restated from time to time.

"Applicable Law" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"Available Net Cash Flow" means all cash received by the Company from its operations or the operations of the Controlled Entities during any taxable year or other period, less all cash disbursements made by the Company and/or the Controlled Entities during such year or period, and less such reasonable and customary reserves or expenditures for working capital, contingencies and anticipated short-term obligations (including debt service and capital improvements), as the Managers shall deem reasonably necessary in the ordinary course of business; all as determined and accounted for by the Managers from time to time. Available Net Cash Flow shall not include Capital Contributions or the proceeds of Member Loans, if any, but shall be increased by the reduction of any reserve previously established.

"Bankruptcy" means, with respect to a Person, the occurrence of any of the following: (a) the filing of an application by such Person for, or a consent to, the appointment of a trustee of such Person assets; (b) the filing by such Person of a voluntary petition in bankruptcy, insolvency or other similar law ("Debtor Relief Laws"), or the filing of a pleading in any court of record admitting in writing such Person's inability to pay its debts as they come due; (c) the making by such Person of a general assignment for the benefit of such Person's creditors; (d) the filing by such Person of an answer admitting the material allegations of, or such Person's consenting to, or defaulting in answering a bankruptcy petition filed against such Person in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Person a bankrupt or appointing a trustee of such Person's assets.

"Book Depreciation" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the

2

same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Board in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3).

"Book Value" means, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes; provided, however that the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross fair market value as determined by the Managers as of the date of such contribution, and that such Book Value shall be adjusted for any changes in an asset's value that is made under the capital account maintenance provisions of Treasury Regulations Section 1.704-1(b)(2)(iv). The Book Value of all assets shall be adjusted from time to time by Book Depreciation and any other adjustments to the basis of assets. The Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company.

"Business Day" means every day other than a Saturday or Sunday, or a legal holiday recognized as such in Florida.

"Capital Contribution" means the total amount of capital contributed to the Company's capital by each Member pursuant to Section 5.1 of this Agreement, as may be adjusted by the terms hereof.

"Capital Proceeds" means capital distributions received by the Company from entities in which Company has an ownership interest and the net cash proceeds received by the Company from or as a result of a Capital Transaction, after deducting: (i) all expenses paid in connection therewith; (ii) all amounts applied by the Company toward the payment of obligations associated with the Capital Transaction, including payments of principal and interest on mortgages or payments to repair or restore assets, and then payment of other indebtedness of the Company (including indebtedness owed to the Members); (iii) the payment of other expenses; and (iv) the establishment of reserves. If the proceeds of a Capital Transaction are paid in more than one installment, each installment shall be treated as a separate Capital Transaction for purposes of this definition.

"Capital Transaction" means a (i) sale or other disposition of the assets of the Company or a Controlled Entity (other than sales in the ordinary course of business); (ii) financing or refinancing of the assets of the Company or a Controlled Entity; and (iii) receipt of casualty insurance proceeds (other than business interruption insurance) or condemnation awards with respect to the Company's or a Controlled Entity's assets.

"Class A Members" shall mean the Members of the Company that hold Class A Membership Interests.

3

"Class B Members" shall mean the Members of the Company that hold Class B Membership Interests.

"Class A Membership Interests" (or "Class A Interests)" shall mean Interests issued by the Company and designated as Class A Interests, with the voting and other rights, preferences and privileges attributable to such Interests, as set forth in this Agreement.

"Class B Membership Interests" (or "Class B Interests") shall mean Interests issued by the Company and designated as Class B Interests, which are and shall be non-voting Interests, with the rights, preferences and privileges, and subject to the limitations and restrictions, attributable to such Interests, as set forth in this Agreement.

"Class A Net Distributable Cash" shall mean the Available Net Cash Flow deriving from the business of the Company and all Controlled Entities, and/or Capital Proceeds deriving from the Company and all Controlled Entities, as determined by the Managers from time to time to be distributable to the Class A Members; provided that the Class A Net Distributable Cash actually distributed to the Class A Members will be reduced by the dollar amount of the Class B Net Distributable actually distributed to the Class B Members.

"Class B Net Distributable Cash" shall mean the Available Net Cash Flow deriving from the business operations conducted by, Senior Nannies Home Care Services, LLC, and Senior Advantages Assisted Living Placement Services, LLC (collectively, the "Class B Entities") (and no other Controlled Entities or the Company itself), and/or Capital Proceeds deriving from the Company and those specific Class B Entities only, as determined by the Managers from time to time to be distributable to the Class B Members.

"Code" means the Internal Revenue Code of 1986, as amended.

"Controlled Entity" shall mean the individual or collective reference to (i) Senior Nannies Holdings, LLC, Senior Nannies Home Health Care Services, LLC, Senior Advantages Assisted Living Placement Services, LLC, Senior Nannies Management Services, LLC, SN Home Healthcare, LLC, SN DME, LLC, CWGL Commercial, LLC and 3313 Exchange, LLC; or (ii) any other partnership, limited partnership, limited liability company, corporation or other entity or venture owned and controlled by the Company or in which the Company is a general partner, majority owner or manager.

"Disabled" or "Disability" means, in the case of a Member who is employed by or regularly provides services to the Company: (i) the adjudication by a court of competent jurisdiction that such Member is incompetent to manage his or her affairs; or (ii) such Member's physical or mental incapacity for any consecutive three-month period, or for a total of six months in any twelve-month period, of such nature that the Member shall be unable to perform any substantial duties for the Company.

"Distributions" means the quarterly or other periodic distributions based on Class A Net Distributable Cash as applicable to the Class A Members, or Class B Net Distributable Cash as applicable to the Class B Members, respectively, and periodic tax distributions as made by the Managers from time to time.

"Economic Right" means an Interested Nonmember's rights to receive allocations of Profits and Losses and distributions.

"Fiscal Year" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"Former Member" means any Member to whom a Triggering Event occurs.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"Immediate Family" means, as to any Member, the persons who have any of the following relationships to such Member, whether as a result of birth or the legal adoption of any one or more individuals: a spouse, a spouse's siblings or their children, a parent, a parent's siblings, a child and a child's lineal descendants, a brother or sister or their lineal descendants, or a first or second cousin.

"Founding Member(s)" means either Claudia Wechter or Gary R. Loffredo, and both of them.

"Interest" or "Membership Interest" means an equity interest in the Company owned by a Member, designated either as a Class A Interest or a Class B Interest, including (a) such Member's right to a distributive share of (i) Profits, Losses and other items of income, gain, loss and deduction of the Company and (ii) the assets of the Company; (b) as to Class A Members, such Member's right to vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (c) such Member's right to any and all other benefits to which a Class A Member or a Class B Member, as applicable, may be entitled as provided in this Agreement or the Act.  The Company shall have two classes of Membership Interests, Class A Interests and Class B Interests. The Interest of each Member shall be expressed as a percentage interest (the "Percentage Interest") and shall be as set forth on Exhibit A attached hereto, as may be amended by a Manager from time to time to reflect the issuance of new Membership Interests (if any) or the Transfer of Membership Interests to any new or existing Member in accordance with the terms of this Agreement.

"Interested Nonmember" means any Person other than a Member owning or holding any Economic Right. A Person who acquires an Economic Right  but who is not admitted as a substitute Member pursuant to Article 9 hereof shall be entitled only to Economic Rights in accordance with this Agreement, and shall have no Management Rights.

"Major Decisions" shall refer to any of the decisions described in Section 4.4.

"Management Rights" means the rights of a Class A Member to participate in the management of the Company and to vote, consent to or approve actions of the Company, and for any Member to receive information and inspect the books and records of the Company.

"Manager" or "Managers" means that person or those persons elected by the Class A Members to manage the Company. The Managers as of the Effective Date are Claudia Wechter and Gary R. Loffredo.

"Member Loan" means a loan from a Member to the Company as described in Section 5.1(b).

"Members" means, as of the Effective Date, the Founding Members, who shall be the sole owners of the Class A Interests, and Bryan Solomon and Brett Feldman, who, as of the Effective Date shall be Class B Members, and other persons who are admitted to the Company as additional or substitute Members from time to time in accordance with this Agreement.

"Parties" shall mean the Company and the Members (each of whom is a "Party").

"Person" means a natural person, corporation, association, partnership, joint venture, limited liability company, trust or any other entity defined as a "person" under the Act.

"Prime Rate" means the prime rate of interest as published from time to time by *The Wall Street Journal*.

"Profits" and "Losses" means, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a)    any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)    any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulation Section 1.704-1(b)(2)(iv)(i) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)    any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

7742056-9

(d)    any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(e)    if the Book Value of any Company property is adjusted pursuant to the definition of "Book Value," then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(f)    to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(g)    any items of income, gain, loss or deduction that are specially allocated shall not be taken into account in computing Profits and Losses.

"Pro Rata" means the ratio that a particular Class A Member's Interests bear to all Class A Interests or that a particular Class B Member's Interests bear to all Class B Interests.

"Purchase Notice" means a written notice delivered in connection with a proposed Transfer pursuant to Section 9.8 or Section 9.9 setting forth (a) the name of the Person or Persons to whom a Transfer is proposed to be made, (b) the purchase price per Unit, (c) the terms and conditions of the Transfer and (d) all other pertinent details of the proposed Transfer.

"Securities Act" means the Securities Act of 1933, as amended.

"Super Majority in Interest" (or "Super Majority") shall refer to those Class A Members who, in the aggregate, hold at least ninety percent (90%) of the Percentage Interests held by all Class A Members.

"Transfer" means a sale, assignment, gift, or other disposition, or the pledge, grant of a security interest or lien in, or other encumbrance, whether voluntary or by operation of law, directly or indirectly, of all or part of a Member's interest in the Company (including, without limitation, the transfer of an ownership interest in a Member entity).

"Transferor" and "Transferee" mean a Person who makes or receives a Transfer, respectively.

"Treasury Regulations" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"Unanimous Consent" means the affirmative vote of each Class A Member.

7

1.3     Effective Date. This Agreement, and the terms, conditions and obligations of the parties contained herein, shall become effective as of the Effective Date (regardless of whether full execution and delivery hereof occurs thereafter within a period of time acceptable to the Class A Members). This Agreement supersedes any prior agreement or understanding by, between or among any of the Members or other Persons concerning the Company and/or the Business as defined below.

1.4     Sole and Exclusive Operating Agreement; Effect of Inconsistencies with the Act.

(a)     The terms and conditions of this Agreement, as the same may from time to time be amended, supplemented, or restated (solely in accordance with this Agreement), are intended to be the sole and exclusive "operating agreement" of the Company for purposes of the Act.

(b)     To the extent any provision of this Agreement is prohibited or otherwise invalid or ineffective under the Act, this Agreement shall be considered amended (to the least extent possible) in order to make such provision permitted, valid and effective under the Act. Subject to the foregoing, if any term in this Agreement governs, provides for or otherwise addresses any matter (including relations among the Members or between the Members and the Company or the Manager(s), the rights or duties of a Person, or the activities or affairs of the Company), and such matter is also governed by one or more provisions of the Act (which statutory provisions are commonly referred to as "default rules" that apply pursuant to Section 605.0105(2) of the Act), then such term in this Agreement shall prevail over the corresponding default rule of the Act. The preceding sentence shall apply regardless of whether the term in this Agreement expressly states that it is intended to replace, supplement or otherwise modify such default rule, and regardless of whether the term in this Agreement applies only partially or by implication to the matter governed by such default rule.

(c)     The Members intend that any court (or any arbitrator or other Person charged with the interpretation or enforcement of this Agreement) shall give maximum effect to the principle of freedom of contract and to the enforceability of this Agreement. Accordingly, if a term in this Agreement does not expressly or directly displace or modify a default rule, but enforcement or other effectuation of such term in this Agreement question cannot occur but for the displacement or modification of the default rule, then such default rule shall be deemed to have been displaced or modified accordingly, to the fullest extent permissible under applicable law. Without limiting the foregoing, and for the avoidance of any doubt: (i) the provisions of Section 605.04092 of the Act shall not apply to this Agreement; it being the intent of the parties that this Agreement definitively and completely contains the agreements and understandings of the Members and the Company with respect to transactions that may otherwise be subject to Section 605.04092; and (ii) that each of the provisions of this Agreement (whether considering it as a whole or any part(s) thereof) are fair and reasonable under the circumstances, were negotiated at arms-length by highly sophisticated and capable parties who were separately represented by competent legal counsel, and such provisions will not be deemed manifestly unreasonable, invalid or otherwise improper under the Act.

1.5     Executory Agreement in Bankruptcy. The Parties acknowledge and agree that this Agreement constitutes an "executory" agreement with respect to all Membership Interests issued

8

by the Company and shall be governed by 11 U.S.C. § 365 in connection with any Bankruptcy of the Company or of any Member because, among other provisions and obligations, this Agreement imposes on each Party material and affirmative duties which constitute material and unperformed future obligations. Accordingly, any trustee in a Bankruptcy proceeding holding a right in or claim to any Membership Interests issued by the Company shall be required to comply with the terms of this Agreement and Florida law governing this Agreement, including, without limitation, the restrictions of the rights of a creditor of a Member pursuant to Section 605.0503, Florida Statutes.

      1.6    Additional Classes or Series of Member Interests. The Company reserves the right to create, authorize and issue any one or more new, additional or modified class or series of Member Interests (if any, "Supplemental Member Classifications"). Any such Supplemental Member Classifications, if any, shall have such designations or voting or other rights and preferences only as may be determined by unanimous vote of the Founding Members. Without limiting the generality of the foregoing, Supplemental Member Classifications may be granted relative, participating and/or priority rights as to distributions in liquidation or otherwise, prior to, on parity with, or junior to, any outstanding class or series of Membership Interests, all as determined by unanimous vote of the Class A Members. The designations, terms, rights and provisions pertaining to each and all Supplemental Member Classifications (if any) shall be set forth in an amendment or supplement to this Operating Agreement, if any, approved by each Class A Member.

      1.7    Unregistered Securities; Compliance. Each Member acknowledges and agrees that such Member's Interests and all Interests constitute securities that have not been registered under any federal or state securities laws by virtue of exemptions from the registration provisions thereof and consequently may not be sold except pursuant to appropriate registration or exemption from registration as applicable. Subject to compliance with the terms hereof regarding Transfers, all transfers of any Interests (if any) shall: (a) be made pursuant to and only in accordance with the terms of this Agreement; and (b) comply with the Securities Act of 1933, as amended (the "Securities Act"), the Securities Exchange Act of 1934, as amended, and all applicable federal and state securities laws, unless the transfer is exempt from the requirements of such laws. Each Member represents and warrants to the Company that: (i) the Member is acquiring its Interest for investment for its own account and not with a view to or for sale in connection with any distribution thereof; (ii) the Member has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Company and is capable of bearing the economic risks of such investment; and (iii) the Member is an "accredited investor" as defined in Rule 501 under the Securities Act.

      1.8    Certificates; Legend. The Company may issue membership certificates identifying each Member and each Member's Interest, if both Members elect to do so. If issued, the Company will endorse on each such certificate a legend reading substantially as follows:

            The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, or the securities laws of any state or other jurisdiction, and may not be sold, transferred, pledged, hypothecated or otherwise disposed of in the absence of

9

(1) an effective Registration Statement for such securities under applicable law, or (2) an opinion of counsel, satisfactory to the Company, that such registration is not required.

The limited liability company membership interests represented by this certificate are subject to a Second Amended and Restated Operating Agreement dated as of May ___, 2017 between the Members of the Company and the Company ("Operating Agreement"). The holder of the membership interests represented by this certificate may not transfer, assign, encumber or otherwise dispose of such interests except in accordance with the terms of the Operating Agreement. A copy of the Operating Agreement is on file at the Company's principal office. By acceptance of this certificate, the holder hereof agrees to be bound by the terms of the Operating Agreement.

1.9    Related Parties / Subsidiaries. With respect to any Controlled Entity owned or controlled by the Company or in which the Company or the Class A Members own any or all equity interests, the Class A Members (as members or equity holders) shall have the same voting (or non-voting), management, Deadlock resolution rights, restrictions on transfer and buy-sell rights with respect to each such Controlled Entity as apply to the Company pursuant to this Agreement. The Class A Members shall take all such actions as may be necessary or desirable to give effect to this provision. The Class A Members acknowledge that the Company's Affiliates and subsidiaries and other Controlled Entities as of the Effective Date of this Agreement are identified in Schedule 1.9 hereto. This provision is intended to be and shall automatically be deemed to be incorporated by reference in each operating agreement or similar governing document as applicable to each Company Affiliate or subsidiary or other Controlled Entity. The Parties acknowledge that the Class B Members have no equity interests in any Controlled Entity.

ARTICLE II
NAME; PURPOSE AND POWERS; ANNUAL REPORT; MEETINGS

2.1    Name of Company. The name of the Company is CWGL Holdings, LLC. The Company may do business under that name or such other name as the Managers may from time-to-time determine. If the Company does business under a name other than that set forth in its Articles, the Company shall file a fictitious name certificate as required by Applicable Law.

2.2    Purpose and Powers. The Company is organized for the purposes of owning, managing and performing administrative services in support of various senior assisted living service providers, or home health care, or durable medical equipment providers, all of which are (and will be) owned and operated by the Company or Affiliates (and all comprising Controlled Entities), as well as for the purpose of conducting or transacting any lawful businesses or purposes within the State of Florida or any other jurisdiction where the Company desires to transact business (the "Business"). The Company is empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of the Business, and the Company shall have all powers of a limited liability company under the Act, including the power to do all things necessary or convenient to operate its Business and accomplish its purposes as described herein.

10

2.3    <u>Annual Report</u>. The Company shall file an annual report with the Florida Secretary of State on or before the required filing date of such report for each calendar year, on the form provided by the Secretary of State.

2.4    <u>Meetings</u>.  A general meeting of the Members may be held each year on such date (a Business Day) and at such time as the Manager may designate for the transaction of such business as may properly come before the Members at such meeting. In addition, special meetings of the Members may be held on a Business Day if called by any Member. Such general or special meetings shall be held at the principal office of the Company or at such other such place as determined by the Managers. The presence or participation of both Founding Members will constitute a quorum for purposes of any meeting of the Class A Members. The presence or participation of both Class B Members will constitute a quorum for purposes of any meeting of the Class B Members. Members shall be deemed present at a meeting if a conference telephone or similar communications equipment is used, by means of which all persons participating in the meeting may simultaneously hear each other.

2.5    <u>Notice of Meeting</u>.  Written notice stating the place, day and hour of the meeting, indicating that it is being issued by or at the direction of the person or persons calling the meeting, and stating the purpose or purposes for which the meeting is called shall be delivered to each Member at least five (5) Business Days prior to the meeting.  Notices may be delivered either personally, or by telephone (provided that the notice is communicated directly to the Member), facsimile or other form of electronic communication, or by mail or courier service. Written notice is effective on the earlier of receipt or three (3) Business Days after deposit in the United States mail, addressed to the Member at the Member's address as it appears on the records of the Company, with postage thereon prepaid.

2.6    <u>Waiver of Notice</u>.  A Member may waive any notice required hereunder either before or after the date and time stated in the notice. The waiver must be in writing signed by each Member entitled to such notice, and delivered to the other Member.  Neither the business to be transacted at, nor the purpose of, any general or special meeting of the Members need be specified in any written waiver of notice.  Attendance of a Member at any meeting of Members shall constitute a waiver of notice of such meeting, except if at the beginning of the meeting, the Member objects to the transaction of any business.  Attendance shall also constitute a waiver of objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

2.7    <u>Voting</u>.   Except as otherwise specifically provided herein, all matters which require the consent and approval of, or other determination by, the Members under this Agreement shall require the affirmative vote or written consent of each Class A Member. The affirmative vote or written consent of each Class A Member as to each matter to come before the Members shall be the act of the Members. Each Class A Member shall be entitled to vote in proportion to that Member's Percentage Interest. Class B Interests do not confer Management

11

Rights or voting rights with respect to the Company. Notwithstanding anything herein to the contrary, an Interested Nonmember or other Transferee shall have no right to participate as a Member in the management and conduct of the Company's business and affairs or vote on or consent to any matter reserved to the Members hereunder or under the Act.

2.8     Proxies. A Class A Member entitled to vote on any matter properly coming before the Class A Members for a vote may vote in person or by proxy. A Class A Member may appoint a proxy to vote or otherwise act for such Member by signing a reasonably acceptable appointment form, as reasonably approved by the other Member.

2.9     Action by Members Without a Meeting. Any action required or permitted to be taken by the Class A Members at a meeting of said Members may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by both Class A Members. Prompt notice (and in any event notice given within ten (10) days after obtaining authorization by written consent) of the taking of the action without a meeting shall be given to each Class B Member, provided that failure to give such notice shall not invalidate any action so taken.

2.10    Waiver of Appraisal Rights. To the extent the appraisal rights provisions of Section 605.1006 of the Act may apply to any merger, conversion, interest exchange, sale of assets, amendment of this Agreement, or to any other action or event described thereunder, the Members hereby evidence their acknowledgment of such appraisal rights provisions and hereby irrevocably and unconditionally waive all such rights. For the avoidance of doubt, this waiver shall also apply to any Transferee.

2.11    Collaboration; Deadlock; Deadlock Resolution.

(a)     The Members and Managers each acknowledge that they each are sophisticated in business and experienced in the particular business conducted by the Company. In recognition of the fact that their mutual and reciprocal interests are intrinsically aligned with the best interests of the Company, the Members and Managers agree to cooperate in good faith and use their respective commercially reasonable efforts to address and resolve disagreements in a collaborative manner to reach reasonable consensus; it being acknowledged that only Class A Members have Management Rights and voting rights. If despite good faith and commercially reasonable efforts to reach needed agreements as contemplated above, the Class A Members or Managers are unable to reach a mutually acceptable agreement on a required decision after at least two meetings, the result is referred to as a "Deadlock".

(b)     During the pendency of any Deadlock, the Company shall continue to operate in a manner consistent with its prior practices until such time as the Deadlock is resolved, and the Class A Members and Managers will continue in their good faith attempts to resolve the Deadlock by reaching consensual agreement on the matter or matters at issue. If the Deadlock pertains to the approval of the Company's annual business plan or budget, then Company shall operate in accordance with the business plan or budget as in effect immediately prior to the Deadlock; provided that, if necessary based on actual costs as then in effect, the monetary line items in such continuing budget will be increased by 5% or a percentage that

12

correlates to the actual cost inflation, whichever is greater.

(c)    If the Class A Members or Managers are unable to reach agreement as to the matter or matters at issue causing Deadlock within one year of the date the Deadlock arises, a Class A Member dissatisfied with the Deadlock may elect to invoke the "shotgun" buy/sell procedures set forth in Section 9.15 below.

ARTICLE III
TERM

The Company shall continue until terminated as provided in Article 12.

ARTICLE IV
MANAGERS: MANAGEMENT

4.1    <u>Managers and Management</u>. Except as otherwise provided in this Agreement, the overall management and control of the business and affairs of the Company shall be vested in the Managers; provided that the Managers may delegate specific duties to officers, employees or contractors serving the Company under their supervision. The Managers shall devote their full time efforts to the business and affairs of the Company. The number of Managers of the Company initially shall be two and the Managers initially shall be Claudia Wechter and Gary R. Loffredo.  The number of Managers shall be fixed from time to time by the Class A Members.

4.2    <u>Management Tenure</u>. Each Manager shall serve until his or her death, disability, resignation, or removal.   Upon the death, Disability, resignation or removal of a Manager for "cause", the remaining Manager shall serve as the sole Manager of the Company, unless a replacement, new or additional Manager is appointed by such the remaining Manager. For purposes of this Section, the term "<u>disability</u>" or "<u>disabled</u>" shall mean the inability of a Manager to perform the Manager's ordinary and customary duties as a Manager for and on behalf of the Company for a continuous period of one hundred twenty (120) days due to a physical or mental illness or impairment, as determined by two (2) licensed physicians, one of whom shall be the Manager's regularly attending physician, if any.

4.3    <u>Day-to-Day Rights and Powers of Managers</u>. In addition to the rights and powers which the Managers may have under the Act, and except as otherwise specifically vested in the Class A Members hereunder or under the Act (with respect to voting members), either Manager, acting alone, shall have all rights and powers necessary for the management of the Company, and subject to the Major Decision limits specified in Section 4.4 below, including, without limitation, the right and power to do the following:

(a)    To execute any and all agreements, contracts, documents, certifications and instruments approved by the Class A Members, as necessary or convenient in connection with the management of the Company or its assets;

13

(b)    To engage in any kind of lawful activity and to perform and carry out contracts of any kind necessary to or in connection with or incidental to the accomplishment of the purpose of the Company as may be lawfully carried on or performed under the laws of the State of Florida and/or in other jurisdictions in which the Company transacts business;

(c)    To acquire, by purchase, lease, option, or otherwise, any personal property or equipment approved by the Class A Members which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company; provided, however, that either Manager may approve equipment leases or purchases not to exceed a total cost of $3,000 in any instance or $10,000 cumulatively in any year;

(d)    To engage in such other activities and incur such other incidental expenses in furtherance of the foregoing.

4.4    <u>Major Decisions</u>. Notwithstanding anything to the contrary in this Agreement, the following actions (the "<u>Major Decisions</u>") shall require the prior written consent and approval of each Class A Member:

(a)    Determination that additional Capital Contributions, Member loans or other financings are required;

(b)    Admitting a new Member, changing the Member Interest classification of any Member, altering the Percentage Interest of any Member, altering Management Rights or Economic Rights conferred hereunder; or altering the rights and limitations attributable to any Interested Nonmember;

(c)    Except for equipment leases and nominal purchases as provided in Section 4.3, borrowing any money on behalf of the Company or pledging or encumbering any assets of the Company, or the acquisition, sale, lease, exchange or other Transfer by the Company of any property, or the granting of an option or right of first offer or refusal with respect to any of the foregoing;

(d)    The Transfer of all or substantially all of the assets of the Company, or pursuit of Business Opportunities as contemplated in Article VIII, or any sale, merger, consolidation or similar transaction affecting the Company or Membership Interests, or the granting of an option or right of first offer or refusal with respect to any of the foregoing;

(e)    Entering into contracts or leases which are not terminable at will, without penalty, or which involve cost to the Company, or any Controlled Entity, or any Member, in excess of $3,000 in any instance or $10,000 cumulatively in any year;

14

(f)     Lending money to, or guaranteeing the debts or other obligations of, a Member, any Controlled Entity, or any other Person by the Company;

(g)     Providing any guarantee, indemnity or other financial support by the Company or any Controlled Entity;

(h)     Commencing, prosecuting, settling, compromising, waiving or submitting to arbitration, any suits, actions, or claims at law or equity to which the Company is a party involving monetary claims in excess of $10,000, or involving claims for injunction or specific performance, or stipulating to the entry of any order, judgment or decree in any such proceeding;

(i)     Converting, merging or consolidating the Company with or into any partnership, limited liability company or other entity;

(j)     Employing or contracting with any Persons, including entering into any employment agreement involving a family member of a Member, or a personal friend of a Member, or entering into any agreement with or making any payment to any relatives, Affiliates or personal friends of a Member, except on arm's-length terms comparable to those obtainable in the market with unaffiliated persons and otherwise approved by both Initial Members after disclosure of the relationship with the relative, Affiliate or friend of a particular Member, or delegating any Manager duties to a relative, Affiliate or personal friend without the prior written consent of the other Member;

(k)     Retaining counsel, accountants, financial advisors, and other professional personnel;

(l)     Changing the name or business purpose of the Company, or otherwise amending the Company's Articles of Organization or this Agreement;

(m)     Establishing any Supplemental Member Classifications;

(n)     The redemption or purchase by the Company of any Member's Interest in the Company, other than any purchase of Interests in accordance with this Agreement;

(o)     Appointment or replacement of a Manager or an Officer, or appointment, replacement or employment decisions regarding professional staff or account executives of the Company, or decisions involving employment agreements, hiring, firing, promotion, demotion or other aspects of human resource management for the Company;

(p)     The filing of a voluntary petition in bankruptcy or a voluntary petition in liquidation by the Company or allowing the filing of an involuntary petition in bankruptcy or an involuntary petition in liquidation of the Company, or seeking the appointment of a receiver or

15

trustee or the making of an assignment for the benefit of creditors, or determining to dissolve or liquidate the Company or any Controlled Entity;

(q)     Any change in the tax status of the Company, or any change in the accounting methods or procedures adopted by the Company;

(r)     Establishment of any incentive compensation or option plan involving Interests or other equity securities of the Company or any Controlled Entity;

(s)     Determining to make distributions from Available Net Cash Flow; or

(t)     Taking any of the foregoing actions for, on behalf of, or affecting any Controlled Entity.

4.5     <u>Resignation of Manager</u>.  A Manager may resign from such position at any time upon giving at least thirty (30) days' prior written notice to the Members.

4.6     <u>For Cause Removal of a Manager</u>.  A Founding Member serving as Manager, or any Manager, may be removed from his or her office as Manager "for cause", at the election of the other Initial Member, acting alone, at any time upon the occurrence of any of the following events:

(a)     If a Manager materially breaches any provision(s) of this Agreement or otherwise fails to perform his or her duties to the Company, including, without limitation, by virtue of a Manager's failure to act in good faith for the best interests of the Company or to comply with the standards of loyalty and reasonable prudence and care owing to the Company, or as evidenced by persistent unexcused absence from work for the Company or persistent inattention to such work without justification reasonably acceptable to the other Manager, where such breach or failure continues uncured (but only if such breach or failure is reasonably capable of being cured) for a period of ten (10) business days after written notice specifying the nature of the alleged breach or failure thereof is given by the Company or by the other Manager; or

(b)     If a Manager engages in any act of fraud, misappropriation or conversion of Company assets, self-dealing, discrimination, gross negligence, embezzlement or willful misconduct with respect to the Company, including without limitation, the intentional misappropriation of funds or property (including intellectual property) of the Company, or conduct that adversely affects the Company's or the Members' or any Controlled Entity's reputation, goodwill, business or assets or the ability of the Manager in question to perform his or her responsibilities to the Company or any Controlled Entity; or

(c)     If a Manager is convicted of, or pleads guilty or no contest to, any crime punishable as a felony or any act in violation of the Company's human resource standards as in effect from time to time; or

16

(d)     If a Manager engages in conduct relating to the Company's business or his duties which is not authorized, directed, approved or ratified by the Company and which is intended or reasonably likely to damage the Company or its reputation, or the reputation of the other Manager or any Controlled Entity, or which adversely affects the Company, any Controlled Entity or any Member, including without limitation, if a governmental action, investigation or sanctions are imposed on the Company, any Controlled Entity or any Member as a result of the Manager's actions or conduct; or

(e)     If a Manager becomes insolvent, in the absence of a reasonably demonstrated plan for rehabilitation or recovery; or

(f)     With exception for purely consensual and private relationships that do not affect and are not reasonably likely to affect the Company or a Controlled Entity in any adverse manner, if a Manager is found to have engaged in conduct proscribed under workplace or other sexual discrimination or predation laws or standards adopted by the Company from time to time, involving or affecting any officer, employee, contractor, customer or third-party doing business with the Company or a Controlled Entity, or if a Manager acts in a manner that implicates discrimination, predation or an offensive or oppressive work environment affecting the Company or a Controlled Entity, or any officer, employee, customer, or third-party doing business with the Company or a Controlled Entity, or if a Manager generally and adversely affects the Company's working environment or liability insurance coverage; or

(g)     If a Manager reports to work under the influence of alcohol, illegal drugs or unauthorized prescription drugs; or such Person uses such substances habitually (or tests positive for such use) while at work or scheduled to be at work, or such Person possesses, sells or distributes illegal drugs or unauthorized prescription drugs (whether or not at the workplace); or

(h)     If a Manager appropriates for himself or herself or his or her family members or friends or any of their respective affiliates a business opportunity of the Company or a Controlled Entity without the prior written consent of the Company, or secures or attempts to secure personally (directly or indirectly), any profit or business advantage in connection with any opportunity inuring to the Company; or

(i)     If a Manager participates actively in a business or businesses in direct competition with the Company or a Controlled Entity, without disclosure in advance and the Company's prior written consent, or violates any of the restrictive covenants set forth in Article VIII.

4.7     <u>Compensation of Managers; Reimbursement for Expenses</u>. The Managers shall receive such compensation for the performance of their duties and responsibilities, as approved in writing by each Class A Member, and each Manager's compensation will be equal to the other Manager's in the amount so approved by the Class A Members. If a Manager is a party to an Employment Agreement with the Company, the employment agreement (and not this Agreement) shall govern with respect to compensation. The Company shall reimburse the Managers for all reasonable expenses incurred by the Managers in connection with and arising out of the performance of their duties and responsibilities, consistent with the Company's

17

reasonable and customary business practices and provided that such expenses are supported by adequate documentation.

## ARTICLE V
## CAPITAL CONTRIBUTIONS; ADDITIONAL FINANCING; CAPITAL ACCOUNTS

5.1     Initial Capital Contributions. The Members confirm that as their initial Capital Contributions they have contributed, or will contribute upon execution of this Agreement, cash or services in exchange for their respective Membership Interests in the Company, as described in Exhibit A attached hereto.

5.2     Additional Capital Contributions. Other than the Member's initial Capital Contributions set forth on Exhibit A, no Member may make any further Capital Contributions to the Company without Super Majority approval.

5.3     Maintenance of Capital Accounts.  The Company shall establish and maintain for each Member a separate capital account (a "Capital Account") on its books and records in accordance with this Section 5.3. Each Member's Capital Account shall be increased by the amount of: (a) such Member's Capital Contributions, including such Member's initial Capital Contribution; and (b) any Profits or other item of income or gain allocated to such Member pursuant to Article VI; and (c) any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member. Each Member's Capital Account shall be decreased by: (x) the cash amount or Book Value of any property distributed by the Company to such Member; and (y) the amount of any Losses or other item of loss or deduction allocated to such Member pursuant to Article VI; and (z) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

5.4     No Interest on Capital Contributions.  Except as otherwise provided in this Agreement, Members shall not be paid interest on their Capital Contributions.

5.5     No Withdrawal of Capital Contributions.  Except as otherwise provided in this Agreement, Members shall not be entitled to withdraw any part of their Capital Contributions until the full and complete winding-up and liquidation of the business and affairs of the Company.

5.6     Loans by Members. The Members may, but shall not be required to, make any loans to the Company, upon such terms and conditions as determined by a Super Majority ("Member Loans"). Any Member Loans shall be evidenced by separate promissory notes specifying the terms and conditions of such loans. If required by the Manager at the time of making the Member Loan or at any time thereafter, Member Loans shall be subordinated to any other secured arm's-length indebtedness of the Company or its subsidiaries.

7742056-9

5.7    No Third Party Beneficiaries. The obligations of the Members under this Article V are not intended to create any obligation to, or be enforceable by, any third party beneficiaries. No creditor may rely on any obligations hereunder unless the Member against whom the obligation is asserted and the Company has expressly agreed in writing that the creditor may do so.  The Members have not agreed to make any additional Capital Contributions or loans to the Company, except as expressly described in this Article V; provided that such agreements hereunder do not give rise to any commitment or any liability to any Person other than the Members and the Company.

5.8    Succession Upon Transfer. In the event that any Membership Interests are transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interests.

5.9    Negative Capital Accounts. In the event that any Member shall have a deficit balance in his, her or its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by applicable law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

ARTICLE VI
TAXATION: ALLOCATION OF PROFITS AND LOSSES

6.1    No State Law Partnership: Partnership Tax. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member(s), or a Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this Section 6.1.

6.2    Allocation of Profits and Losses. Profits or Losses of the Company for any taxable year thereof shall be allocated among the Members in a manner such that the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the distributions that would be made to such Member if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed to the Members immediately after making such allocations, in accordance with Section 7.1 (or, with respect to a Fiscal Year in which an actual liquidation occurs, in accordance with Section 7.1 and

19

Section 11.3), minus (b) such Member's share of "partnership minimum gain" (as determined pursuant to Treasury Regulations Sections 1.704-2(d) and 1.704-2(g)) and "partner nonrecourse debt minimum gain" (as determined pursuant to Treasury Regulations Sections 1.704-2(i)(3) and 1.704-2(i)(5)), computed immediately prior to the hypothetical sale of assets.  Notwithstanding the foregoing, the allocations attributable to the Class B will be based on Profits and Losses attributable to the Class B Entities only.

6.3    Special Allocations Rules.

(a)    Qualified Income Offset.  If any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6) which results in such Member having a deficit Capital Account balance, or otherwise has a deficit Capital Account balance, which exceeds the sum of (i) the amount of such deficit the Member is obligated to restore, and (ii) the amount of such deficit the Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), such Member will be specially allocated items of income and gain of the Company  in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit in such Member's Capital Account as quickly as possible; provided, that an allocation pursuant to this Section 6.3(a) shall be made if and only to the extent that such Member would have an Capital Account deficit after all other allocations provided in this Article IV have been tentatively made as if this Section 6.3(a) were not in the Agreement. This Section 6.3(a) is intended to constitute a "qualified income offset" as provided by Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.  Any special allocation made pursuant to this Section 6.3(a) shall be taken into account for purposes of determining subsequent allocations of income and losses, so that the total allocations will, to the extent possible, equal the allocations which would have been made if this Section 6.3(a) had not previously applied.

(b)    Minimum Gain Chargeback.  Except as otherwise set forth in Treasury Regulations Section 1.704-2(f), and notwithstanding any other provision of this Article IV, if, during any taxable year of the Company, there is a net decrease in "partnership minimum gain" (within the meaning of Treasury Regulations Section 1.704-2(d)), each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease in partnership minimum gain, as determined in accordance with Treasury Regulations Section 1.704-2(g).  The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 4.5(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(c)    Member Nonrecourse Debt Minimum Gain Chargeback.    Except as

20

otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, and notwithstanding any other provision of this Article IV, if there is a net decrease in "partner nonrecourse debt minimum gain" (within the meaning of Treasury Regulations Section 1.704-2(i)(3)) attributable to a "partner nonrecourse debt" (within the meaning of Treasury Regulations Section 1.704-2(b)(4)) during any Company taxable year, each Member who has a share of that partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt (as determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the year shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to that Member's share of the net decrease in the partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, as determined in accordance with Treasury Regulations Section 1.704-2(i)(4).  The items to be so allocated shall be determined in a manner that is consistent with the provisions of Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations.  This Section 4.4(c) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(d)     <u>Nonrecourse Deductions</u>.  Nonrecourse deductions (as such term is defined in Treasury Regulations Section 1.704-2(b)), if any, for any taxable year or other period shall be allocated among the Members in proportion to their respective Percentage Interests.

(e)     <u>Partner Nonrecourse Deductions</u>.  Any "partner nonrecourse deductions" (within the meaning of Treasury Regulations Section 1.704-2(i)) for any taxable year or other period shall be specially allocated to the Member who bears the "economic risk of loss" with respect to the partner nonrecourse debt (within the meaning of Treasury Regulations Section 1.704-2(b)(4)) to which such partner nonrecourse deductions are attributable, in accordance with Treasury Regulations Section 1.704-2(i).

(f)     <u>Code Section 704(c) Allocations</u>.  To the extent required under Code Section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take into account the difference, if any, between the tax basis of the property to the Company and its Book Value at the time of contribution to the Company. If the Book Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f), subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(g)     <u>Compliance with Treasury Regulations</u>.  It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the requirements set forth in the Treasury Regulations promulgated under Section 704(b) of the Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such manner as shall conform to the allocation rules and principles

7742056-9

set forth in such Treasury Regulations as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in light of such Treasury Regulations.

(h)     <u>Allocations in Respect of Transferred Membership Interests</u>. In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with this Agreement, Profits and Losses and other items of income, gain, loss and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

## ARTICLE VII
## DISTRIBUTIONS

7.1     <u>Available Net Cash Flow</u>. Except as provided in Sections 7.2, 7.3, and 11.3, if the Mangers determine (as a Major Decision) to make Distributions, the Managers shall make Distributions periodically as they determine, acting reasonably. Distributions for Class A Members will be based on Class A Net Distributable Cash, and Distributions for Class B Members will be based on Class B Net Distributable Cash. If made, Distributions shall be made to the Members at the addresses specified on the signature pages of this Agreement or such other address contained in a written notice from a Member to the Company.  If made, Distributions shall be made to Class A Members (based on Class A Net Distributable Cash) and to Class B Members (based on Class B Net Distributable Cash), respectively, each Pro Rata. To the extent any Member has an outstanding Member Loan, Distributions will be applied by the recipient Member first to pay interest and then to reduce principal on such Member Loan, and the Company will account for amounts so credited as deductible to the extent permissible under the Code. The Class A Net Distributable Cash will be distributed 100% to the Class A Members, Pro Rata, and the Class B Net Distributable Cash will be distributed 100% to the Class B Members, Pro Rata.

7.2     <u>Limitation</u>. Except in the case of liquidation of the Company, at the time of a Distribution of Class A Net Distributable Cash or Class B Net Distributable Cash, the Company must have available to it unencumbered cash funds sufficient for normal working capital and for amounts needed for a reasonable reserve for the continuing conduct of the business of the Company and the Controlled Entities. In addition, the Distribution may not impair the capital of the Company as described in Section 605.0408 of the Act (or of any Controlled Entity).

7.3     <u>Capital Proceeds</u>. If Capital Proceeds are received by the Company (except in the case of a liquidation of all assets of the Company, in which case the provisions of Section 12.3 shall be applicable), the Capital Proceeds shall be distributed in the same order of priority as Class A Net Distributable Cash or Class B Net Distributable Cash; it being understood and agreed that the Class B Members will be entitled to Capital Proceeds deriving from the Class B Entities only.

7.4     <u>Minimum Distribution for Taxes</u>. To the extent permitted under the Company's loan covenants and to the extent of Available Net Cash Flow, and subject to the Manager's determination to make a Distribution, the Company will distribute to the Members with respect

22

to each fiscal quarter an amount of cash (a "Minimum Tax Distribution") which in the good faith judgment of the Managers equals (a) the aggregate amount of Profits allocable to the Members in respect of such fiscal quarter (net of taxable Losses allocated to the Members in respect of prior fiscal quarters and not previously taken into account under this clause), multiplied by (b) 40% (or such other rate determined by the Managers to be the maximum combined federal, state and local aggregate income or other tax rate applicable to the individual direct or indirect owner of the Member with the highest such tax rate), with such Minimum Tax Distribution to be made to the Members in the same proportions that Profits was allocated to the Members during such fiscal quarter (net of taxable Losses allocated to the Member in respect of prior fiscal quarters and not previously taken into account under this clause).  To the extent the Company does not make the full amount of a Minimum Tax Distribution with respect to a fiscal quarter, the shortfall shall be added to all subsequent fiscal quarters until it is paid in full. Minimum Tax Distributions shall be treated for purposes of this Agreement as advances on distributions and shall be offset against distributions pursuant to Section 7.1 in such a manner that each Member has received an amount of distributions (taking into account all distributions, including Minimum Tax Distributions) equal to the distributions that such Member would have received in the absence of this Section 7.2.

7.5    Distribution of Assets in Kind. If assets of the Company are distributed in kind, they shall be distributed to the Members as tenants-in-common in the same proportions in which the Members would have been entitled to cash distributions had there been a sale of these assets.

7.6    Demand for Distribution. No Member shall be entitled to demand and receive a distribution of Company property in return for such Member's Capital Contributions to the Company.

7.7    Transferees. A non-Member transferee shall be entitled to the distributions attributed to the Member providing the non-Member Transfer to the Transferee; provided that a Transferee shall have no voting rights or other rights attributable to the Member who made the Transfer to the non-Member.

ARTICLE VIII
RESTRICTIVE COVENANTS

8.1    Member and Affiliate Business Dealings.

(a)    Each Member understands and acknowledges that the conduct of the business of the Company or a Controlled Entity may involve business dealings with other separate businesses or interests of a Member or Persons affiliated with a Member (as generally understood under Florida law, "Affiliates"); provided that Persons with whom the Company engages in business may be Affiliates one or more Member(s), but not necessarily all Members. Such separate dealings may include the Company's or a Controlled Entity's entering into contracts with such other businesses or interests.  For purposes of this Article VIII, references to the Company shall be deemed to include each Controlled Entity.

(b)    The creation of the Company, and the admission of each Member as a

23

Member, and the assumption by each of the Members of their respective duties hereunder shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain such other businesses and interests and to receive and enjoy profits or compensation therefrom, and without prejudice to the Company's right to enter into contracts with such other businesses or interests. Accordingly, each Member waives any rights he or she might otherwise have to share or participate in such other businesses or interests of the other Members or their respective Affiliates; provided, however, that (i) each Member shall give notice to the other Members of his or her (or an Affiliates') interest in any contract or business dealing which the Member or an Affiliate proposes to enter into with the Company; (ii) the contract or business dealing is not manifestly unreasonable to the Company; and (iii) the business dealing or contract with the Company is approved in advance by the Managers.

8.2    Business Opportunities with Third-Persons.  Subject in all cases to the provisions of Section 8.1 above, each Member agrees that any and all business opportunities that involve, relate to or are in any manner associated with the business of the Company anywhere in the United States ("Business Opportunities") shall be first offered to the Company. Each Member desiring to pursue any Business Opportunities shall provide written notice ("Notice of Business Opportunities") to the other Members. The Notice of Business Opportunities shall contain a detailed description of the Business Opportunities proposed for the Company (or a Controlled Entity). The Company shall have the right of first refusal to pursue any such Business Opportunities. Such right of refusal shall be exercised by the Class A Members, acting unanimously, by providing written notice within thirty (30) days following receipt of the Notice of Business Opportunities. If the Class A Members rejects any such Business Opportunity (or fail to exercise, on a timely basis, the Company's right of first refusal), then such Business Opportunities may be acted upon by the Member(s) who proposed the Business Opportunities presented to but not acted upon by the Company, or the rejecting Class A Member may declare that the Class A Members are in Deadlock.

8.3    Non-Compete; Non-Solicitation.

(a)    Each Member acknowledges and recognizes that the highly competitive nature of the Company's business and that the goodwill and patronage of the Company's customers constitute a substantial asset of the Company, having been acquired through considerable time, effort and money.  Accordingly, each Member agrees that, for a period of 12 months following the date (if any) that such person is no longer a Member, he shall not, without the written consent of the Company, directly or indirectly, either individually or as an employee, agent, partner, member, shareholder, venturer, consultant, option holder, guarantor or in any other capacity other than as a lender of money or passive investor of less than 5% of the equity, participate in, engage in or have an active financial interest or management position in any business, firm, company, person or entity if it competes with the material business operations conducted by the Company or its subsidiaries or affiliates or any successor or assign thereof, nor will he solicit any other person to engage in any of the foregoing activities, in each case within any geographic location(s) in which the Company or its subsidiaries conducts material business operations or in which the Company is then actively pursuing business opportunities. For purposes of this Section 8.3, a "subsidiary" is any entity in which the Company or owns, directly or indirectly, more than a 25% equity interest. The Members acknowledge that the scope of this

24

restriction is reasonable, appropriate and necessary to protect the Company's legitimate business interests. The foregoing provisions of this Section shall not prohibit any Member to own (as the result of open market purchase) 5% or less of any class of capital stock of a company which is regularly traded on a national securities exchange or over-the-counter on the NASDAQ System. As to the Class B Members, the non-compete provisions set forth in the respective employment agreements for each Class B Member shall govern and control over this subsection.

(b)     For a period of two years following the date (if any) that a Member is no longer a Member, such Person agrees not to solicit (directly or indirectly) or assist or encourage the solicitation of any other Member, or any officer or employee of the Company or any of its subsidiaries to work for any competing business, firm, company, person or entity in which the former Member, directly or indirectly, in any capacity described in subsection (a) above, participates or engages (or expects to participate or engage) or has (or expects to have) a financial interest or management position. As to the Class B Members, the non-solicitation provisions set forth in the respective employment agreements for each Class B Member shall govern and control over this subsection.

(c)     For a period of two years following the date (if any) that a Member is no longer a Member, such Person agrees not to compete with the Company by soliciting (directly or indirectly), inducing or influencing any of the customers of the Company or any subsidiary to discontinue or reduce the extent of such relationship with the Company, or commence or expand any such relationship with any competitor of the Company.

(d)     If any of the covenants contained in this Section 8.3 are held by a court of competent jurisdiction to be unenforceable because of the duration or scope of such provision, the activity limited by or the subject of such provision and/or the time-period or area covered thereby, then the court making such determination shall construe such restriction so as to thereafter be limited or reduced to be enforceable to the greatest extent permissible by applicable law.

8.4     Confidential Information. Each Member agrees that he or she shall not, without the prior written consent of the other Member, divulge, furnish or make accessible to any Person, firm or other business entity, any information, trade secrets, technical data or know-how relating to the business, business practices, methods, products, processes, equipment, clients' prices, lists of customers or marketing agents of the Company, or other confidential or secret aspect of the business of the Company and/or any subsidiary (as defined above), except as may be required in good faith in the course of his or her employment with and service to the Company as a Member and/or Manager or officer, or as may be required by law (and then, only with as much prior notice to the Company as is practicable), unless such information shall become public knowledge or becomes available from independent sources, in each case other than by reason of a Member's breach of the provisions hereof.

8.5     Equitable Remedies. In consideration of this Agreement, each Member acknowledges that the Company will suffer irreparable damage if any provisions of Sections 8.1, 8.2, 8.3 or 8.4 hereof are not performed strictly in accordance with their terms or are otherwise breached. Each Member hereby expressly agrees that the Company and each other Member shall

7742056-9

be entitled as a matter of right to injunctive or other equitable relief, in addition to all other remedies permitted by law, to prevent a breach or violation by a Member and to secure enforcement of the provisions of Sections 8.1, 8.2, 8.3 and 8.4 hereof.  The Company's or a Member's resort to such equitable relief, however, shall not constitute a waiver or any other rights or remedies that the Company or any Member may have.

8.5     Indemnification.  The Company shall defend, indemnify and hold harmless the Members, the Managers and any Officers of the Company, to the fullest extent permitted under the Act, from and against any and all liability, loss, expense or damage (including reasonable attorney's fees and disbursements) incurred or sustained by them in the course of the conduct of the business of the Company and arising out of any act or omission to act occurring in good faith and within the scope of the authority, if any, conferred by this Agreement upon them.

ARTICLE IX<br>TRANSFER OF MEMBERSHIP INTERESTS

9.1     General Restriction on Transfers.  Except as otherwise set forth in this Agreement, Interests (or any portion thereof) may not be the subject of a Transfer, directly or indirectly, voluntarily or involuntarily, without the Class A Members' unanimous consent. If each Class A Member does not approve of the proposed Transfer, the Transferee shall have no right to participate in the management or conduct of the Company's activities and affairs or to become a Member thereof (or exercise any rights or powers of a Member including, without limitation, any voting rights), and absent such written consent, the Transferee shall only be a "transferee" within the meaning of the Act and shall be entitled to receive only distributions to which the transferor Member otherwise would be entitled. A Transfer of the ownership interests of a Member or Transferee that is an entity shall be considered a Transfer of an Interest in the Company for this purpose.

9.2     Unauthorized Transfer.  Any Transfer of Interests in violation of this Agreement shall be deemed invalid, null and void, and of no force and effect, and neither the Company nor any Member shall have any obligation to recognize any such unauthorized Transfer. Except as expressly provided in this Article IX, no Transferee of all or any portion of an Interest shall have the right to become a substituted Member in place of his transferor, unless: (a) Unanimous Consent to such substitution shall have been obtained; and (b) the approved Transferee shall have executed a Joinder (as defined in Section 9.12 to this Agreement) evidencing such Transferee's agreement to be bound by the terms and conditions herein.

9.3     Issuance of Additional Interests. The Company shall not issue any additional Interests, including to any existing Member, without Unanimous Consent.

9.4     Admission of New Members. Except as expressly provided in this Article IX, no Person shall be admitted to the Company as a new Member unless (a) Unanimous Consent is first given; and (b) the Person shall have executed a Joinder evidencing the intention and agreement of the new Member to be bound by the terms and conditions herein. The applicable terms and conditions of such admission, including, without limitation, the consideration payable by the new Member and the Interest to be acquired by the new Member, shall be determined by

26

the Initial Members.

9.5     <u>Withdrawal or Dissociation of Members</u>. No Member shall have the power or right to voluntarily withdraw or dissociate from the Company prior to the dissolution and winding up of the Company and any such withdrawal or dissociation or attempted withdrawal or dissociation by a Member prior to the dissolution and winding up of the Company shall be null and void.

9.6     <u>Effectiveness of Transfer</u>.

(a)     If Unanimous Consent is given to a Transfer of Interests, the Transfer by a Member or a transferee of all or any part of such Member's Membership Interest shall become effective on the first day of the month following receipt by the Company of evidence of the Transfer in form and substance reasonably satisfactory to the Company and a Transfer fee sufficient to cover all reasonable expenses of the Company connected with the Transfer.

(b)     No Transfer that violates this Article 9 shall be valid or effective, and the Company shall not recognize the purported Transfer for the purposes of allocating net profits and losses in accordance with Article 6 or making distributions in accordance with Article 7. The Company may enforce the provisions of this Article 9 directly or indirectly or through its agents by entering an appropriate stop transfer order on its books or otherwise refusing to register or transfer or permit the registration or transfer on its books of any proposed Transfers not made in full compliance with this Article 9.

(c)     The Company shall, from the time, whenever a Membership Interest is registered in the name of the transferee on the Company's books in accordance with the above provisions, pay to the transferee all further distributions or other compensation by way of income or return of capital, on account of the Membership Interest transferred. Until the Transfer is registered on the Company's books, the Company may proceed as if no Transfer had occurred.

9.7     <u>Bona Fide Third-Party Offers</u>.

(a)     <u>Bona Fide Offer; Notice</u>. If a Member ("<u>Selling Member</u>") receives a *bona fide* written offer ("<u>Offer</u>") from any third party ("<u>Offeror</u>") to purchase all or any portion of the Selling Member's Interests which the Selling Member desires to accept ("<u>Proposed Sale</u>"), the Selling Member shall be obligated to give written notice of the Proposed Sale ("<u>Notice of Proposed Sale</u>") to the Company and to the other Members ("<u>Other Members</u>") within five (5) business days of receipt of such Offer. The Notice of Proposed Sale shall set forth the particulars of the Offer including: (i) the name and address of the Offeror, and information concerning the Offeror's background, reputation and creditworthiness; (ii) the Interest classification and Percentage Interests that the Offeror desires to purchase and the Selling Member desires to sell ("<u>Offered Interests</u>"); (iii) the price, terms and conditions of the proposed sale of the Offered Interests; and (iv) reasonable evidence that the Offer is a *bona fide* offer and that the Offeror has the present and projected ability to pay the price pursuant to the Offer. The Selling Member shall also provide the Company and the Other Members with a copy of the Offer.

27

(b)      Right of First Refusal. The Other Members shall have the first right and option to purchase all of the Offered Interests (proportionate to each Other Members' Percentage Interests), or at their election, all of the Selling Member's Interests (if the Offered Interests are less than 100% of the Selling Member's Interests), at the same price per Percentage Interest and on the same terms and conditions as set forth in the Notice of Proposed Sale. This first right and option shall be exercisable by the Other Members by written notice to the Selling Member and Offeror within thirty (30) days following the Other Members' receipt of the Notice of Proposed Sale ("Option Period").

(c)      Drag-Along Right. If the Offered Interests comprise all of the Selling Member's Interests, and the Other Members do not elect to purchase the Offered Interests during the Option Period, and the Offeror's purchase price is greater than the difference between the Other Members' Capital Contributions less the aggregate distributions previously made to the Other Members, then, the Selling Member shall have the right, by giving written notice to the Other Member within five business days after the end of the Option Period, to require that the Other Members sell all of the Interests then owned by the Other Members to the Offeror, at the same price per Percentage Interest and on substantially the same terms and conditions as set forth in the Notice of Proposed Sale ("Drag-along Sale"); provided, however, that the Other Members shall not be required to participate in a Drag-along Sale if the consideration for the Drag-along Sale is other than cash or registered securities listed on an established U.S. or foreign securities exchange or traded on the NASDAQ Stock Market or foreign established over-the-counter trading system.

(d)      Tag-Along Right. If the Offered Interests comprise all of the Selling Member's Interests, and if the Other Members do not elect to purchase the Offered Interests during the Option Period, then, the Other Members shall have the right, by giving written notice to the Selling Members and to the Offeror within five business days after the end of the Option Period, to require that the Offeror purchase all of the Interests of the Company, including the Other Members' Interests, at the same price per Percentage Interest and on substantially the same terms and conditions as set forth in the Notice of Proposed Sale ("Tag-along Sale").

(e)      Drag-along or Tag-along Provisions. Each Member shall take all actions as may be reasonably necessary to consummate a Drag-along Sale or Tag-along Sale. The Members shall make or provide the same (or comparable, as tailored to each Member) representations, warranties, covenants and indemnities; provided that representations, warranties, covenants and indemnities will (unless otherwise agreed by the Members) be made or given by the Members severally and not jointly.  Transactional fees and expenses will be shared equally.

(f)      Consummation of Proposed Sale to Offeror. If the Other Members do not elect to purchase Offered Interests, or to require a Drag-along Sale or a Tag-along Sale, the Selling Member shall be allowed to sell the Offered Interests, but only to the Offeror and only at the same price and upon the same terms and conditions as set forth in the Notice of Proposed Sale; provided, however, that such sale is completed within six (6) months from the expiration of the Option Period and the Offeror complies with the transfer and Joinder provisions hereof. If the Offered Interests are not transferred to the Offeror within six (6) months from the expiration of the Option Period, and if the third-party offer is still in effect, the Selling Member shall be

7742056-9

required to renotify the Other Members in the manner provided for in this Section, in which case the Other Members will have the same options, renewed, as set forth in this Section.

9.8    Involuntary Transfers: Option Rights. If (a) a petition in bankruptcy is filed by or against a Member, or if a Member admits in writing his or her inability to pay debts as they become due, or if a Member makes an assignment for the benefit of its creditors; or (b) a creditor seeks to levy or attach Interests owned by a Member then, in each such instance (each, a "First Refusal Event"), the other Members shall have the first right and option ("First Right") to purchase all (or any portion) of the Interests owned by the Member whose Interests are affected by the First Refusal Event, for a purchase price equal to equal to (i) the fair market value of the affected Member's Interest in the Company, as determined by agreement among all Members or, absent such agreement, by an independent valuation firm as of the date of the First Refusal Event ("FMV"), less (ii) any damages or indebtedness owing by the affected Member to the Company or the other Member(s) pursuant to this Agreement (the "Net FMV Price"). The First Right shall be exercisable by the other Members by written notice to the affected Member within thirty (30) days following the date the other Members first become aware of the First Refusal Event. The failure of the other Members to exercise First Rights, or their failure to purchase Interests pursuant thereto, will not alter or waive the prohibitions against Involuntary Transfers otherwise provided for herein. The Class B Members acknowledge that FMV for Class B Interests are and will be affected by the non-voting and minority percentage attributes of Class B Interests.

9.9    Capital Transaction. If the Company receives a *bona fide* offer from a third party offeror to purchase the Company applicable (a "Capital Transaction Offer"), the Company will provide a Notice of Proposed Sale to the Members, similar to that described in Section 9.7 (a). The Members will meet within 10 Business Days to authorize or reject the Capital Transaction Offer.

(a)    If the Managers recommends approval and one Class A Member but not both approve the recommended sale, then, a Deadlock will be deemed to have arisen on account of the rejected Capital Transaction Offer. In such event, the Class A Member approving the Capital Transaction Offer ("Approving Member") shall have an irrevocable "call" option to purchase the Interests of the Class A Member rejecting the Capital Transaction ("Rejecting Member"), for a Net FMV Price as defined in Section 9.8, calculated based on the Rejecting Member's percentage Interest (expressed as a fraction) multiplied by the Net FMV Price (net of reasonable and customary closing costs attributable to a seller).

(b)    Alternatively, if the Rejecting Member elects, such Member may purchase the Approving Members' Interests for Net FMV price determined in the same manner as described above; provided that the Rejecting Member electing to acquire such Interests must post a cash deposit within three Business Days of its rejection of the Capital Transaction Offer, and close and pay the purchase price in full to the Approving Member on a Business Day which is not more than ten calendar days after the Member vote rejecting the Capital Transaction Offer. If the Rejecting Member fail to timely close, its "call" right with respect to the Approving Member's Interests will lapse and be null and void, the Approving Member may consummate the call right as provided in subsection (a) above, and the Rejecting Members will reasonably cooperate in consummating such sale.

7742056-9

(c)      Under the circumstances described in this Section 9.9, an Approving Member may elect to consummate the Capital Transaction Offer, and use the sale proceeds to pay the Net FMV Price to the Rejecting Member at the closing. Subject to its right to receive the Net FMV Price at such closing in immediately available funds, the Rejecting Member hereby authorizes the Manager and the Approving Member to consummate the sale represented by the Capital Transaction Offer that the Approving Member approved, and the Rejecting Member hereby agrees to execute and deliver closing certificates and authorizations consistent with this section; it being acknowledged and agreed that this section will be self-effectuating and that the Manager is authorized to refer to this section as evidence of the Rejecting Member's authorization and written consent to any such sale, without the need for further action or documentation.

9.10    Offset of Purchase Price by Indebtedness Owed to Purchaser. The purchase price for any Interests otherwise payable in connection with a Transfer under this Agreement shall be reduced, on a dollar-for-dollar basis (but not below zero), by the amount of any actual outstanding indebtedness, if any, owed by the Member selling Interests (or his Permitted Transferee or estate) to the Company or to the other Member or to the third-party purchaser. Said indebtedness shall be deemed paid to the extent of such reduction applied against the indebtedness.

9.11    Tax Disclosure.  Each Member acknowledges that a Transfer may have federal and state income tax consequences to each Member and to the Company, and that each Member has been advised to obtain their own independent tax counsel. If a Transfer occurs, the Members will cooperate in filing appropriate documentation to terminate the tax year of the Company as of the closing date, and the Company's taxable items for the year in which the closing occurs shall be allocated among the Members in accordance with the number of days in the year preceding and following the closing date. Upon consummation of any Transfer, the remaining Members will be responsible to account for and pay any income or capital gains taxes of the Company following closing.

9.12      Joinder.  If (a) any Member shall Transfer Interests in compliance with the provisions of this Agreement to any person or entity who is not then a Member and a signatory either to this Agreement or a Joinder to this Agreement, or (b) the Company shall issue any additional Interests or any other security, option, warrant or right to acquire any such Interests to any person or entity who is not then a Member and a signatory to either this Agreement or a Joinder to this Agreement, then, in either such instance and as a material condition precedent to the Transfer of Interests or issuance of securities, the person or entity to whom Interests or other securities are to be transferred or issued shall agree in writing (for and on behalf of such person or entity and his, her or its legal or personal representatives, heirs, transferees, successors and assigns), to be bound by all of the provisions of this Agreement as a party hereto by executing and delivering to the Company and all Members a Joinder to Operating Agreement in form and substance acceptable to the Company and each existing Member ("Joinder"). The failure or refusal of any such person or entity so acquiring securities of the Company to execute and

30

deliver to the Company such a Joinder shall not limit the applicability of this Agreement to such person or entity and the securities transferred or issued or purported to be transferred or issued.

9.13    <u>Right to Partition</u>. No Member shall have the right to partition any assets of the Company or any interest therein, nor shall a Member make application or institute proceedings for a partition thereof.

9.14    <u>Deadlock; "Shotgun" Buy-Sell Provisions</u>.

(a)    If Deadlock occurs and is not resolved by consensual agreement of the Class A Members within one year, and if a Class A Member is dissatisfied with the cause or resolution of the Deadlock, then, within thirty (30) days after the one-year anniversary of the Deadlock (the "<u>Shotgun Period</u>"), either Class A Member shall have the right to invoke the "shotgun" buy/sell provisions set forth in this Section (collectively, the "<u>Shotgun Provisions</u>").

(b)    To initiate the Shotgun Provisions, within the Shotgun Period the Class A Member invoking the Shotgun Provisions ("<u>Initiating Member</u>") shall deliver a written notice ("<u>Buy/Sell Offering Notice</u>") to the other Class A Member ("<u>Responding Member</u>"). For purposes of this Agreement, a "<u>Buy/Sell Offering Notice</u>" shall mean a written notice, executed and delivered by the Initiating Member to the Responding Member that constitutes an irrevocable offer by the Initiating Member either to (A) purchase all, but not less than all, of the Interests owned by the Responding Member and its Permitted Transferees for a net purchase price offered by the Initiating Member ("<u>Stipulated Price</u>"), or (B) at the option of the Responding Member, sell to the Responding Member all, but not less than all, of the Interests owned by the Initiating Member and its Permitted Transferees for the Stipulated Price, in either case, in accordance with the Shotgun Provisions.

(c)    Simultaneously with the delivery of a Buy/Sell Offering Notice, the Initiating Member shall execute and deliver an earnest money deposit in the amount of $50,000 ("<u>Buy/Sell Deposit</u>") into escrow to be held by the Company's legal counsel or other Florida counsel selected by the Initiating Member. The Buy/Sell Deposit shall be in the form of immediately available funds, in escrow.

(d)    If simultaneously with delivering the Buy/Sell Offering Notice, the Initiating Member fails to post the required Buy/Sell Deposit in escrow, accompanied by written evidence of the escrow agreement with the selected escrow agent, then, the Responding Members may elect, at their option, either to treat the offer as null and void upon providing the Initiating Member with written notice of such election, or elect to deliver a Responsive Notice (as hereinafter defined) and either sell their Interests to the Initiating Member or purchase the Initiating Member's Interests, for the Stipulated Price.

(e)    A Buy/Sell Offering Notice shall be without qualification or condition other than the Shotgun Provisions set forth herein. No Buy/Sell Offering Notice or Responsive Notice may be rescinded or amended once given without the written consent of all Members. A Buy/Sell Offering Notice must indicate the time and date on which it is delivered to the Responding Members and the manner by which delivery is effectuated. Delivery must be

31

effectuated in the manner prescribed for notice in this Agreement.

(f)       In the event more than one Member delivers a Buy/Sell Offering Notice on the same date, then, the Buy/Sell Deposit delivered to the escrow agent first in time on such date shall be deemed to be the applicable Buy/Sell Offering Notice and such other Buy/Sell Offering Notice shall be ineffective and have no force or effect in any respect.

(g)       The Initiating Member's implementation of the Buy/Sell Provisions does not give rise to either a "put" or "call" right, but merely confers upon the Responding Members the option either to sell or purchase Interests.

(h)       Not later than twenty (20) Business Days following the date of receipt of the Buy/Sell Offering Notice (the "Buy/Sell Response Deadline Date"), the Responding Member shall deliver to the Initiating Member a written notice (the "Responsive Notice"), without qualification or condition other than the Shotgun Provisions set forth herein, irrevocably electing either to (i) sell its Interests to the Initiating Member for the Stipulated Price; or (ii) alternatively, at the election of the Responding Member, purchase the Initiating Member's Interests at the same price. The failure of the Responding Member to give a Responsive Notice (without qualification or condition) by the Buy/Sell Response Deadline Date shall be deemed notice of an election by the Responding Member to sell all its Interests to the Initiating Member. The date that the Responding Member gives notice of its election (or is deemed to have made an election by failing to respond) shall be the "Buy/Sell Election Date".

(i)       If the Responding Member elects to buy the Initiating Member's Interests, then, by no later than the Buy/Sell Election Date, the Responding Member will execute and deliver to the other Member a properly completed escrow agreement and post the required Buy/Sell Deposit. If the Responding Member fails to post the Escrow Deposit as provided above simultaneously with delivering the Responsive Notice pursuant to which Responding Member elects to be the buyer, then, the Initiating Member may elect, at its option, either to treat the Responsive Notice offer as null and void upon providing the Responding Member with written notice of such election, or elect to deliver its own Responsive Notice in accordance with the terms of subsection (h), and purchase the Responding Member's Interests for the Stipulated Price.

(j)       If the Shotgun Provisions are invoked, each Class A Member agrees to use commercially reasonable efforts to take or cause to be taken all actions, and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the closing on the offer, including entering into agreements and delivering certificates and instruments and procuring necessary waivers, consents, releases and approvals from governmental authorities, lenders, limited partners and other Persons whose consent, authorization or release is required in order to consummate a sale transaction.

(k)       The closing on the sale pursuant to the Shotgun Provisions shall occur within thirty days of the Buy/Sell Election Date; time being of the essence. The Stipulated Price will be paid in immediately available funds at the closing, and the selling Member(s) shall, and

32

shall cause his Permitted Transferees to, deliver to the buying Member(s) the certificate or certificates representing the seller's Interests, accompanied by transfer powers and assignments.

(l)      While the Shotgun Provisions are in effect and pending closing, the Members shall conduct the Company's business, operations and financial affairs in the ordinary course and consistent with the prior practices in accordance with this Agreement.

## ARTICLE X
## BOOKS OF ACCOUNT, FINANCIAL REPORTS, RECORDS, FISCAL YEAR, BANKING AND ACCOUNTING DECISIONS

10.1    Books of Account. The Company shall keep adequate books and records of the Company wherein shall be recorded and reflected all of the Capital Contributions of the Members to the Company and all of the income, expenses and transactions of the Company. The books and records shall be kept at the principal place and business of the Company, and each Member and such Member's authorized representative shall have, at reasonable times during normal business hours, free access to and the right to inspect and, at such Member's expense, copy such books and records of the Company, including a list of the names and addresses and interests owned of each of the Members.

10.2    Bank Accounts, Funds and Assets. The funds of the Company shall be deposited in such bank or banks as shall be deemed appropriate by the Manager. Such funds shall be withdrawn only by such authorized persons as may be designated by the Manager.

10.3    Tax Returns and Reports. Appropriate tax returns and reports for the Company shall be prepared and timely filed with the proper authorities. The Company shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, all reports, required to be filed with such entities under then current applicable laws, rules and regulations. Any Member shall be provided with a copy of any such report upon request without expense to the Member.

10.4    Reports and Financial Statements. The Company shall provide the reports and financial statements to the Members as determined by the Managers.

10.5    Fiscal Year. Unless otherwise determined pursuant to the Code, the fiscal year of the Company for both reporting and federal income tax purposes shall begin with the 1st day of January and end on the 31st day of December in each calendar year.

## ARTICLE XI
## DISSOLUTION AND TERMINATION

11.1    Dissolution of Company. The term of the Company shall begin on the Effective Date and shall be dissolved and its business shall terminate upon the earliest occurrence of any of the following events:

(a)      delivery to the Managers of a written agreement in which each Class A Member

or a Super Majority approve of the dissolution of the Company;

(b)    the sale, exchange, forfeiture or other disposition of all or substantially all the properties of the Company, unless the Class A Members or a Super Majority agree otherwise; or

(c)    any event described in Section 605.0701 of the Act (or successor provision of the Act) for a limited liability company with perpetual life.

The Company shall continue to exist after the happening of any of the foregoing events solely for the purpose of winding up its affairs in accordance with the Act.

11.2    <u>Procedure on Liquidation</u>. Unless the business of the Company is continued pursuant to the provisions of this Agreement, upon the dissolution of the Company, the person or persons required by law to wind up the Company's affairs shall liquidate the assets of the Company and apply the proceeds of liquidation in the order of priority provided in Section 11.3 for the fiscal year of liquidation. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of its liabilities to minimize losses that might otherwise occur in connection with the liquidation. The Company shall follow the procedures contained in the Act in connection with the liquidation of the Company. Upon liquidation and winding up of the Company, unsold Company property shall be valued to determine the gain or loss that would have resulted if the property were sold. Upon completion of the liquidation of the Company and distribution of the proceeds, the person supervising the liquidation shall file certificate of dissolution with the Secretary of State.

11.3    <u>Liquidation Proceeds</u>. The proceeds from the liquidation of the assets of the Company (including any proceeds from the collection of the receivables of the Company) and the assets distributed in kind shall be distributed in the following order of priority:

(a)    first, to the payment of debts and liabilities of the Company which are due and owing (including Member Loans), except that expenses or debts that may be deferred in accordance with an agreement providing for deferral may be deferred to the extent that the Company expects to receive proceeds that can be used to satisfy the expenses and debts;

(b)    second, to the setting up and disbursement of reserves for payment of contingent liabilities or obligations of the Company, and, at the expiration of the reserve period, the balance of the reserves, if any, shall be distributed as liquidating proceeds received at the end of the reserve period; and

(c)    third, to the Members, Pro Rata; provided that the liquidating proceeds attributable to the Class B Members shall be limited to such proceeds (or Capital Proceeds) deriving from the dissolution, liquidation and wind-up of any or all Class B Entities only (and no other Controlled Entities or the Company itself).

All distributions pursuant to clause (c) shall be made no later than the end of the Company's fiscal year during which the liquidation of the Company occurs (or, if later, within 90 days after the date of the liquidation.)  With respect to the Class B Members, liquidation proceeds may be

34

subject to employment tax withholding, if required by the Code.

## ARTICLE XII
## INDEMNIFICATION OF MEMBERS

12.1. <u>Right to Indemnification</u>. Each person (including the heirs, executors, administrators, and estate to each person) (1) who is or was a Member, (2) who is or was a Manager and/or officer of the Company, or (3) who is or was serving at the request of the Company in the position of a director, officer, trustee, partner, agent, or employee of another corporation, partnership, joint venture, trust or other enterprise and as to whom the Company has agreed to grant an indemnity hereunder, shall be indemnified by the Company as of right to the fullest extent permitted or authorized by the Act or future legislation or by current or future judicial or administrative decision (but, in the case of future legislation or decision, only to the extent that it permits the Company to provide broader indemnification rights than permitted prior to the legislation or decision), against all fines, liabilities, settlements, losses, damages, costs and expenses, including attorneys' fees, asserted against him or incurred by him in his capacity as a Member, Manager, officer, director, officer, trustee, partner, agent or employee, or arising out of his status as a Member, Manager, officer, director, officer, trustee, partner, agent or employee. The foregoing right of indemnification shall not be exclusive of other rights to which those seeking indemnification may be entitled. The Company may maintain insurance, at its expense, to protect itself and the indemnified persons against all fines, liabilities, costs and expenses, including attorneys' fees, whether or not the Company would have the legal power to indemnify him directly against such liability.

12.2. <u>Advances</u>. Costs, charges and expenses (including attorneys' fees) incurred by a person referred to in Section 12.1 of this Article in defending a civil or criminal suit, action or proceeding shall be paid by the Company in advance of the final disposition thereof upon receipt of an undertaking to repay all amounts advanced if it is ultimately determined that the person is not entitled to be indemnified by the Company as authorized by this Article and upon satisfaction of other conditions established from time to time by the Manager or as required by current or future legislation (but, with respect to future legislation, only to the extent that it provides conditions less burdensome than those previously provided).

## ARTICLE XIII
## INVESTMENT REPRESENTATIONS AND WARRANTIES

In addition to the representations contained in Section 1.7, each Member represents and warrants as follows:

13.1    Each Member has been furnished with all additional documents and information about the Company which the Member has requested and has had access to full and fair disclosure of all material information concerning the Company.

13.2    In determining to purchase an ownership interest in the Company, each Member has relied only on the foregoing information and the documents reviewed during such Member's due diligence investigation of the Company and (except as otherwise provided in any

35

subscription agreement between the Company and the Member) has not relied on any representations of the Company or its agents other than those contained in this Agreement.

13.3    Each Member is acquiring an ownership interest in the Company for the Member's own account and not on behalf of other persons and the Member is acquiring such interest for investment purposes only and not with a view to the resale or distribution thereof; the Member does not have any contract, agreement or arrangement with any person or entity to sell, transfer, or pledge to such person or entity such interest which the Member is acquiring and the Member does not have any present plan to enter into any such contract, agreement or arrangement.

13.4    Each Member recognizes that the information furnished by the Company or its agents does not constitute investment, accounting, legal or tax advice. Each Member is relying on such Member's own professional advisors for such advice.

13.5    Each Member has adequate means for providing for the Member's current needs and contingencies, has no need for liquidity in this investment and is able to stand a complete loss of the Member's investment.

13.6    Each Member has knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of investing in the Company.

## ARTICLE XIV
## MISCELLANEOUS

14.1    <u>Notices</u>. All notices, payments, demands and communications required or permitted to be given by this Agreement shall be in writing and shall be deemed to have been delivered and given for all purposes (a) if delivered personally to the party or to an officer of the party to whom the same is directed or (b) whether or not the same is actually received, if sent by registered or certified mail, postage and charges prepaid, addressed to the addresses set forth on the signature page of this Agreement or to such other address as the Member from time to time specifies by written notice to the Company. Any notice shall be deemed to have been given as of the date delivered if delivered personally, or three days after the date on which it was deposited in a regularly maintained receptacle for the deposit of. United States mail, addressed and sent as aforesaid. Any notice may be waived by the person entitled to receive the notice.

14.2    <u>Section Captions</u>. Section and other captions contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or <u>limit</u>, the scope, extent or intent of any part of this Agreement.

14.3    <u>Severability</u>. Every provision of this Agreement is intended to be severable. If any term or provision is illegal or invalid for any reason whatsoever, the illegality or invalidity shall not affect the validity of the remainder of this Agreement.

14.4    <u>Amendments</u>. The Members may amend this Agreement only by the approval of the Class A Members; provided that any amendment to, or modification of, this Agreement that

36

would create obligations or liabilities to be imposed on a Class B Member under this Agreement shall require the written approval of such Class B Member.

14.5    _Governing Law, Jurisdiction and Venue_. This Agreement and the rights of the Members shall be governed by and construed and enforced in accordance with the laws of the State of Florida, and the Act as now in effect or as amended in the future shall govern and supersede any provision of this Agreement which would otherwise be in violation of the Act. Exclusive venue for any dispute arising out of or related to this Agreement shall be the appropriate state court in Broward County, Florida or federal court for the Southern District of Florida and the parties hereto submit to the jurisdiction of such courts.

14.6    _Counterpart Execution_, This Agreement may be executed in any number of counterparts with the same effect as if all parties had signed the same document. All counterparts shall be construed together and shall constitute one Agreement.

14.7    _Parties in Interest_. Subject to the provisions contained in Article IX, every covenant, term, provision and agreement in this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties.

14.8    _Integrated Agreement_. This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter, and there are no agreements, understandings, restrictions, representations or warranties among the parties other than those set forth in this Agreement.

14.9    _Executory Agreement_. The parties agree that this Agreement constitutes an executory agreement with respect to all Membership Interests in the Company and shall be governed by 11 U.S.C. §365 in connection with the bankruptcy of the Company or of any Member because, among other provisions and obligations, this Agreement imposes on each Member the following affirmative duties (each of which constitutes a material unperformed, future obligation): (a) the duty and obligation not to transfer his, her or its Membership Interest in the Company except in accordance with Article 9; and (b) the duty and obligation not to bring any action for partition under Section 9.11. Accordingly, any trustee in bankruptcy with rights in and to any Membership Interest in the Company shall be required to comply with the terms of this Agreement and Florida law governing this Agreement, including, without limitation, the restrictions of the rights of a creditor of a Member or transferee.

14.10    _Number and Gender_. Where the context so indicates, the masculine shall include the feminine and neuter, the singular shall include the plural and "person" shall include a corporation and other entities.

14.11    _No Presumption_.  The fact that the first (or later) draft of this Agreement was prepared by counsel for either party shall create no presumptions and specifically shall not cause any ambiguities to be construed against the other party.

14.12    _Litigation_.  If any party hereto is required to engage in litigation against any other party hereto, either as plaintiff or as defendant, in order to enforce or defend any of its or

37

7742056-9

his rights under this Agreement, and such litigation results in a final judgment in favor of such party ("Prevailing Party"), then the party or parties against whom said final judgment is obtained shall reimburse the Prevailing Party for all direct, indirect or incidental expenses incurred by the Prevailing Party in so enforcing or defending its or his rights hereunder, including, but not limited to, all attorneys' fees and court costs and other expenses incurred throughout all negotiations, trials or appeals undertaken in order to enforce the Prevailing Party's rights hereunder.

14.13    Remedies.  Each party hereto recognizes and agrees that the violation of any term, provision or condition of this Agreement may cause irreparable damage to the other parties which may be difficult to ascertain, and that the award of any sum of damages may not be adequate relief to such parties.  Each party, therefore, agrees that, in addition to other remedies available in the event of a breach of this Agreement, any other party shall have a right to equitable relief, including, but not limited to, the remedy of specific performance.

14.14    No Third Party Rights.  None of the provisions contained in this Agreement shall be for the benefit of or enforceable by any third parties, including creditors of the Company.

14.15    Rights and Remedies Cumulative.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right not to use any or all other remedies.  Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

14.16    Waiver of Jury Trial.  EACH PARTY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

14.17    Attorneys' Representation.  The parties all acknowledge that Berger Singerman LLP has prepared this Agreement on behalf of and in the course of their representation of the Company, and that:

(a)    THE PARTIES HAVE BEEN ADVISED BY BERGER SINGERMAN LLP THAT THE INTEREST OF THE COMPANY REPRESENTED BY BERGER SINGERMAN LLP MAY BE ADVERSE TO THE INTEREST OF THE OTHER PARTIES;

(b)    THE PARTIES HAVE BEEN ADVISED BY BERGER SINGERMAN LLP TO SEEK THE ADVICE OF INDEPENDENT COUNSEL TO REPRESENT THEM IN CONNECTION WITH THE REVIEW AND NEGOTIATION OF THIS AGREEMENT; AND

(c)    THE PARTIES HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT COUNSEL.

38

IN WITNESS WHEREOF, this Second Amended and Restated Operating Agreement has been executed and made effective as of May 1, 2017.

CLASS A MEMBERS:

By: _____

Claudia Wechter

By: _____

Gary R. LoNfredo

CLASS B MEMBERS:

By: _____

Bryan Solomon

By: _____

Brett Feldman

6/22/2017

39

EXHIBIT A

The Membership Interest classifications and Percentage Interests of each Member as of the Effective Date of May 1, 2017 shall be as set forth below:

<u>CLASS A MEMBERS</u>:

| Name | Percentage Interest |
|------|---------------------|
| Claudia Wechter | 45% |
| Gary R. Loffredo | 45% |
| Total | 90% |

<u>CLASS B MEMBERS</u>

| | |
|------|------|
| Bryan Solomon | 2.5% |
| Brett Feldman | 2.5% |
| Issued by Reserved (in treasury, as of the Effective Date): | 5% |
| Total | 10% |

7742056-9

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

BRETT FELDMAN and BRYAN
SOLOMON,

CASE NO.: CACE22-013915

     Plaintiffs,

v.

CWGL HOLDINGS, LLC, CLAUDIA
WECHTER, and GARY LOFFREDO,

     Defendants.

_____/

## CWGL HOLDINGS, LLC's ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

Defendant CWGL HOLDINGS, LLC, through undersigned counsel and pursuant to the Florida Rules of Civil Procedure, files its Answer, Affirmative Defenses, and Counterclaim in response to Plaintiffs' Amended Complaint. For the pursposes of this pleading, all allegations not expressly admitted are denied.

### JURISDICTION AND VENUE

1.     Admitted that the Plaintiffs seek damages in excess of the jurisdictional limits of this Court; denied that the Plaintiffs are entitled to this amount or to any damages.

2.     Without knowledge and therefore denied.

3.     Without knowledge and therefore denied.

4.     Admitted.

5.     Admitted.

6.     Admitted.

7.     Admitted for venue purposes only; all inferences derived therefrom are denied.

8.     Denied.

## GENERAL ALLEGATIONS

9.     Denied as phrased.

10.    Denied as phrased.

11.    Admitted that the Solomon Agreement speaks for itself. All other allegations not admitted are denied.

12.    Admitted that the Solomon Agreement speaks for itself. All other allegations not admitted are denied.

13.    Admitted that the Feldman Agreement speaks for itself. All other allegations not admitted are denied.

14.    Admitted that the Feldman Agreement speaks for itself. All other allegations not admitted are denied.

15.    Admitted that the Agreements speak for themselves. All other allegations not admitted are denied.

16.    Admitted that the Second Amended Operating Agreement speaks for itself. All other allegations not admitted are denied.

17.    Admitted that the Second Amended Operating Agreement speaks for itself. All other allegations not admitted are denied.

18.    Denied.

19.    Denied.

20.    (a-c) Denied.

2

21.     (a-c) Denied.

22.     Denied.

23.     Denied.

24.     Admitted that the Agreements speak for themselves. All other allegations not admitted are denied.

## COUNT I – BREACH OF SOLOMON CONTRACT

25.     CWGL re-alleges its responses to paragraphs 1 through 24 of the Amended Complaint as if set forth herein.

26.     Admitted that the Solomon Agreement speaks for itself. All other allegations not admitted are denied.

27.     Denied.

28.     Denied.

29.     Denied.

30.     Denied.

## COUNT II – BREACH OF FELDMAN CONTRACT

31.     CWGL re-alleges its responses to paragraphs 1 through 24 of the Amended Complaint as if set forth herein.

32.     Admitted that the Feldman Agreement speaks for itself. All other allegations not admitted are denied.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

3

## COUNT III – BREACH OF FIDUCIARY DUTY

37.    CWGL re-alleges its responses to paragraphs 1 through 24 of the Amended Complaint as if set forth herein.

38.    It does not appear that this allegation or count is directed at this Defendant. To the extent a response is required, the allegations are denied.

39.    It does not appear that this allegation or count is directed at this Defendant. To the extent a response is required, the allegations are denied.

40.    (i-iv) It does not appear that this allegation or count is directed at this Defendant. To the extent a response is required, the allegations are denied.

41.    It does not appear that this allegation or count is directed at this Defendant. To the extent a response is required, the allegations are denied.

## AFFIRMATIVE DEFENSES

1.    Plaintiffs have failed to comply with the conditions precedent necessary to bring this Action.

2.    CWGL has complied with all of its contractual obligations due and owing under both the Agreements and Second Amended Operating Agreements.

3.    Plaintiffs committed wrongful acts or threats against CWGL, causing CWGL financial distress and lacking a reasonable course of action.

4.    Plaintiffs claims are barred, in whole or in party, by the doctrine of unclean hands.

5.    By virtue of their own conduct and statements, Plaintiffs are estopped from recovering for the claims alleged in Plaintiffs' Amended Complaint.

6.    Plaintiffs have waived any right to recovery from CWGL.

4

7.      Plaintiffs' claims are barred to the extent they have failed to mitigate damages.

Wherefore, Defendant CWGL HOLDINGS, LLC prays for the following relief:

1.      That judgment be entered against Plaintiffs and in favor of Defendants on all causes of action.

2.      That Plaintiffs take nothing by their Amended Complaint.

3.      That CWGL be awarded its attorney's fees and costs; and,

4.      All other relief equity and justice may require.

## COUNTERCLAIM

Counter-Plaintiff CWGL HOLDINGS, LLC, through undersigned counsel and pursuant to the Florida Rules of Civil Procedure, sues Counter-Defendants BRETT FELDMAN and BRYAN SOLOMON, and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for damages and permanent injunctive relief against Counter-Defendants being brought due to Counter-Defendants' violation of the non-competition, non-soliciation, and confidentiality covenants contained in Counter-Defendants' employment agreements.

2.      In addition, Counter-Defendants, minority owners of CWGL, have breached their fuduciary duties of care, loyalty, and good faith by establishing and operating rival businesses to CWGL.

## PARTIES

1.      Counter-Plaintiff CWGL HOLDINGS, LLC ("CWGL") is a Florida Limited Liability Company with its principal place of business in Fort Lauderdale, Broward County,

5

CASE NO.: CACE22-013915

Florida.

2.      Counter-Defendant BRETT FELDMAN ("Feldman") is an individual over the age of 18 residing in Palm Beach County, Florida.

3.      Counter-Defendant BRYAN SOLOMON ("Solomon") is an individual over the age of 18 residing in Palm Beach County, Florida.

## JURISDICTION AND VENUE

4.      This is an action for damages in excess of $30,000.00, exclusive of interest, attorneys' fees and costs, for certain legal and equitable claims, as more particularly alleged herein.

5.      Venue is proper in Broward County pursuant to Fla. Stat. § § 47.011 and 47.051 because Counter-Plaintiff's causes of action accrued in Broward County, Florida.

## FACTUAL ALLEGATIONS

### Pre-Suit Mediation Demand

6.      CWGL made written demand on Counter-Defendants on June 7, 2022 (more than three months before Plaintiffs filed their lawsuit) advising that they were in violation of their restrictive covenants and demanding that they engage in pre-suit mediation in accordance with the terms and conditions of their Employment Agreements. *See* Cease-and-Desist Letters and Mediation Demands, attached as Composite Exhibit "A."

7.      Counter-Defendants responded to the demands by filing the instant lawsuit.

8.      Accordingly, all conditions precedent to this filing of this action have been performed, complied with, have occurred, have been waived, or have otherwise been

6

excused, would be futile, or would result in irreparable injury in accordance with Fla. Stat.

§ § 607.07401 and 607.0742.

**CWGL Background and Counter-Defendants' Employment**

9.      CWGL is a Florida Limited Liability Company formed in 2014 that owns and

operates various businesses in the homecare industry. Included within its portfolio is a

durable-medical-equipment company (SN DME, LLC) and a home-health agency (Senior

Nannies).

10.     CWGL hired Solomon in 2012 as an account executive.

11.     CWGL hired Feldman in 2013 as an account executive.

12.     In May 2017, Counter-Defendants became Class B Members of CWGL,

with each owning 2.5% Membership Interests. *See* Second Amended and Restated

Operating Agreement, attached as Exhibit "B."

13.     In addition, Counter-Defendants became vice presidents of the company

and received five-year employment agreements. *See* Solomon Agreement, attached as

Exhibit "C" and Feldman Agreement, attached as Exhibit "D."

14.     Solomon's agreement became effective on May 1, 2017 and ran through

April 30, 2022. *See* Exhibit "C."

15.     Feldman's agreement became effective on May 1, 2017 and runs through

December 31, 2022. *See* Exhibit "D."

16.     Each agreement contained the following restrictive covenants:

**10. Restrictive Covenants**.

**(a) Proprietary and Confidential Information**. Employee hereby acknowledges that
as a result of his employment relationship with, Employee has been provided
access to, and has become familiar with, certain trade secrets and other

7

proprietary and confidential information of the Company and its Affiliates, including, without limitation, business and corporate strategies, business plans, product strategies, unique methodology and systems, product cost and pricing information, customer lists, vendor lists, lead lists, lead conversion, lead formation sales reports, operating plans, marketing strategies and plans, methods, financial information, contracts, agreements, computer programs, manuals, and any other confidential information pertaining to the financial condition, business affairs or business prospects of the Company or any Affiliates (collectively, the "**Confidential Trade Secret Information**"). The Confidential Trade Secret Information has great value to the Company and significantly affects the successful conduct of its Business and goodwill. Employee hereby further acknowledges that the Company has expended substantial time, money and effort to develop and maintain this Confidential Trade Secret Information and that the Company will continue to develop and maintain this Confidential Trade Secret Information in connection with the successful conduct of its Business. Accordingly, Employee shall not use, reveal, report, publish, copy, transcribe, transfer or otherwise disclose or make available to any person, corporation or other entity any of the Confidential Trade Secret Information, directly or indirectly, during the term of this Agreement or thereafter, except as required in the course of employment with the Company or as may be required by law. All Confidential Trade Secret Information relating to the Company's Business, whether prepared by Employee or otherwise, coming into Executive's possession, whether or not contributed or developed in whole or in part by Executive, shall remain the exclusive property of the Company and shall not be removed from the Company's premises under any circumstances without the prior written consent of the Board, and then, under restrictions as the Board may impose.

**(b) Non-Competition Agreement**. During Employee's employment with the Company during the Initial Term and, if Employee is terminated prior to the end of the Initial Term for cause or by Employee voluntarily, of his own volition, for one year after the end of the Initial Term ("**Non-Competition Period**"), Employee will not directly or indirectly own a majority interest in, operate, manage, consult with, control, participate in the management or control or be employed by, be associated with or maintain or continue any interest whatsoever in any person or entity engaged in business substantially similar to the Company's Business within the Counties in Florida within which Employee was, during his employment, actively working. This subsection will be null and void if Employee remains employed by the Company during the entire Initial Term, or if Employee is terminated by the Company during the Initial Term without cause.

**(c) Non-Solicitation of Customers and Accounts**. During Employee's employment with the Company and for one (1) year thereafter ("**Non-Solicitation Period**"), Employee will not directly or indirectly or in concert with others, call upon, solicit, service, or sell any of the services that comprise the Business to any customers of the Company or an affiliate, on Employee's own behalf; on behalf of a Company

8

CASE NO.: CACE22-013915

customer or on behalf of a competitor of the Company. This restriction shall apply to any customer of the Company or an affiliate that was a customer at any time during Employee's last two (2) years of employment with the Company as well as any prospective customer of the Company with whom Employee had any contact during Executive's last year of employment with the Company. "Solicit" shall mean to call upon, or lend any assistance in any way to, any person or entity for the purpose of encouraging, enticing, or persuading any person or entity to do business with any person or entity in competition with the Company. Solicitation shall also include a general or specific advertisement wherein Employee is advertising in any way the fact that Employee is engaged indirect or indirect competition with the Company. This prohibition expressly precludes Employee, during the Non-Solicitation Period, from conducting business similar to the Company's Business with any customer of the Company, even if the customer first contacts Executive.

**(d) Non-Interference With Other Executives or Representatives**. During Employee's employment with the Company and for two years thereafter ("**Non-Interference Period**"), Employee will not, either directly or indirectly or in concert with others, seek to influence any employees, agents or representatives of the Company to leave the Company. "Seek to influence" includes discussion with an employee, agent or representative, about the possibility of the employee, agent or representative leaving the Company, even when the issue of leaving the Company is first raised by the Company employee, agent or representative.

**(e) Return of Documents**. Employee acknowledges that all files, records, documents, notes, memoranda, costing and account information, and other similar items which Employee prepares, uses, or comes into contact with during Employee's employment with the Company, are and shall remain the sole and exclusive property of the Company, whether in hard copy or electronic format. Employee agrees not to remove from the Company's premises the original or any reproduction of any such information, nor the information contained therein, including any computers or software programs without the prior consent of the Company. All such material information and property in Employee's possession or control shall be immediately turned over to the Company at its corporate headquarters, currently located at 3313 West Commercial Boulevard, Fort Lauderdale, Florida.

**(f) Legitimate Business Interests**. Employee acknowledges that the restrictive covenants set forth in this Section 10, including the Non-competition Period, Non-Solicitation Period and Non-Interference Period ("Restrictive Covenants"), and the Restricted Areas, are reasonable in time and scope and are necessary to protect the legitimate business interests of the Company; including but not limited to, the protection of trade secrets and valuable confidential business information of the Company, and substantial relationships with specific prospective and existing customers of the Company, and goodwill associated with the Company, and the

9

extraordinary and specialized training that Employee will receive or has received from the Company.

**(g) <u>Right to Injunction</u>**. Employee agrees that any violation or breach of the Restrictive Covenants set forth in this Section 10 would cause irreparable harm to the Company and that such harm cannot be adequately compensated by money damages. Accordingly, any such violation or breach may be enjoined by any court of competent jurisdiction, without causing or affecting claims for damages incurred by the Company in connection with such violation or breach. In no event shall a delay by the Company of its right to seek immediate relief under this Agreement constitute a waiver of any rights set forth herein, and in no case shall a waiver by the Company of its right to seek relief under this Agreement constitute a waiver of any other or further violation of this Agreement. The parties hereto agree and confirm that all restrictions in this Agreement are reasonable and valid. In addition, in the event of an alleged breach or violation of any Restrictive Covenant, the applicable restrictive period (i.e., the Non-Competition Period, Non-Solicitation Period or Non-Interference Period) shall be tolled until such breach or violation has been duly cured.

**(h) <u>Third-Party Beneficiary</u>**. All members and affiliates of the Company (including without limitation affiliates and/or subsidiaries as identified in the Operating Agreement) are third-party beneficiaries of this Agreement, and the restrictive covenants set forth in this Section 10 and the remedies hereunder inuring to the Company are intended to benefit all such members and Affiliates and may be enforced by all such members and affiliates or subsidiaries.

*See* Exhibits "C" and "D" at ¶¶10(a-j).

17.    Each of the restrictive covenants contained in the Agreement are reasonable and necessary to protect CWGL's legitimate business interests, including its confidential information and substantial relationships with existing customers and employees.

18.    In addition, both Agreements contained a non-disparagement provision that provides as follows:

**12. <u>Non-Disparagement</u>.** During Employee's employment with the Company, whether or not under this Agreement, and thereafter, Employee will not, directly or indirectly, make any disparaging statements or other negative remarks, written or oral, about the Company, its members and Managers, its subsidiaries or any of their respective practices, Affiliates, directors, officers, employees, owners,

10

CASE NO.: CACE22-013915

managers, members, partners, agents, attorneys or representatives that would be reasonably likely to cast disrepute on or damage the Company or its Managers or their respective Affiliates, or for the hoped-for competitive advantage of Employee or a third person or the competitive disadvantage of the Company or its Affiliates. This Section 12 shall not, however, prohibit Employee from testifying truthfully as a witness in any court proceeding or governmental investigation.

*See id.,* at ¶¶12.

19.     In their capacities as account executives, vice presidents, and minority owners, Counter-Defendants were primarily responsible for business development; marketing and sales; identifying strategic growth opportunities for CWGL; identifying potential customers; solidifying CWGL's presence in new markets; designing, supervising, implementing and achieving sales strategies; and for training and supervising the Company's sales force.

20.     Accordingly, Counter-Defendants became privy to a host of CWGL's Propriety Confidential Information including business and corporate strategies, business plans, product strategies, unique methodology and systems, product cost and pricing information, customer lists, vendor lists, employee lists, lead lists, lead conversion, lead formation sales reports, operating plans, marketing strategies and plans, methods, financial information, contracts, agreements, computer programs, and manuals, among others.

### Solomon Establishes Direct Rival to CWGL During His Employment and Begins Diverting CWGL Customers to Rivals

21.     On April 29, 2020, while still employed by CWGL, Solomon established a durable-medical-equipment business, #1 DME LLC. *See* Exhibit "E."

22.     #1 DME LLC was a direct rival to CWGL affiliate SN DME, LLC.

23.     By establishing and operating a rival business to CWGL during his

11

employment, Solomon breached the non-competition restrictive covenant contained in his Agreement.

24.     In addition to violating his own non-competition contractual obligations, Solomon further breached (and continues to breach) the non-solicitation provisions of his Agreement.

25.     A primary aspect of Counter-Defendants' employment was to secure new clients to CWGL's businesses.

26.     Beginning in 2022, CWGL began noticing drops in both new-client revenue and existing-client revenue for the clients that Solomon acquired.

27.     For example, in January 2022, Solomon signed 23 new clients; in February, he signed 13 clients; in March, he signed 11; and in April he signed 7.

28.     Further, there was a nearly $100,000.00 drop in Solomon's existing-client revenue between January and April 2022.

29.     Solomon's agreement was not renewed and lapsed on April 30, 2022.

30.     That same day, Solomon sent the following email to a guardian for CWGL client, M.S.:

**COLE, SCOTT & KISSANE, P.A.**
110 TOWER - 110 S.E. 6TH STREET, SUITE 2700  - FT. LAUDERDALE, FLORIDA 33301 (954) 703-3700 (954) 703-3701 FAX

CASE NO.: CACE22-013915

———— Forwarded message ————
From: Bryan Solomon <opssolomon@gmail.com>
Date: Sat, Apr 30, 2022, 2:02 PM
Subject: ~~█████████~~
To: <~~█████████~~.com>

il.google.com/mail/u/0/?ik=ae537386b0&view=pt&search=all&permmthid=thread-f%3A1750305853624659147&simpl=msg-f%3A1750305853…    1/4

──────────────────────────────

, 11:45 AM                          Senior Nannies Mail - Fwd: Fw: Bryan Solomon

Earl,

I really enjoyed talking with you again this afternoon about your aunt █████ care at home in Boca Raton or search for a senior living community in/near Boca Raton, FL. My name is Bryan Solomon, I am the Regional Manager of South Florida for **#1 HOME CARE SERVICES.**

Here is a letter of what I can provide for your aunt Marie, and assist as we discussed. If you need a private duty nurse, I can help. Our HHA/CNA's are responsible for everything from transferring, continence care, dressing and driving to cooking, bathing and safety supervision. They are 22 p/ hour or 280 p/ day for 24 hour live in care. They all have level 2 FBI background screens, licensure and insurance (more for couple care and Covid-19).

**We accept all Long Term Care Insurance and Veteran's Benefits as well as all private pay options :)**

We also when needed, offer higher licensed, **FREE** placement for families and their loved ones into **Independent Living, Skilled Nursing, Memory Care and Assisted Living** communities. Based on the person's level of care, location and budget we will recommend only communities that I would feel comfortable having my family move into. I am available to show the communities and talk further 24/7 for my patients. Try these local, active, quality options for your aunt Marie.

31.     Similarly, Solomon convinced the daughter and guardian of another client, J.K., to leave CWGL for his own company.

32.     In May 2022, the daughter left Solomon a voicemail complaining of the quality of care her mother was receiving by Solomon's business:

> Hey Brian, it's me. Ok, so I don't know if there's a misunderstanding. Originally, when I talked to you, and said I was going to get away from [CWGL], but the [caregivers] have to be paid the same, you know, they're not going to come work for lower. So you know I had my whole team set up for the people for my mom…I

13
**COLE, SCOTT & KISSANE, P.A.**

CASE NO.: CACE22-013915

don't know now if I made a huge mistake here by switching, because I had what I needed as far as the people and now I don't know...I mean you send me a lady who's 8-months pregnant and my mother is in shit for three hours.

33.    The above examples are representative of the ways in which Solomon sought to steer CWGL's clients to his own businesses, in direct violation of the non-solicitation provisions of his Agreement.

34.    By the end of October 2022, existing-client revenue for Solomon's clients was down nearly $310,000.00 from January 2022, evidencing further client solicitation and poaching.

35.    Feldman was terminated for-cause on December 27, 2022.

### Counter-Defendants Establish Rival Businesses to CWGL, Seek to Solicit its Customers and Employees, and Disparage the Company

36.    On May 3, 2022, while Feldman was still employed by CWGL, Solomon filed articles of organization for a competing business, #1 Placement Services, LLC. *See* Articles of Organization, attached as Exhibit "F."

37.    Counter-Defendants doubled-down and organized another competing business, #1 Care Services, LLC, on June 13, 2022. *See* Articles of Organization, attached as Exhibit "G."

38.    As Counter-Defendants established rival businesses to CWGL and sought to poach its clients, they also began defaming and disparaging CWGL.

39.    In November 2022, Solomon visited Wellington Regional Medical Center for marketing purposes. Upon seeing CWGL advertisements on a case manager's desk, he threw the materials away and replaced them with ones for #1 Placement Services:

14

CASE NO.: CACE22-013915





**COLE, SCOTT & KISSANE, P.A.**
110 TOWER - 110 S.E. 6TH STREET, SUITE 2700 - FT. LAUDERDALE, FLORIDA 33301 (954) 703-3700 (954) 703-3701 FAX

CASE NO.: CACE22-013915



## Services Provided

### Personal Services

Bathing and Dressing
Safety Supervision
Walking and Ambulating
Feeding
Transfer from Bed or Chair
Bathroom and Continence care

### Home Making Services

Laundry and Linens
Meal Preparation
Grocery Shopping
Driving
Light Housekeeping
Pet Care

### Payment Options for Private Duty Care

- All Private Pay Options
- Long Term Care Insurance
- Various Benefits

#1 Home Care Services LLC

1200 N Federal Highway
Suite 200
Boca Raton, FL 33432

License # 30232384

Our clients are provided with the highest level of care to promote independence;

Wherever home may be!

**877-227-3581 (CARE581)**

**561-797-7528**

Serving all of Palm Beach & The Treasure Coast

www.1homecareservices.com

## Our Passion

### Your #1 Team!

#1 Home Care Services LLC has over 49 years of experience serving the Florida community. We are the premier Nurse Registry for providing high quality caregivers for private home health care. We can offer:

- Registered Nurses
- Licensed Practical Nurses
- Certified Nursing Assistants
- Home Health Aides

Call us and schedule a complimentary home consultation!

1-877-227-3581

At #1 Home Care Services your satisfaction is 100% guaranteed by matching you to a care professional that meets your staff and personality needs.

All Home Health Aides and Certified Home Assistants have:

- Course completion certificate provided from a Florida school
- Proof of Citizenship
- Work Authorization/Social Security Card
- Physical exam, chest X-Ray, or negative test for Tuberculosis
- AIDS/OSHA Certificate
- CPR Card

**COLE, SCOTT & KISSANE, P.A.**
110 TOWER - 110 S.E. 6TH STREET, SUITE 2700  - FT. LAUDERDALE, FLORIDA 33301 (954) 703-3700 (954) 703-3701 FAX

CASE NO.: CACE22-013915

40.     In December 2022, Solomon approached another CWGL client, B.S., and attempted to poach her by advising that CWGL "was just a start-up" whose employees were "just marketers."

41.     At numerous industry events, Counter-Defendants have boasted about suing CWGL and have made disparaging remarks about the company, its principals, employees, and quality of care.

## COUNT I – BREACH OF CONTRACT (FELDMAN)

42.     CWGL reincorporates and re-alleges the allegations contained in Paragraphs 1 – 41 as if set forth herein.

43.     This is an action for damages and temporary and permanent injunctive relief against Counter-Defendant Feldman for his breach of contract.

44.     Feldman willfully entered into the agreement with CWGL that contained certain restrictive covenants.

45.     In exchange for agreeing to the restrictions, Feldman continued to be gainfully employed by, and further received equity in, CWGL.

46.     The restrictive covenants are necessary, reasonable, and supported by adequate consideration.

47.     The non-compete provision restricts Feldman from owning or working with an entity engaged in business substantially similar to CWGL's.

48.     During the course of his employment with CWGL, and subsequent to his termination for cause, Feldman established direct competitors to CWGL—#1 Placement Services, LLC and #1 Care Services, LLC.

49.     By establishing #1 Placement Services, LLC and #1 Care Services, LLC,

17

CASE NO.: CACE22-013915

Feldman has violated the non-compete provision of his agreement.

50.     The non-solicitation provision of his agreement further restricts Feldman from soliciting CWGL clients.

51.     Feldman has violated the non-solicitation provision of his agreement by being a principal in #1 Placement Services, LLC and #1 Care Services, LLC—entities who have actively solicited CWGL clients, including, but not limited to M.S., B.S., and J.K.

52.     The confidentiality provision of Feldman's agreement restricts Feldman from divulging or using any of CWGL's confidential information, including, among other things, product cost, pricing information, and customer lists.

53.     Feldman has violated the confidentiality provision of his agreement by using CWGL's Confidential Trade Secret Information for his benefit and the benefit of #1 Placement Services, LLC and #1 Care Services, LLC.

54.     The non-disparagement provision of Feldman's agreement restricts Feldman from making any disparaging statements or other negative remarks about CWGL.

55.     Feldman has violated the non-disparagement provision of his agreement by boasting about suing CWGL and making negative remarks about the company, its principals, employees, and quality of care.

56.     Unless Feldman and those who are in active concert or participation with him, including Solomon, are enjoined against violation of his agreement, CWGL will suffer irreparable injury and harm in the form of, among other things:

>  a.  Use and disclosure of customer information, financial information, and other Confidential Trade Secret Information that is the property of

18

CASE NO.: CACE22-013915

CWGL;

b. Present economic loss, which is not ascertainable at this time, and future economic loss, which is incalculable; and,

c. Loss of customer goodwill, damage to customer relationships, loss of market position and reputation in the industry, and damage to its valuable competitive advantage—all of which cannot be compensated by an award of damages.

57.     The balance of equities weighs in favor of CWGL because the injuries and threatened injuries to CWGL outweigh any harm an injunction poses to Feldman.

58.     As a result of the irreparable injury and harm detailed above, CWGL has no adequate remedy at law.

59.     The public interest in enjoining this behavior will be served, as the public has a vested interest in ensuring the sanctity of contracts.

60.     CWGL has a substantial likelihood of prevailing on the merits of this cause of action at trial.

61.     As a result of Feldman's wrongful conduct, CWGL has suffered and will continue to suffer certain calculable damages in an amount to be determined at trial.

**COUNT II – BREACH OF CONTRACT (SOLOMON)**

62.     CWGL reincorporates and re-alleges the allegations contained in Paragraphs 1 – 41 as if set forth herein.

63.     This is an action for damages and temporary and permanent injunctive relief against Counter-Defendant Solomon for his breach of contract.

64.     Solomon willfully entered into the agreement with CWGL that contained

19

certain restrictive covenants.

65.     In exchange for agreeing to the restrictions, Solomon continued to be gainfully employed by, and further received equity in, CWGL.

66.     The restrictive covenants are necessary, reasonable, and supported by adequate consideration.

67.     The non-compete provision restricts Solomon from owning or working with an entity engaged in business substantially similar to CWGL's.

68.     During the course of his employment with CWGL, Solomon established a direct competitor to CWGL—# 1 DME, LLC.

69.     By establishing #1 DME, LLC, Solomon has violated the non-compete provision of his agreement.

70.     The non-solicitation provision of his agreement further restricts Solomon from soliciting CWGL clients.

71.     Solomon has violated the non-solicitation provision of his agreement by actively soliciting CWGL clients, including, but not limited to M.S., B.S., and J.K, on behalf of his rival businesses, #1 DME, LLC, #1 Placement Services, LLC and #1 Care Services, LLC.

72.     The confidentiality provision of Solomon's agreement restricts Solomon from divulging or using any of CWGL's confidential information, including, among other things, product cost, pricing information, and customer lists.

73.     Solomon has violated the confidentiality provision of his agreement by using CWGL's Confidential Trade Secret Information for his benefit and the benefit of #1 DME, LLC, #1 Placement Services, LLC and #1 Care Services, LLC.

**COLE, SCOTT & KISSANE, P.A.**
110 TOWER - 110 S.E. 6TH STREET, SUITE 2700  - FT. LAUDERDALE, FLORIDA 33301 (954) 703-3700 (954) 703-3701 FAX

74.     The non-disparagement provision of Solomon's agreement restricts Solomon from making any disparaging statements or other negative remarks about CWGL.

75.     Solomon has violated the non-disparagement provision of his agreement by boasting about suing CWGL and making negative remarks about the company, its principals, employees, and quality of care.

76.     Unless Solomon and those who are in active concert or participation with him, including Solomon, are enjoined against violation of his agreement, CWGL will suffer irreparable injury and harm in the form of, among other things:

    a.   Use and disclosure of customer information, financial information, and other Confidential Trade Secret Information that is the property of CWGL;

    b.   Present economic loss, which is not ascertainable at this time, and future economic loss, which is incalculable; and,

    c.   Loss of customer goodwill, damage to customer relationships, loss of market position and reputation in the industry, and damage to its valuable competitive advantage—all of which cannot be compensated by an award of damages.

77.     The balance of equities weighs in favor of CWGL because the injuries and threatened injuries to CWGL outweigh any harm an injunction poses to Solomon.

78.     As a result of the irreparable injury and harm detailed above, CWGL has no adequate remedy at law.

79.     The public interest in enjoining this behavior will be served, as the public

21

**COLE, SCOTT & KISSANE, P.A.**
110 TOWER - 110 S.E. 6TH STREET, SUITE 2700  - FT. LAUDERDALE, FLORIDA 33301 (954) 703-3700 (954) 703-3701 FAX

has a vested interest in ensuring the sanctity of bargained-for exchanges.

80.    CWGL has a substantial likelihood of prevailing on the merits of this cause of action at trial.

81.    As a result of Solomon's wrongful conduct, CWGL has suffered and will continue to suffer certain calculable damages in an amount to be determined at trial.

## COUNT III – BREACH OF FIDUCIARY DUTY (FELDMAN)

82.    CWGL reincorporates and re-alleges the allegations contained in Paragraphs 1 – 41 as if set forth herein.

83.    At all materials times, Feldman was, and continues to be, a member of CWGL.

84.    As a member of CWGL, Feldman owes fiduciary duties of care, loyalty, and good faith to CWGL.

85.    Feldman breached his fiduciary duties of care, loyalty, and good faith by establishing competitors to CWGL, soliciting CWGL's clients, disparaging CWGL, and using CWGL's Confidential Trade Secret Information.

86.    CWGL has been damaged by Feldman's breach of his fiduciary duties.

## COUNT IV – BREACH OF FIDUCIARY DUTY (SOLOMON)

87.    CWGL reincorporates and re-alleges the allegations contained in Paragraphs 1 – 41 as if set forth herein.

88.    At all materials times, Solomon was, and continues to be, a member of CWGL.

89.    As a member of CWGL, Solomon owes fiduciary duties of care, loyalty, and good faith to CWGL.

COLE, SCOTT & KISSANE, P.A.
110 TOWER - 110 S.E. 6TH STREET, SUITE 2700 - FT. LAUDERDALE, FLORIDA 33301 (954) 703-3700 (954) 703-3701 FAX

CASE NO.: CACE22-013915

90.     Solomon has breached his fiduciary duties of care, loyalty, and good faith by establishing competitors to CWGL, soliciting CWGL's clients, disparaging CWGL, and using CWGL's Confidential Trade Secret Information.

91.     CWGL has been damaged by Solomon's breach of his fiduciary duties.

WHEREFORE, CWGL HOLDINGS, LLC, requests this Court entered judgment against Counter-Defendants as follows:

      a. Temporarily and permanently enjoining Counter-Defendants, and all those who act in active concert or partcipation with them in violation of their Agreements, from the following:
          i. Directly or indirectly competing with CWGL within the counties in which they were actively working while employed by CWGL.
          ii. Using or disclosing CWGL's Confidential Trade Secret Information; and,
          iii. Directly or indirectly soliciting customers of CWGL;
      b. Requiring Counter-Defendants to return all documents or materials containing CWGL's Confidential Trade Secret Information;
      c. Awarding CWGL damages in an amount to be determined at trial;
      d. Awarding CWGL costs of this action, including attorney's fees; and,
      e. All other relief this Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of December, 2022, a true and correct copy of the foregoing was filed with the Clerk of Broward County by using the Florida Courts e-Filing Portal, which will send an automatic e-mail message to the following parties registered with the e-Filing Portal system: Joe M. Grant, Esq., Lorium, PLLC, 197 South Federal Highway, Suite 200, Boca Raton, FL 33432, jgrant@loriumlaw.com, counsel for Plaintiffs.

      COLE, SCOTT & KISSANE, P.A.
      Counsel for CWGL Holdings, LLC, Gary Loffredo, and Claudia Wechter
      110 Tower
      110 S.E. 6th Street, Suite 2700
      Fort Lauderdale, Florida 33301
      Telephone (954) 703-3763

CASE NO.: CACE22-013915

Facsimile (954) 703-3701
Primary e-mail: patrick.mccardle@csklegal.com
Secondary e-mail: cody.german@csklegal.com
Alternate e-mail:  kristie.carroll@csklegal.com

By:  s/ *Patrick McCardle, Esq.*
     PATRICK C MCCARDLE
     Florida Bar No.:  99042
     CODY GERMAN
     Florida Bar No.:  58654

24

**CSK** Cole, Scott & Kissane

110 TOWER
110 S.E. 6TH STREET, SUITE 2700
FORT LAUDERDALE, FLORIDA 33301

TELEPHONE (954) 703-3700
FACSIMILE (954) 703-3701
DIRECT LINE (954) 703-3763

patrick.mccardle@csklegal.com

June 7, 2022

**VIA EMAIL AND CERTIFIED MAIL**
Bryan Solomon
3760 Isle Vista Blvd.
Wellington, FL 33449

## NOTICE TO CEASE-AND-DESIST

Dear Mr. Solomon:

Please be advised that this law firm represents CWGL Holdings, LLC and its affiliates ("CWGL") in regard to your breach of the restrictive covenant provisions of your employment agreement with CWGL, which we have enclosed with this correspondence.

At the time of your commencement of employment with CWGL, you signed a Non-Solicitation Agreement that expressly prohibits you from soliciting customers of CWGL. The fact that you are now working for a competitor (#1 Home Care Services) and soliciting customers of CWGL is a complete breach and violation of the Agreement. More specifically, the Agreement states as follows:

During [your] employment with the Company and for two (2) years thereafter ("Non-Solicitation Period"), [you] will not directly or indirectly or in concert with others, call upon, solicit, service, or sell any of the services that comprise the Business to any customers of the Company or an affiliate, on [your] own behalf, or on behalf of a Company customer or on behalf of a competitor of the Company. This restriction shall apply to any customer of the Company or an affiliate that was a customer at any time during [your] last two (2) years of employment with the Company as well as any prospective customer of the Company with whom [you] had any contact during [your] last year of employment with the Company. "Solicit" shall mean to call upon, or lend any assistance in any way to, any person or entity for the purpose of encouraging, enticing, or persuading any person or entity to do business with any person or entity in competition with the Company. Solicitation shall also include a general or specific advertisement wherein [you are] advertising in any way the fact that [you are] engaged in direct or indirect competition with the Company. This prohibition expressly precludes [you] during the Non-Solicitation Period from conducting business similar to the Company's Business with any customer of the Company, even if the customer first contacts [you].

Cole, Scott & Kissane
www.csklegal.com

Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville North
Jacksonville South | Tampa | Bonita Springs | Pensacola | Fort Myers | Tallahassee | Key West

**EXHIBIT A**

Mr. Bryan Solomon
June 7, 2022
Page 2

It has come to our attention that you are attempting to solicit business from CWGL's customers, which is a clear breach and direct violation of the terms of your Agreement. We hereby demand that you: (1) immediately cease and desist from such conduct; (2) confirm in writing your intent to do so within 24 hours of the date of this letter; (3) confirm your compliance with this demand within seven (7) days from the date of this letter; and, (4) provide a list of all CWGL's customers with whom you have been in contact with within five (5) business days from the date of this letter.

In accordance with the terms of your Employment Agreement, the prevailing party of any resulting litigation from the terms of the agreement shall be entitled to an award of its attorneys' fees and costs.

Please govern yourself accordingly.

Sincerely,

*Patrick McCardle*

Patrick C McCardle, Esq.
Cody German, Esq.

PCM
cc: Gary Loffredo, Claudia Wechter
enclosures: Employment Agreement
5018.3410-00/-1



**Cole, Scott & Kissane**

110 TOWER
110 S.E. 6TH STREET, SUITE 2700
FORT LAUDERDALE, FLORIDA 33301

TELEPHONE (954) 703-3700
FACSIMILE (954) 703-3701
DIRECT LINE (954) 703-3763

patrick.mccardle@csklegal.com

June 7, 2022

**<u>VIA EMAIL AND CERTIFIED MAIL</u>**
Bryan Solomon
3760 Isle Vista Blvd.
Wellington, FL 33449

**<u>MEDIATION DEMAND</u>**

Dear Mr. Solomon:

Please be advised that this law firm represents CWGL Holdings, LLC and its affiliates ("CWGL") in regard to your breach of the non-solicitation provisions of your Employment Agreement with CWGL, which we have enclosed with this correspondence. We demand that you immediately cease and desist your breaches of the restrictive covenants found in your Employment Agreement.

In accordance with the terms of your Employment Agreement, CWGL hereby demands that the ongoing disputes between you and CWGL be mediated within 14 days from the date of this letter. Please confirm in writing your agreement to do so within three (3) days from the date of this letter. Your failure to do so will be deemed a waiver of such condition precedent and CWGL will pursue its litigation options immediately if you do not wish to engage in the pre-suit mediation requirement.

Please govern yourself accordingly.

Sincerely,

*Patrick McCardle*

Patrick C McCardle, Esq.
Cody German, Esq.

PCM
cc: Gary Loffredo, Claudia Wechter
Enclosures: Employment Agreement
5018.3410-00/-1

**Cole, Scott & Kissane**
www.csklegal.com

Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville North
Jacksonville South | Tampa | Bonita Springs | Pensacola | Fort Myers | Tallahassee | Key West

**CSK** Cole, Scott
& Kissane

110 TOWER
110 S.E. 6TH STREET, SUITE 2700
FORT LAUDERDALE, FLORIDA 33301

TELEPHONE (954) 703-3700
FACSIMILE (954) 703-3701
DIRECT LINE (954) 703-3763

patrick.mccardle@csklegal.com

June 30, 2022

**VIA EMAIL AND CERTIFIED MAIL**
Brett Feldman
9773 Parkview Ave.
Boca Raton, FL 33428

**MEDIATION DEMAND**

Dear Mr. Feldman:

Please be advised that this law firm represents CWGL Holdings, LLC and its affiliates ("CWGL") in regard to your breach of the non-solicitation provisions of your Employment Agreement with CWGL, which we have enclosed with this correspondence. We demand that you immediately cease and desist your breaches of the restrictive covenants found in your Employment Agreement.

In accordance with the terms of your Employment Agreement, CWGL hereby demands that the ongoing disputes between you and CWGL be mediated within 14 days from the date of this letter. Please confirm in writing your agreement to do so within three (3) days from the date of this letter. Your failure to do so will be deemed a waiver of such condition precedent and CWGL will pursue its litigation options immediately if you do not wish to engage in the pre-suit mediation requirement.

Please govern yourself accordingly.

Sincerely,

*Patrick McCardle*

Patrick C McCardle, Esq.
Cody German, Esq.

PCM
cc: Gary Loffredo, Claudia Wechter
Enclosures: Employment Agreement
5018.3410-00/-1

**Cole, Scott & Kissane**
www.csklegal.com

Miami | Fort Lauderdale West | Fort Lauderdale East | West Palm Beach | Orlando | Jacksonville North
Jacksonville South | Tampa | Bonita Springs | Pensacola | Fort Myers | Tallahassee | Key West



**Cole, Scott**
**& Kissane**

110 TOWER
110 S.E. 6TH STREET, SUITE 2700
FORT LAUDERDALE, FLORIDA 33301

TELEPHONE (954) 703-3700
FACSIMILE (954) 703-3701
DIRECT LINE (954) 703-3763

patrick.mccardle@csklegal.com

June 30, 2022

**VIA US MAIL**
Brett Feldman
9773 Parkview Ave.
Boca Raton, FL 33428

## NOTICE TO CEASE-AND-DESIST

Dear Mr. Feldman:

Please be advised that this law firm represents CWGL Holdings, LLC and its affiliates ("CWGL") in regard to your breach of the restrictive covenant provisions of your Employment Agreement ("Agreement") with CWGL, which we have enclosed with this correspondence.

At the time of your commencement of employment with CWGL, you signed the Agreement that expressly prohibits you from soliciting customers and accounts of CWGL for a one-year period following the termination of your employment with CWGL. Upon information and belief, you are now working for a competitor (#1 Care Services, LLC) and soliciting customers of CWGL which is a clear breach and direct violation of the Agreement. More specifically, Section 10.(c) of the Agreement, a redacted version of which is enclosed, states as follows:

During [your] employment with the Company and for one (1) year thereafter ("Non-Solicitation Period"), [you] will not directly or indirectly or in concert with others, call upon, solicit, service, or sell any of the services that comprise the Business to any customers of the Company or an affiliate, on [your] own behalf, or on behalf of a Company customer or on behalf of a competitor of the Company. This restriction shall apply to any customer of the Company or an affiliate that was a customer at any time during [your] last two (2) years of employment with the Company as well as any prospective customer of the Company with whom [you] had any contact during [your] last year of employment with the Company. "Solicit" shall mean to call upon, or lend any assistance in any way to, any person or entity for the purpose of encouraging, enticing, or persuading any person or entity to do business with any person or entity in competition with the Company. Solicitation shall also include a general or specific advertisement wherein [you are] advertising in any way the fact that [you are] engaged in direct or indirect competition with the Company. This prohibition expressly precludes

**Cole, Scott & Kissane**
www.csklegal.com

Mr. Brett Feldman
June 29, 2022
Page 2

[you] during the Non-Solicitation Period from conducting business similar to the Company's Business with any customer of the Company, even if the customer first contacts [you].

It has come to our attention that you are attempting to solicit business from CWGL's customers, which is a clear breach and direct violation of the terms of your Agreement. We hereby demand that you: (1) immediately cease and desist from such conduct; (2) confirm in writing your intent to do so within 24 hours of the date of this letter; (3) confirm your compliance with this demand within seven (7) days from the date of this letter; and, (4) provide a list of all CWGL's customers with whom you have been in contact with within five (5) business days from the date of this letter.

In accordance with the terms of your Employment Agreement, the prevailing party of any resulting litigation from the terms of the agreement shall be entitled to an award of its attorneys' fees and costs.

Please govern yourself accordingly.

Sincerely,

*Patrick McCardle*

Patrick C McCardle, Esq.
Cody German, Esq.

PCM
cc: Gary Loffredo, Claudia Wechter
enclosures: Employment Agreement
5018.3410-00/-1

6/23/2017

*CW mvg (handwritten)*

## SECOND AMENDED AND RESTATED OPERATING AGREEMENT
### Of
### CWGL HOLDINGS, LLC

THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT ("Agreement") of CWGL HOLDINGS, LLC (the "Company"), is made and entered into effective as of May 1, 2017 ("Effective Date"), by and among the Company and the Members listed on Exhibit A attached hereto. This Agreement amends, restates, and replaces in its entirety the Prior Operating Agreements as defined below.

### Preliminary Statements

A.     The Company was formed on August 15, 2014, pursuant to Articles of Organization ("Articles") filed with the Florida Department of State. The sole Members at inception were the Founding Members, Claudia Wechter and Gary R. Loffredo.

B.     Prior to the Effective Date of this Agreement, the Company and the Founding Members adopted an Operating Agreement of the Company bearing a date of August 13, 2014 ("Initial Operating Agreement"), as amended and restated in its entirety pursuant to that certain Amended and Restated Operating Agreement of the Company dated November 14, 2015 ("First Amended Operating Agreement"; and with the Initial Operating Agreement, collectively, the "Prior Operating Agreements").

C.     As of the Effective Date of this Agreement, two Class B Members (Bryan Solomon and Brett Feldman) have been admitted as Members of the Company, subject to the terms and conditions of this Agreement, along with the Founding Members who are the sole Class A Members.

D.     The Members and the Company now desire to amend and restate the First Amended Operating Agreement in its entirety, in order to provide for Class B Member Interests, to reflect the admission of the Class B Members, and to provide for the ongoing governance of the Company and other matters affecting the Member Interests and the Company.

E.     This Agreement amends, restates, replaces and supersedes each of the Prior Operating Agreements, effective as of the Effective Date.

### ARTICLE I
### INTRODUCTION; DEFINED TERMS, ETC.

1.1     Recitals.  The recitals set forth as preliminary statements each are true and correct and are incorporated by reference into this Agreement.

1.2     Defined Terms.  The following capitalized terms shall have the meanings as set forth in this Section 1.2. Capitalized terms defined in the introductory paragraph or recitals or elsewhere in this Agreement shall have the meanings assigned to them at the place first defined.

## EXHIBIT B

"Act" means the Florida Revised Limited Liability Company Act, Chapter 605 of Florida Statutes, as may be amended from time to time.

"Affiliate" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

"Agreement" means this Operating Agreement, as may be amended or restated from time to time.

"Applicable Law" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"Available Net Cash Flow" means all cash received by the Company from its operations or the operations of the Controlled Entities during any taxable year or other period, less all cash disbursements made by the Company and/or the Controlled Entities during such year or period, and less such reasonable and customary reserves or expenditures for working capital, contingencies and anticipated short-term obligations (including debt service and capital improvements), as the Managers shall deem reasonably necessary in the ordinary course of business; all as determined and accounted for by the Managers from time to time. Available Net Cash Flow shall not include Capital Contributions or the proceeds of Member Loans, if any, but shall be increased by the reduction of any reserve previously established.

"Bankruptcy" means, with respect to a Person, the occurrence of any of the following: (a) the filing of an application by such Person for, or a consent to, the appointment of a trustee of such Person assets; (b) the filing by such Person of a voluntary petition in bankruptcy, insolvency or other similar law ("Debtor Relief Laws"), or the filing of a pleading in any court of record admitting in writing such Person's inability to pay its debts as they come due; (c) the making by such Person of a general assignment for the benefit of such Person's creditors; (d) the filing by such Person of an answer admitting the material allegations of, or such Person's consenting to, or defaulting in answering a bankruptcy petition filed against such Person in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Person a bankrupt or appointing a trustee of such Person's assets.

"Book Depreciation" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the

2

same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Board in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3).

"Book Value" means, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes; provided, however that the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross fair market value as determined by the Managers as of the date of such contribution, and that such Book Value shall be adjusted for any changes in an asset's value that is made under the capital account maintenance provisions of Treasury Regulations Section 1.704-1(b)(2)(iv). The Book Value of all assets shall be adjusted from time to time by Book Depreciation and any other adjustments to the basis of assets. The Book Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company.

"Business Day" means every day other than a Saturday or Sunday, or a legal holiday recognized as such in Florida.

"Capital Contribution" means the total amount of capital contributed to the Company's capital by each Member pursuant to Section 5.1 of this Agreement, as may be adjusted by the terms hereof.

"Capital Proceeds" means capital distributions received by the Company from entities in which Company has an ownership interest and the net cash proceeds received by the Company from or as a result of a Capital Transaction, after deducting: (i) all expenses paid in connection therewith; (ii) all amounts applied by the Company toward the payment of obligations associated with the Capital Transaction, including payments of principal and interest on mortgages or payments to repair or restore assets, and then payment of other indebtedness of the Company (including indebtedness owed to the Members); (iii) the payment of other expenses; and (iv) the establishment of reserves. If the proceeds of a Capital Transaction are paid in more than one installment, each installment shall be treated as a separate Capital Transaction for purposes of this definition.

"Capital Transaction" means a (i) sale or other disposition of the assets of the Company or a Controlled Entity (other than sales in the ordinary course of business); (ii) financing or refinancing of the assets of the Company or a Controlled Entity; and (iii) receipt of casualty insurance proceeds (other than business interruption insurance) or condemnation awards with respect to the Company's or a Controlled Entity's assets.

"Class A Members" shall mean the Members of the Company that hold Class A Membership Interests.

7742056-9

"Class B Members" shall mean the Members of the Company that hold Class B Membership Interests.

"Class A Membership Interests" (or "Class A Interests)" shall mean Interests issued by the Company and designated as Class A Interests, with the voting and other rights, preferences and privileges attributable to such Interests, as set forth in this Agreement.

"Class B Membership Interests" (or "Class B Interests") shall mean Interests issued by the Company and designated as Class B Interests, which are and shall be non-voting Interests, with the rights, preferences and privileges, and subject to the limitations and restrictions, attributable to such Interests, as set forth in this Agreement.

"Class A Net Distributable Cash" shall mean the Available Net Cash Flow deriving from the business of the Company and all Controlled Entities, and/or Capital Proceeds deriving from the Company and all Controlled Entities, as determined by the Managers from time to time to be distributable to the Class A Members; provided that the Class A Net Distributable Cash actually distributed to the Class A Members will be reduced by the dollar amount of the Class B Net Distributable actually distributed to the Class B Members.

"Class B Net Distributable Cash" shall mean the Available Net Cash Flow deriving from the business operations conducted by, Senior Nannies Home Care Services, LLC, and Senior Advantages Assisted Living Placement Services, LLC (collectively, the "Class B Entities") (and no other Controlled Entities or the Company itself), and/or Capital Proceeds deriving from the Company and those specific Class B Entities only, as determined by the Managers from time to time to be distributable to the Class B Members.

"Code" means the Internal Revenue Code of 1986, as amended.

"Controlled Entity" shall mean the individual or collective reference to (i) Senior Nannies Holdings, LLC, Senior Nannies Home Health Care Services, LLC, Senior Advantages Assisted Living Placement Services, LLC, Senior Nannies Management Services, LLC, SN Home Healthcare, LLC, SN DME, LLC, CWGL Commercial, LLC and 3313 Exchange, LLC; or (ii) any other partnership, limited partnership, limited liability company, corporation or other entity or venture owned and controlled by the Company or in which the Company is a general partner, majority owner or manager.

"Disabled" or "Disability" means, in the case of a Member who is employed by or regularly provides services to the Company: (i) the adjudication by a court of competent jurisdiction that such Member is incompetent to manage his or her affairs; or (ii) such Member's physical or mental incapacity for any consecutive three-month period, or for a total of six months in any twelve-month period, of such a nature that the Member shall be unable to perform any substantial duties for the Company.

"Distributions" means the quarterly or other periodic distributions based on Class A Net Distributable Cash as applicable to the Class A Members, or Class B Net Distributable Cash as applicable to the Class B Members, respectively, and periodic tax distributions as made by the Managers from time to time.

4

"Economic Right" means an Interested Nonmember's rights to receive allocations of Profits and Losses and distributions.

"Fiscal Year" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"Former Member" means any Member to whom a Triggering Event occurs.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"Immediate Family" means, as to any Member, the persons who have any of the following relationships to such Member, whether as a result of birth or the legal adoption of any one or more individuals: a spouse, a spouse's siblings or their children, a parent, a parent's siblings, a child and a child's lineal descendants, a brother or sister or their lineal descendants, or a first or second cousin.

"Founding Member(s)" means either Claudia Wechter or Gary R. Loffredo, and both of them.

"Interest" or "Membership Interest" means an equity interest in the Company owned by a Member, designated either as a Class A Interest or a Class B Interest, including (a) such Member's right to a distributive share of (i) Profits, Losses and other items of income, gain, loss and deduction of the Company and (ii) the assets of the Company; (b) as to Class A Members, such Member's right to vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (c) such Member's right to any and all other benefits to which a Class A Member or a Class B Member, as applicable, may be entitled as provided in this Agreement or the Act.  The Company shall have two classes of Membership Interests, Class A Interests and Class B Interests. The Interest of each Member shall be expressed as a percentage interest (the "Percentage Interest") and shall be as set forth on Exhibit A attached hereto, as may be amended by a Manager from time to time to reflect the issuance of new Membership Interests (if any) or the Transfer of Membership Interests to any new or existing Member in accordance with the terms of this Agreement.

"Interested Nonmember" means any Person other than a Member owning or holding any Economic Right. A Person who acquires an Economic Right  but who is not admitted as a substitute Member pursuant to Article 9 hereof shall be entitled only to Economic Rights in accordance with this Agreement, and shall have no Management Rights.

"Major Decisions" shall refer to any of the decisions described in Section 4.4.

"Management Rights" means the rights of a Class A Member to participate in the management of the Company and to vote, consent to or approve actions of the Company, and for any Member to receive information and inspect the books and records of the Company.

"Manager" or "Managers" means that person or those persons elected by the Class A Members to manage the Company. The Managers as of the Effective Date are Claudia Wechter and Gary R. Loffredo.

"Member Loan" means a loan from a Member to the Company as described in Section 5.1(b).

"Members" means, as of the Effective Date, the Founding Members, who shall be the sole owners of the Class A Interests, and Bryan Solomon and Brett Feldman, who, as of the Effective Date shall be Class B Members, and other persons who are admitted to the Company as additional or substitute Members from time to time in accordance with this Agreement.

"Parties" shall mean the Company and the Members (each of whom is a "Party").

"Person" means a natural person, corporation, association, partnership, joint venture, limited liability company, trust or any other entity defined as a "person" under the Act.

"Prime Rate" means the prime rate of interest as published from time to time by *The Wall Street Journal.*

"Profits" and "Losses" means, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a)    any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)    any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulation Section 1.704-1(b)(2)(iv)(i) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)    any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

6

(d)     any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g);

(e)     if the Book Value of any Company property is adjusted pursuant to the definition of "Book Value," then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(f)     to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulation Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(g)     any items of income, gain, loss or deduction that are specially allocated shall not be taken into account in computing Profits and Losses.

"Pro Rata" means the ratio that a particular Class A Member's Interests bear to all Class A Interests or that a particular Class B Member's Interests bear to all Class B Interests.

"Purchase Notice" means a written notice delivered in connection with a proposed Transfer pursuant to Section 9.8 or Section 9.9 setting forth (a) the name of the Person or Persons to whom a Transfer is proposed to be made, (b) the purchase price per Unit, (c) the terms and conditions of the Transfer and (d) all other pertinent details of the proposed Transfer.

"Securities Act" means the Securities Act of 1933, as amended.

"Super Majority in Interest" (or "Super Majority") shall refer to those Class A Members who, in the aggregate, hold at least ninety percent (90%) of the Percentage Interests held by all Class A Members.

"Transfer" means a sale, assignment, gift, or other disposition, or the pledge, grant of a security interest or lien in, or other encumbrance, whether voluntary or by operation of law, directly or indirectly, of all or part of a Member's interest in the Company (including, without limitation, the transfer of an ownership interest in a Member entity).

"Transferor" and "Transferee" mean a Person who makes or receives a Transfer, respectively.

"Treasury Regulations" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"Unanimous Consent" means the affirmative vote of each Class A Member.

1.3     Effective Date. This Agreement, and the terms, conditions and obligations of the parties contained herein, shall become effective as of the Effective Date (regardless of whether full execution and delivery hereof occurs thereafter within a period of time acceptable to the Class A Members). This Agreement supersedes any prior agreement or understanding by, between or among any of the Members or other Persons concerning the Company and/or the Business as defined below.

1.4     Sole and Exclusive Operating Agreement; Effect of Inconsistencies with the Act.

(a)     The terms and conditions of this Agreement, as the same may from time to time be amended, supplemented, or restated (solely in accordance with this Agreement), are intended to be the sole and exclusive "operating agreement" of the Company for purposes of the Act.

(b)     To the extent any provision of this Agreement is prohibited or otherwise invalid or ineffective under the Act, this Agreement shall be considered amended (to the least extent possible) in order to make such provision permitted, valid and effective under the Act. Subject to the foregoing, if any term in this Agreement governs, provides for or otherwise addresses any matter (including relations among the Members or between the Members and the Company or the Manager(s), the rights or duties of a Person, or the activities or affairs of the Company), and such matter is also governed by one or more provisions of the Act (which statutory provisions are commonly referred to as "default rules" that apply pursuant to Section 605.0105(2) of the Act), then such term in this Agreement shall prevail over the corresponding default rule of the Act. The preceding sentence shall apply regardless of whether the term in this Agreement expressly states that it is intended to replace, supplement or otherwise modify such default rule, and regardless of whether the term in this Agreement applies only partially or by implication to the matter governed by such default rule.

(c)     The Members intend that any court (or any arbitrator or other Person charged with the interpretation or enforcement of this Agreement) shall give maximum effect to the principle of freedom of contract and to the enforceability of this Agreement. Accordingly, if a term in this Agreement does not expressly or directly displace or modify a default rule, but enforcement or other effectuation of such term in this Agreement question cannot occur but for the displacement or modification of the default rule, then such default rule shall be deemed to have been displaced or modified accordingly, to the fullest extent permissible under applicable law. Without limiting the foregoing, and for the avoidance of any doubt: (i) the provisions of Section 605.04092 of the Act shall not apply to this Agreement; it being the intent of the parties that this Agreement definitively and completely contains the agreements and understandings of the Members and the Company with respect to transactions that may otherwise be subject to Section 605.04092; and (ii) that each of the provisions of this Agreement (whether considering it as a whole or any part(s) thereof) are fair and reasonable under the circumstances, were negotiated at arms-length by highly sophisticated and capable parties who were separately represented by competent legal counsel, and such provisions will not be deemed manifestly unreasonable, invalid or otherwise improper under the Act.

1.5     Executory Agreement in Bankruptcy. The Parties acknowledge and agree that this Agreement constitutes an "executory" agreement with respect to all Membership Interests issued

8

by the Company and shall be governed by 11 U.S.C. § 365 in connection with any Bankruptcy of the Company or of any Member because, among other provisions and obligations, this Agreement imposes on each Party material and affirmative duties which constitute material and unperformed future obligations. Accordingly, any trustee in a Bankruptcy proceeding holding a right in or claim to any Membership Interests issued by the Company shall be required to comply with the terms of this Agreement and Florida law governing this Agreement, including, without limitation, the restrictions of the rights of a creditor of a Member pursuant to Section 605.0503, Florida Statutes.

1.6    Additional Classes or Series of Member Interests. The Company reserves the right to create, authorize and issue any one or more new, additional or modified class or series of Member Interests (if any, "Supplemental Member Classifications"). Any such Supplemental Member Classifications, if any, shall have such designations or voting or other rights and preferences only as may be determined by unanimous vote of the Founding Members. Without limiting the generality of the foregoing, Supplemental Member Classifications may be granted relative, participating and/or priority rights as to distributions in liquidation or otherwise, prior to, on parity with, or junior to, any outstanding class or series of Membership Interests, all as determined by unanimous vote of the Class A Members. The designations, terms, rights and provisions pertaining to each and all Supplemental Member Classifications (if any) shall be set forth in an amendment or supplement to this Operating Agreement, if any, approved by each Class A Member.

1.7    Unregistered Securities; Compliance. Each Member acknowledges and agrees that such Member's Interests and all Interests constitute securities that have not been registered under any federal or state securities laws by virtue of exemptions from the registration provisions thereof and consequently may not be sold except pursuant to appropriate registration or exemption from registration as applicable. Subject to compliance with the terms hereof regarding Transfers, all transfers of any Interests (if any) shall: (a) be made pursuant to and only in accordance with the terms of this Agreement; and (b) comply with the Securities Act of 1933, as amended (the "Securities Act"), the Securities Exchange Act of 1934, as amended, and all applicable federal and state securities laws, unless the transfer is exempt from the requirements of such laws. Each Member represents and warrants to the Company that: (i) the Member is acquiring its Interest for investment for its own account and not with a view to or for sale in connection with any distribution thereof; (ii) the Member has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Company and is capable of bearing the economic risks of such investment; and (iii) the Member is an "accredited investor" as defined in Rule 501 under the Securities Act.

1.8    Certificates; Legend. The Company may issue membership certificates identifying each Member and each Member's Interest, if both Members elect to do so. If issued, the Company will endorse on each such certificate a legend reading substantially as follows:

The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, or the securities laws of any state or other jurisdiction, and may not be sold, transferred, pledged, hypothecated or otherwise disposed of in the absence of

(1) an effective Registration Statement for such securities under applicable law, or (2) an opinion of counsel, satisfactory to the Company, that such registration is not required.

The limited liability company membership interests represented by this certificate are subject to a Second Amended and Restated Operating Agreement dated as of May ___, 2017 between the Members of the Company and the Company ("Operating Agreement"). The holder of the membership interests represented by this certificate may not transfer, assign, encumber or otherwise dispose of such interests except in accordance with the terms of the Operating Agreement. A copy of the Operating Agreement is on file at the Company's principal office. By acceptance of this certificate, the holder hereof agrees to be bound by the terms of the Operating Agreement.

1.9    Related Parties / Subsidiaries. With respect to any Controlled Entity owned or controlled by the Company or in which the Company or the Class A Members own any or all equity interests, the Class A Members (as members or equity holders) shall have the same voting (or non-voting), management, Deadlock resolution rights, restrictions on transfer and buy-sell rights with respect to each such Controlled Entity as apply to the Company pursuant to this Agreement. The Class A Members shall take all such actions as may be necessary or desirable to give effect to this provision. The Class A Members acknowledge that the Company's Affiliates and subsidiaries and other Controlled Entities as of the Effective Date of this Agreement are identified in Schedule 1.9 hereto. This provision is intended to be and shall automatically be deemed to be incorporated by reference in each operating agreement or similar governing document as applicable to each Company Affiliate or subsidiary or other Controlled Entity. The Parties acknowledge that the Class B Members have no equity interests in any Controlled Entity.

## ARTICLE II
## NAME; PURPOSE AND POWERS; ANNUAL REPORT: MEETINGS

2.1    Name of Company. The name of the Company is CWGL Holdings, LLC. The Company may do business under that name or such other name as the Managers may from time-to-time determine. If the Company does business under a name other than that set forth in its Articles, the Company shall file a fictitious name certificate as required by Applicable Law.

2.2    Purpose and Powers. The Company is organized for the purposes of owning, managing and performing administrative services in support of various senior assisted living service providers, or home health care, or durable medical equipment providers, all of which are (and will be) owned and operated by the Company or Affiliates (and all comprising Controlled Entities), as well as for the purpose of conducting or transacting any lawful businesses or purposes within the State of Florida or any other jurisdiction where the Company desires to transact business (the "Business"). The Company is empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of the Business, and the Company shall have all powers of a limited liability company under the Act, including the power to do all things necessary or convenient to operate its Business and accomplish its purposes as described herein.

7742056-9

2.3    Annual Report. The Company shall file an annual report with the Florida Secretary of State on or before the required filing date of such report for each calendar year, on the form provided by the Secretary of State.

2.4    Meetings. A general meeting of the Members may be held each year on such date (a Business Day) and at such time as the Manager may designate for the transaction of such business as may properly come before the Members at such meeting. In addition, special meetings of the Members may be held on a Business Day if called by any Member. Such general or special meetings shall be held at the principal office of the Company or at such other such place as determined by the Managers. The presence or participation of both Founding Members will constitute a quorum for purposes of any meeting of the Class A Members. The presence or participation of both Class B Members will constitute a quorum for purposes of any meeting of the Class B Members. Members shall be deemed present at a meeting if a conference telephone or similar communications equipment is used, by means of which all persons participating in the meeting may simultaneously hear each other.

2.5    Notice of Meeting. Written notice stating the place, day and hour of the meeting, indicating that it is being issued by or at the direction of the person or persons calling the meeting, and stating the purpose or purposes for which the meeting is called shall be delivered to each Member at least five (5) Business Days prior to the meeting. Notices may be delivered either personally, or by telephone (provided that the notice is communicated directly to the Member), facsimile or other form of electronic communication, or by mail or courier service. Written notice is effective on the earlier of receipt or three (3) Business Days after deposit in the United States mail, addressed to the Member at the Member's address as it appears on the records of the Company, with postage thereon prepaid.

2.6    Waiver of Notice. A Member may waive any notice required hereunder either before or after the date and time stated in the notice. The waiver must be in writing signed by each Member entitled to such notice, and delivered to the other Member. Neither the business to be transacted at, nor the purpose of, any general or special meeting of the Members need be specified in any written waiver of notice. Attendance of a Member at any meeting of Members shall constitute a waiver of notice of such meeting, except if at the beginning of the meeting, the Member objects to the transaction of any business. Attendance shall also constitute a waiver of objection to consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

2.7    Voting. Except as otherwise specifically provided herein, all matters which require the consent and approval of, or other determination by, the Members under this Agreement shall require the affirmative vote or written consent of each Class A Member. The affirmative vote or written consent of each Class A Member as to each matter to come before the Members shall be the act of the Members. Each Class A Member shall be entitled to vote in proportion to that Member's Percentage Interest. Class B Interests do not confer Management

11

Rights or voting rights with respect to the Company. Notwithstanding anything herein to the contrary, an Interested Nonmember or other Transferee shall have no right to participate as a Member in the management and conduct of the Company's business and affairs or vote on or consent to any matter reserved to the Members hereunder or under the Act.

2.8     Proxies. A Class A Member entitled to vote on any matter properly coming before the Class A Members for a vote may vote in person or by proxy. A Class A Member may appoint a proxy to vote or otherwise act for such Member by signing a reasonably acceptable appointment form, as reasonably approved by the other Member.

2.9     Action by Members Without a Meeting. Any action required or permitted to be taken by the Class A Members at a meeting of said Members may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by both Class A Members. Prompt notice (and in any event notice given within ten (10) days after obtaining authorization by written consent) of the taking of the action without a meeting shall be given to each Class B Member, provided that failure to give such notice shall not invalidate any action so taken.

2.10     Waiver of Appraisal Rights. To the extent the appraisal rights provisions of Section 605.1006 of the Act may apply to any merger, conversion, interest exchange, sale of assets, amendment of this Agreement, or to any other action or event described thereunder, the Members hereby evidence their acknowledgment of such appraisal rights provisions and hereby irrevocably and unconditionally waive all such rights. For the avoidance of doubt, this waiver shall also apply to any Transferee.

2.11     Collaboration; Deadlock; Deadlock Resolution.

(a)     The Members and Managers each acknowledge that they each are sophisticated in business and experienced in the particular business conducted by the Company. In recognition of the fact that their mutual and reciprocal interests are intrinsically aligned with the best interests of the Company, the Members and Managers agree to cooperate in good faith and use their respective commercially reasonable efforts to address and resolve disagreements in a collaborative manner to reach reasonable consensus; it being acknowledged that only Class A Members have Management Rights and voting rights. If despite good faith and commercially reasonable efforts to reach needed agreements as contemplated above, the Class A Members or Managers are unable to reach a mutually acceptable agreement on a required decision after at least two meetings, the result is referred to as a "Deadlock".

(b)     During the pendency of any Deadlock, the Company shall continue to operate in a manner consistent with its prior practices until such time as the Deadlock is resolved, and the Class A Members and Managers will continue in their good faith attempts to resolve the Deadlock by reaching consensual agreement on the matter or matters at issue. If the Deadlock pertains to the approval of the Company's annual business plan or budget, then Company shall operate in accordance with the business plan or budget as in effect immediately prior to the Deadlock; provided that, if necessary based on actual costs as then in effect, the monetary line items in such continuing budget will be increased by 5% or a percentage that

correlates to the actual cost inflation, whichever is greater.

       (c)    If the Class A Members or Managers are unable to reach agreement as to the matter or matters at issue causing Deadlock within one year of the date the Deadlock arises, a Class A Member dissatisfied with the Deadlock may elect to invoke the "shotgun" buy/sell procedures set forth in Section 9.15 below.

ARTICLE III
TERM

The Company shall continue until terminated as provided in Article 12.

ARTICLE IV
MANAGERS; MANAGEMENT

    4.1    <u>Managers and Management</u>. Except as otherwise provided in this Agreement, the overall management and control of the business and affairs of the Company shall be vested in the Managers; provided that the Managers may delegate specific duties to officers, employees or contractors serving the Company under their supervision. The Managers shall devote their full time efforts to the business and affairs of the Company. The number of Managers of the Company initially shall be two and the Managers initially shall be Claudia Wechter and Gary R. Loffredo. The number of Managers shall be fixed from time to time by the Class A Members.

    4.2    <u>Management Tenure</u>. Each Manager shall serve until his or her death, disability, resignation, or removal. Upon the death, Disability, resignation or removal of a Manager for "cause", the remaining Manager shall serve as the sole Manager of the Company, unless a replacement, new or additional Manager is appointed by such the remaining Manager. For purposes of this Section, the term "<u>disability</u>" or "<u>disabled</u>" shall mean the inability of a Manager to perform the Manager's ordinary and customary duties as a Manager for and on behalf of the Company for a continuous period of one hundred twenty (120) days due to a physical or mental illness or impairment, as determined by two (2) licensed physicians, one of whom shall be the Manager's regularly attending physician, if any.

    4.3    <u>Day-to-Day Rights and Powers of Managers</u>. In addition to the rights and powers which the Managers may have under the Act, and except as otherwise specifically vested in the Class A Members hereunder or under the Act (with respect to voting members), either Manager, acting alone, shall have all rights and powers necessary for the management of the Company, and subject to the Major Decision limits specified in Section 4.4 below, including, without limitation, the right and power to do the following:

       (a)    To execute any and all agreements, contracts, documents, certifications and instruments approved by the Class A Members, as necessary or convenient in connection with the management of the Company or its assets;

13

(b)     To engage in any kind of lawful activity and to perform and carry out contracts of any kind necessary to or in connection with or incidental to the accomplishment of the purpose of the Company as may be lawfully carried on or performed under the laws of the State of Florida and/or in other jurisdictions in which the Company transacts business;

(c)     To acquire, by purchase, lease, option, or otherwise, any personal property or equipment approved by the Class A Members which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company; provided, however, that either Manager may approve equipment leases or purchases not to exceed a total cost of $3,000 in any instance or $10,000 cumulatively in any year;

(d)     To engage in such other activities and incur such other incidental expenses in furtherance of the foregoing.

4.4     Major Decisions. Notwithstanding anything to the contrary in this Agreement, the following actions (the "Major Decisions") shall require the prior written consent and approval of each Class A Member:

(a)     Determination that additional Capital Contributions, Member loans or other financings are required;

(b)     Admitting a new Member, changing the Member Interest classification of any Member, altering the Percentage Interest of any Member, altering Management Rights or Economic Rights conferred hereunder; or altering the rights and limitations attributable to any Interested Nonmember;

(c)     Except for equipment leases and nominal purchases as provided in Section 4.3, borrowing any money on behalf of the Company or pledging or encumbering any assets of the Company, or the acquisition, sale, lease, exchange or other Transfer by the Company of any property, or the granting of an option or right of first offer or refusal with respect to any of the foregoing;

(d)     The Transfer of all or substantially all of the assets of the Company, or pursuit of Business Opportunities as contemplated in Article VIII, or any sale, merger, consolidation or similar transaction affecting the Company or Membership Interests, or the granting of an option or right of first offer or refusal with respect to any of the foregoing;

(e)     Entering into contracts or leases which are not terminable at will, without penalty, or which involve cost to the Company, or any Controlled Entity, or any Member, in excess of $3,000 in any instance or $10,000 cumulatively in any year;

7742056-9

14

(f)     Lending money to, or guaranteeing the debts or other obligations of, a Member, any Controlled Entity, or any other Person by the Company;

(g)     Providing any guarantee, indemnity or other financial support by the Company or any Controlled Entity;

(h)     Commencing, prosecuting, settling, compromising, waiving or submitting to arbitration, any suits, actions, or claims at law or equity to which the Company is a party involving monetary claims in excess of $10,000, or involving claims for injunction or specific performance, or stipulating to the entry of any order, judgment or decree in any such proceeding;

(i)     Converting, merging or consolidating the Company with or into any partnership, limited liability company or other entity;

(j)     Employing or contracting with any Persons, including entering into any employment agreement involving a family member of a Member, or a personal friend of a Member, or entering into any agreement with or making any payment to any relatives, Affiliates or personal friends of a Member, except on arm's-length terms comparable to those obtainable in the market with unaffiliated persons and otherwise approved by both Initial Members after disclosure of the relationship with the relative, Affiliate or friend of a particular Member, or delegating any Manager duties to a relative, Affiliate or personal friend without the prior written consent of the other Member;

(k)     Retaining counsel, accountants, financial advisors, and other professional personnel;

(l)     Changing the name or business purpose of the Company, or otherwise amending the Company's Articles of Organization or this Agreement;

(m)     Establishing any Supplemental Member Classifications;

(n)     The redemption or purchase by the Company of any Member's Interest in the Company, other than any purchase of Interests in accordance with this Agreement;

(o)     Appointment or replacement of a Manager or an Officer, or appointment, replacement or employment decisions regarding professional staff or account executives of the Company, or decisions involving employment agreements, hiring, firing, promotion, demotion or other aspects of human resource management for the Company;

(p)     The filing of a voluntary petition in bankruptcy or a voluntary petition in liquidation by the Company or allowing the filing of an involuntary petition in bankruptcy or an involuntary petition in liquidation of the Company, or seeking the appointment of a receiver or

15

trustee or the making of an assignment for the benefit of creditors, or determining to dissolve or liquidate the Company or any Controlled Entity;

(q) Any change in the tax status of the Company, or any change in the accounting methods or procedures adopted by the Company;

(r) Establishment of any incentive compensation or option plan involving Interests or other equity securities of the Company or any Controlled Entity;

(s) Determining to make distributions from Available Net Cash Flow; or

(t) Taking any of the foregoing actions for, on behalf of, or affecting any Controlled Entity.

4.5    <u>Resignation of Manager</u>.  A Manager may resign from such position at any time upon giving at least thirty (30) days' prior written notice to the Members.

4.6    <u>For Cause Removal of a Manager</u>. A Founding Member serving as Manager, or any Manager, may be removed from his or her office as Manager "for cause", at the election of the other Initial Member, acting alone, at any time upon the occurrence of any of the following events:

(a) If a Manager materially breaches any provision(s) of this Agreement or otherwise fails to perform his or her duties to the Company, including, without limitation, by virtue of a Manager's failure to act in good faith for the best interests of the Company or to comply with the standards of loyalty and reasonable prudence and care owing to the Company, or as evidenced by persistent unexcused absence from work for the Company or persistent inattention to such work without justification reasonably acceptable to the other Manager, where such breach or failure continues uncured (but only if such breach or failure is reasonably capable of being cured) for a period of ten (10) business days after written notice specifying the nature of the alleged breach or failure thereof is given by the Company or by the other Manager; or

(b) If a Manager engages in any act of fraud, misappropriation or conversion of Company assets, self-dealing, discrimination, gross negligence, embezzlement or willful misconduct with respect to the Company, including without limitation, the intentional misappropriation of funds or property (including intellectual property) of the Company, or conduct that adversely affects the Company's or the Members' or any Controlled Entity's reputation, goodwill, business or assets or the ability of the Manager in question to perform his or her responsibilities to the Company or any Controlled Entity; or

(c) If a Manager is convicted of, or pleads guilty or no contest to, any crime punishable as a felony or any act in violation of the Company's human resource standards as in effect from time to time; or

16

(d)     If a Manager engages in conduct relating to the Company's business or his duties which is not authorized, directed, approved or ratified by the Company and which is intended or reasonably likely to damage the Company or its reputation, or the reputation of the other Manager or any Controlled Entity, or which adversely affects the Company, any Controlled Entity or any Member, including without limitation, if a governmental action, investigation or sanctions are imposed on the Company, any Controlled Entity or any Member as a result of the Manager's actions or conduct; or

(e)     If a Manager becomes insolvent, in the absence of a reasonably demonstrated plan for rehabilitation or recovery; or

(f)     With exception for purely consensual and private relationships that do not affect and are not reasonably likely to affect the Company or a Controlled Entity in any adverse manner, if a Manager is found to have engaged in conduct proscribed under workplace or other sexual discrimination or predation laws or standards adopted by the Company from time to time, involving or affecting any officer, employee, contractor, customer or third-party doing business with the Company or a Controlled Entity, or if a Manager acts in a manner that implicates discrimination, predation or an offensive or oppressive work environment affecting the Company or a Controlled Entity, or any officer, employee, customer, or third-party doing business with the Company or a Controlled Entity, or if a Manager generally and adversely affects the Company's working environment or liability insurance coverage; or

(g)     If a Manager reports to work under the influence of alcohol, illegal drugs or unauthorized prescription drugs; or such Person uses such substances habitually (or tests positive for such use) while at work or scheduled to be at work, or such Person possesses, sells or distributes illegal drugs or unauthorized prescription drugs (whether or not at the workplace); or

(h)     If a Manager appropriates for himself or herself or his or her family members or friends or any of their respective affiliates a business opportunity of the Company or a Controlled Entity without the prior written consent of the Company, or secures or attempts to secure personally (directly or indirectly), any profit or business advantage in connection with any opportunity inuring to the Company; or

(i)     If a Manager participates actively in a business or businesses in direct competition with the Company or a Controlled Entity, without disclosure in advance and the Company's prior written consent, or violates any of the restrictive covenants set forth in Article VIII.

4.7     <u>Compensation of Managers; Reimbursement for Expenses</u>. The Managers shall receive such compensation for the performance of their duties and responsibilities, as approved in writing by each Class A Member, and each Manager's compensation will be equal to the other Manager's in the amount so approved by the Class A Members. If a Manager is a party to an Employment Agreement with the Company, the employment agreement (and not this Agreement) shall govern with respect to compensation. The Company shall reimburse the Managers for all reasonable expenses incurred by the Managers in connection with and arising out of the performance of their duties and responsibilities, consistent with the Company's

17

reasonable and customary business practices and provided that such expenses are supported by adequate documentation.

## ARTICLE V
### CAPITAL CONTRIBUTIONS; ADDITIONAL FINANCING; CAPITAL ACCOUNTS

5.1     Initial Capital Contributions. The Members confirm that as their initial Capital Contributions they have contributed, or will contribute upon execution of this Agreement, cash or services in exchange for their respective Membership Interests in the Company, as described in Exhibit A attached hereto.

5.2     Additional Capital Contributions. Other than the Member's initial Capital Contributions set forth on Exhibit A, no Member may make any further Capital Contributions to the Company without Super Majority approval.

5.3     Maintenance of Capital Accounts. The Company shall establish and maintain for each Member a separate capital account (a "Capital Account") on its books and records in accordance with this Section 5.3. Each Member's Capital Account shall be increased by the amount of: (a) such Member's Capital Contributions, including such Member's initial Capital Contribution; and (b) any Profits or other item of income or gain allocated to such Member pursuant to Article VI; and (c) any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member. Each Member's Capital Account shall be decreased by: (x) the cash amount or Book Value of any property distributed by the Company to such Member; and (y) the amount of any Losses or other item of loss or deduction allocated to such Member pursuant to Article VI; and (z) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

5.4     No Interest on Capital Contributions.  Except as otherwise provided in this Agreement, Members shall not be paid interest on their Capital Contributions.

5.5     No Withdrawal of Capital Contributions.  Except as otherwise provided in this Agreement, Members shall not be entitled to withdraw any part of their Capital Contributions until the full and complete winding-up and liquidation of the business and affairs of the Company.

5.6     Loans by Members. The Members may, but shall not be required to, make any loans to the Company, upon such terms and conditions as determined by a Super Majority ("Member Loans"). Any Member Loans shall be evidenced by separate promissory notes specifying the terms and conditions of such loans. If required by the Manager at the time of making the Member Loan or at any time thereafter, Member Loans shall be subordinated to any other secured arm's-length indebtedness of the Company or its subsidiaries.

18

7742056-9

5.7     No Third Party Beneficiaries. The obligations of the Members under this Article V are not intended to create any obligation to, or be enforceable by, any third party beneficiaries. No creditor may rely on any obligations hereunder unless the Member against whom the obligation is asserted and the Company has expressly agreed in writing that the creditor may do so.  The Members have not agreed to make any additional Capital Contributions or loans to the Company, except as expressly described in this Article V; provided that such agreements hereunder do not give rise to any commitment or any liability to any Person other than the Members and the Company.

5.8     Succession Upon Transfer. In the event that any Membership Interests are transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interests.

5.9     Negative Capital Accounts. In the event that any Member shall have a deficit balance in his, her or its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by applicable law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

## ARTICLE VI
## TAXATION; ALLOCATION OF PROFITS AND LOSSES

6.1     No State Law Partnership; Partnership Tax. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member(s), or a Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this Section 6.1.

6.2     Allocation of Profits and Losses. Profits or Losses of the Company for any taxable year thereof shall be allocated among the Members in a manner such that the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the distributions that would be made to such Member if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed to the Members immediately after making such allocations, in accordance with Section 7.1 (or, with respect to a Fiscal Year in which an actual liquidation occurs, in accordance with Section 7.1 and

19

Section 11.3), minus (b) such Member's share of "partnership minimum gain" (as determined pursuant to Treasury Regulations Sections 1.704-2(d) and 1.704-2(g)) and "partner nonrecourse debt minimum gain" (as determined pursuant to Treasury Regulations Sections 1.704-2(i)(3) and 1.704-2(i)(5)), computed immediately prior to the hypothetical sale of assets. Notwithstanding the foregoing, the allocations attributable to the Class B will be based on Profits and Losses attributable to the Class B Entities only.

   6.3   <u>Special Allocations Rules</u>.

      (a)   <u>Qualified Income Offset</u>. If any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6) which results in such Member having a deficit Capital Account balance, or otherwise has a deficit Capital Account balance, which exceeds the sum of (i) the amount of such deficit the Member is obligated to restore, and (ii) the amount of such deficit the Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), such Member will be specially allocated items of income and gain of the Company in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit in such Member's Capital Account as quickly as possible; provided, that an allocation pursuant to this Section 6.3(a) shall be made if and only to the extent that such Member would have an Capital Account deficit after all other allocations provided in this Article IV have been tentatively made as if this Section 6.3(a) were not in the Agreement. This Section 6.3(a) is intended to constitute a "qualified income offset" as provided by Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith. Any special allocation made pursuant to this Section 6.3(a) shall be taken into account for purposes of determining subsequent allocations of income and losses, so that the total allocations will, to the extent possible, equal the allocations which would have been made if this Section 6.3(a) had not previously applied.

      (b)   <u>Minimum Gain Chargeback</u>. Except as otherwise set forth in Treasury Regulations Section 1.704-2(f), and notwithstanding any other provision of this Article IV, if, during any taxable year of the Company, there is a net decrease in "partnership minimum gain" (within the meaning of Treasury Regulations Section 1.704-2(d)), each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Member's share of the net decrease in partnership minimum gain, as determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.5(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

      (c)   <u>Member Nonrecourse Debt Minimum Gain Chargeback</u>.   Except as

20

7742056-9

otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, and notwithstanding any other provision of this Article IV, if there is a net decrease in "partner nonrecourse debt minimum gain" (within the meaning of Treasury Regulations Section 1.704-2(i)(3)) attributable to a "partner nonrecourse debt" (within the meaning of Treasury Regulations Section 1.704-2(b)(4)) during any Company taxable year, each Member who has a share of that partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt (as determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the year shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to that Member's share of the net decrease in the partner nonrecourse debt minimum gain attributable to such partner nonrecourse debt, as determined in accordance with Treasury Regulations Section 1.704-2(i)(4).  The items to be so allocated shall be determined in a manner that is consistent with the provisions of Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations.  This Section 4.4(c) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(d)    Nonrecourse Deductions.    Nonrecourse deductions (as such term is defined in Treasury Regulations Section 1.704-2(b)), if any, for any taxable year or other period shall be allocated among the Members in proportion to their respective Percentage Interests.

(e)    Partner Nonrecourse Deductions.    Any "partner nonrecourse deductions" (within the meaning of Treasury Regulations Section 1.704-2(i)) for any taxable year or other period shall be specially allocated to the Member who bears the "economic risk of loss" with respect to the partner nonrecourse debt (within the meaning of Treasury Regulations Section 1.704-2(b)(4)) to which such partner nonrecourse deductions are attributable, in accordance with Treasury Regulations Section 1.704-2(i).

(f)    Code Section 704(c) Allocations.    To the extent required under Code Section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take into account the difference, if any, between the tax basis of the property to the Company and its Book Value at the time of contribution to the Company. If the Book Value of any Company asset is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f), subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(g)    Compliance with Treasury Regulations.    It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the requirements set forth in the Treasury Regulations promulgated under Section 704(b) of the Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such manner as shall conform to the allocation rules and principles

21

set forth in such Treasury Regulations as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in light of such Treasury Regulations.

       (h)    <u>Allocations in Respect of Transferred Membership Interests</u>. In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with this Agreement, Profits and Losses and other items of income, gain, loss and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

ARTICLE VII
<u>DISTRIBUTIONS</u>

    7.1    <u>Available Net Cash Flow</u>. Except as provided in Sections 7.2, 7.3, and 11.3, if the Mangers determine (as a Major Decision) to make Distributions, the Managers shall make Distributions periodically as they determine, acting reasonably. Distributions for Class A Members will be based on Class A Net Distributable Cash, and Distributions for Class B Members will be based on Class B Net Distributable Cash. If made, Distributions shall be made to the Members at the addresses specified on the signature pages of this Agreement or such other address contained in a written notice from a Member to the Company. If made, Distributions shall be made to Class A Members (based on Class A Net Distributable Cash) and to Class B Members (based on Class B Net Distributable Cash), respectively, each Pro Rata. To the extent any Member has an outstanding Member Loan, Distributions will be applied by the recipient Member first to pay interest and then to reduce principal on such Member Loan, and the Company will account for amounts so credited as deductible to the extent permissible under the Code. The Class A Net Distributable Cash will be distributed 100% to the Class A Members, Pro Rata, and the Class B Net Distributable Cash will be distributed 100% to the Class B Members, Pro Rata.

    7.2    <u>Limitation</u>. Except in the case of liquidation of the Company, at the time of a Distribution of Class A Net Distributable Cash or Class B Net Distributable Cash, the Company must have available to it unencumbered cash funds sufficient for normal working capital and for amounts needed for a reasonable reserve for the continuing conduct of the business of the Company and the Controlled Entities. In addition, the Distribution may not impair the capital of the Company as described in Section 605.0408 of the Act (or of any Controlled Entity).

    7.3    <u>Capital Proceeds</u>. If Capital Proceeds are received by the Company (except in the case of a liquidation of all assets of the Company, in which case the provisions of Section 12.3 shall be applicable), the Capital Proceeds shall be distributed in the same order of priority as Class A Net Distributable Cash or Class B Net Distributable Cash; it being understood and agreed that the Class B Members will be entitled to Capital Proceeds deriving from the Class B Entities only.

    7.4    <u>Minimum Distribution for Taxes</u>. To the extent permitted under the Company's loan covenants and to the extent of Available Net Cash Flow, and subject to the Manager's determination to make a Distribution, the Company will distribute to the Members with respect

22

to each fiscal quarter an amount of cash (a "Minimum Tax Distribution") which in the good faith judgment of the Managers equals (a) the aggregate amount of Profits allocable to the Members in respect of such fiscal quarter (net of taxable Losses allocated to the Members in respect of prior fiscal quarters and not previously taken into account under this clause), multiplied by (b) 40% (or such other rate determined by the Managers to be the maximum combined federal, state and local aggregate income or other tax rate applicable to the individual direct or indirect owner of the Member with the highest such tax rate), with such Minimum Tax Distribution to be made to the Members in the same proportions that Profits are allocated to the Members during such fiscal quarter (net of taxable Losses allocated to the Member in respect of prior fiscal quarters and not previously taken into account under this clause). To the extent the Company does not make the full amount of a Minimum Tax Distribution with respect to a fiscal quarter, the shortfall shall be added to all subsequent fiscal quarters until it is paid in full. Minimum Tax Distributions shall be treated for purposes of this Agreement as advances on distributions and shall be offset against distributions pursuant to Section 7.1 in such a manner that each Member has received an amount of distributions (taking into account all distributions, including Minimum Tax Distributions) equal to the distributions that such Member would have received in the absence of this Section 7.2.

7.5     Distribution of Assets in Kind. If assets of the Company are distributed in kind, they shall be distributed to the Members as tenants-in-common in the same proportions in which the Members would have been entitled to cash distributions had there been a sale of these assets.

7.6     Demand for Distribution. No Member shall be entitled to demand and receive a distribution of Company property in return for such Member's Capital Contributions to the Company.

7.7     Transferees. A non-Member transferee shall be entitled to the distributions attributed to the Member providing the non-Member Transfer to the Transferee; provided that a Transferee shall have no voting rights or other rights attributable to the Member who made the Transfer to the non-Member.

ARTICLE VIII
RESTRICTIVE COVENANTS

8.1     Member and Affiliate Business Dealings.

(a)     Each Member understands and acknowledges that the conduct of the business of the Company or a Controlled Entity may involve business dealings with other separate businesses or interests of a Member or Persons affiliated with a Member (as generally understood under Florida law, "Affiliates"); provided that Persons with whom the Company engages in business may be Affiliates one or more Member(s), but not necessarily all Members. Such separate dealings may include the Company's or a Controlled Entity's entering into contracts with such other businesses or interests. For purposes of this Article VIII, references to the Company shall be deemed to include each Controlled Entity.

(b)     The creation of the Company, and the admission of each Member as a

23

Member, and the assumption by each of the Members of their respective duties hereunder shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain such other businesses and interests and to receive and enjoy profits or compensation therefrom, and without prejudice to the Company's right to enter into contracts with such other businesses or interests. Accordingly, each Member waives any rights he or she might otherwise have to share or participate in such other businesses or interests of the other Members or their respective Affiliates; provided, however, that (i) each Member shall give notice to the other Members of his or her (or an Affiliates') interest in any contract or business dealing which the Member or an Affiliate proposes to enter into with the Company; (ii) the contract or business dealing is not manifestly unreasonable to the Company; and (iii) the business dealing or contract with the Company is approved in advance by the Managers.

      8.2    <u>Business Opportunities with Third-Persons</u>. Subject in all cases to the provisions of Section 8.1 above, each Member agrees that any and all business opportunities that involve, relate to or are in any manner associated with the business of the Company anywhere in the United States ("<u>Business Opportunities</u>") shall be first offered to the Company. Each Member desiring to pursue any Business Opportunities shall provide written notice ("<u>Notice of Business Opportunities</u>") to the other Members. The Notice of Business Opportunities shall contain a detailed description of the Business Opportunities proposed for the Company (or a Controlled Entity). The Company shall have the right of first refusal to pursue any such Business Opportunities. Such right of refusal shall be exercised by the Class A Members, acting unanimously, by providing written notice within thirty (30) days following receipt of the Notice of Business Opportunities. If the Class A Members rejects any such Business Opportunity (or fail to exercise, on a timely basis, the Company's right of first refusal), then such Business Opportunities may be acted upon by the Member(s) who proposed the Business Opportunities presented to but not acted upon by the Company, or the rejecting Class A Member may declare that the Class A Members are in Deadlock.

      8.3    <u>Non-Compete; Non-Solicitation</u>.

      (a)    Each Member acknowledges and recognizes that the highly competitive nature of the Company's business and that the goodwill and patronage of the Company's customers constitute a substantial asset of the Company, having been acquired through considerable time, effort and money.  Accordingly, each Member agrees that, for a period of 12 months following the date (if any) that such person is no longer a Member, he shall not, without the written consent of the Company, directly or indirectly, either individually or as an employee, agent, partner, member, shareholder, venturer, consultant, option holder, guarantor or in any other capacity other than as a lender of money or passive investor of less than 5% of the equity, participate in, engage in or have an active financial interest or management position in any business, firm, company, person or entity if it competes with the material business operations conducted by the Company or its subsidiaries or affiliates or any successor or assign thereof, nor will he solicit any other person to engage in any of the foregoing activities, in each case within any geographic location(s) in which the Company or its subsidiaries conducts material business operations or in which the Company is then actively pursuing business opportunities. For purposes of this Section 8.3, a "subsidiary" is any entity in which the Company or owns, directly or indirectly, more than a 25% equity interest. The Members acknowledge that the scope of this

restriction is reasonable, appropriate and necessary to protect the Company's legitimate business interests. The foregoing provisions of this Section shall not prohibit any Member to own (as the result of open market purchase) 5% or less of any class of capital stock of a company which is regularly traded on a national securities exchange or over-the-counter on the NASDAQ System. As to the Class B Members, the non-compete provisions set forth in the respective employment agreements for each Class B Member shall govern and control over this subsection.

(b)     For a period of two years following the date (if any) that a Member is no longer a Member, such Person agrees not to solicit (directly or indirectly) or assist or encourage the solicitation of any other Member, or any officer or employee of the Company or any of its subsidiaries to work for any competing business, firm, company, person or entity in which the former Member, directly or indirectly, in any capacity described in subsection (a) above, participates or engages (or expects to participate or engage) or has (or expects to have) a financial interest or management position. As to the Class B Members, the non-solicitation provisions set forth in the respective employment agreements for each Class B Member shall govern and control over this subsection.

(c)     For a period of two years following the date (if any) that a Member is no longer a Member, such Person agrees not to compete with the Company by soliciting (directly or indirectly), inducing or influencing any of the customers of the Company or any subsidiary to discontinue or reduce the extent of such relationship with the Company, or commence or expand any such relationship with any competitor of the Company.

(d)     If any of the covenants contained in this Section 8.3 are held by a court of competent jurisdiction to be unenforceable because of the duration or scope of such provision, the activity limited by or the subject of such provision and/or the time-period or area covered thereby, then the court making such determination shall construe such restriction so as to thereafter be limited or reduced to be enforceable to the greatest extent permissible by applicable law.

8.4     <u>Confidential Information</u>. Each Member agrees that he or she shall not, without the prior written consent of the other Member, divulge, furnish or make accessible to any Person, firm or other business entity, any information, trade secrets, technical data or know-how relating to the business, business practices, methods, products, processes, equipment, clients' prices, lists of customers or marketing agents of the Company, or other confidential or secret aspect of the business of the Company and/or any subsidiary (as defined above), except as may be required in good faith in the course of his or her employment with and service to the Company as a Member and/or Manager or officer, or as may be required by law (and then, only with as much prior notice to the Company as is practicable), unless such information shall become public knowledge or becomes available from independent sources, in each case other than by reason of a Member's breach of the provisions hereof.

8.5     <u>Equitable Remedies</u>. In consideration of this Agreement, each Member acknowledges that the Company will suffer irreparable damage if any provisions of Sections 8.1, 8.2, 8.3 or 8.4 hereof are not performed strictly in accordance with their terms or are otherwise breached. Each Member hereby expressly agrees that the Company and each other Member shall

be entitled as a matter of right to injunctive or other equitable relief, in addition to all other remedies permitted by law, to prevent a breach or violation by a Member and to secure enforcement of the provisions of Sections 8.1, 8.2, 8.3 and 8.4 hereof. The Company's or a Member's resort to such equitable relief, however, shall not constitute a waiver or any other rights or remedies that the Company or any Member may have.

8.5     Indemnification. The Company shall defend, indemnify and hold harmless the Members, the Managers and any Officers of the Company, to the fullest extent permitted under the Act, from and against any and all liability, loss, expense or damage (including reasonable attorney's fees and disbursements) incurred or sustained by them in the course of the conduct of the business of the Company and arising out of any act or omission to act occurring in good faith and within the scope of the authority, if any, conferred by this Agreement upon them.

ARTICLE IX
TRANSFER OF MEMBERSHIP INTERESTS

9.1     General Restriction on Transfers. Except as otherwise set forth in this Agreement, Interests (or any portion thereof) may not be the subject of a Transfer, directly or indirectly, voluntarily or involuntarily, without the Class A Members' unanimous consent. If each Class A Member does not approve of the proposed Transfer, the Transferee shall have no right to participate in the management or conduct of the Company's activities and affairs or to become a Member thereof (or exercise any rights or powers of a Member including, without limitation, any voting rights), and absent such written consent, the Transferee shall only be a "transferee" within the meaning of the Act and shall be entitled to receive only distributions to which the transferor Member otherwise would be entitled. A Transfer of the ownership interests of a Member or Transferee that is an entity shall be considered a Transfer of an Interest in the Company for this purpose.

9.2     Unauthorized Transfer. Any Transfer of Interests in violation of this Agreement shall be deemed invalid, null and void, and of no force and effect, and neither the Company nor any Member shall have any obligation to recognize any such unauthorized Transfer. Except as expressly provided in this Article IX, no Transferee of all or any portion of an Interest shall have the right to become a substituted Member in place of his transferor, unless: (a) Unanimous Consent to such substitution shall have been obtained; and (b) the approved Transferee shall have executed a Joinder (as defined in Section 9.12 to this Agreement) evidencing such Transferee's agreement to be bound by the terms and conditions herein.

9.3     Issuance of Additional Interests. The Company shall not issue any additional Interests, including to any existing Member, without Unanimous Consent.

9.4     Admission of New Members. Except as expressly provided in this Article IX, no Person shall be admitted to the Company as a new Member unless (a) Unanimous Consent is first given; and (b) the Person shall have executed a Joinder evidencing the intention and agreement of the new Member to be bound by the terms and conditions herein. The applicable terms and conditions of such admission, including, without limitation, the consideration payable by the new Member and the Interest to be acquired by the new Member, shall be determined by

26

the Initial Members.

9.5    <u>Withdrawal or Dissociation of Members</u>. No Member shall have the power or right to voluntarily withdraw or dissociate from the Company prior to the dissolution and winding up of the Company and any such withdrawal or dissociation or attempted withdrawal or dissociation by a Member prior to the dissolution and winding up of the Company shall be null and void.

9.6    <u>Effectiveness of Transfer</u>.

(a)    If Unanimous Consent is given to a Transfer of Interests, the Transfer by a Member or a transferee of all or any part of such Member's Membership Interest shall become effective on the first day of the month following receipt by the Company of evidence of the Transfer in form and substance reasonably satisfactory to the Company and a Transfer fee sufficient to cover all reasonable expenses of the Company connected with the Transfer.

(b)    No Transfer that violates this Article 9 shall be valid or effective, and the Company shall not recognize the purported Transfer for the purposes of allocating net profits and losses in accordance with Article 6 or making distributions in accordance with Article 7. The Company may enforce the provisions of this Article 9 directly or indirectly or through its agents by entering an appropriate stop transfer order on its books or otherwise refusing to register or transfer or permit the registration or transfer on its books of any proposed Transfers not made in full compliance with this Article 9.

(c)    The Company shall, from the time, whenever a Membership Interest is registered in the name of the transferee on the Company's books in accordance with the above provisions, pay to the transferee all further distributions or other compensation by way of income or return of capital, on account of the Membership Interest transferred. Until the Transfer is registered on the Company's books, the Company may proceed as if no Transfer had occurred.

9.7    <u>Bona Fide Third-Party Offers</u>.

(a)    <u>Bona Fide Offer; Notice</u>. If a Member ("<u>Selling Member</u>") receives a *bona fide* written offer ("<u>Offer</u>") from any third party ("<u>Offeror</u>") to purchase all or any portion of the Selling Member's Interests which the Selling Member desires to accept ("<u>Proposed Sale</u>"), the Selling Member shall be obligated to give written notice of the Proposed Sale ("<u>Notice of Proposed Sale</u>") to the Company and to the other Members ("<u>Other Members</u>") within five (5) business days of receipt of such Offer. The Notice of Proposed Sale shall set forth the particulars of the Offer including: (i) the name and address of the Offeror, and information concerning the Offeror's background, reputation and creditworthiness; (ii) the Interest classification and Percentage Interests that the Offeror desires to purchase and the Selling Member desires to sell ("<u>Offered Interests</u>"); (iii) the price, terms and conditions of the proposed sale of the Offered Interests; and (iv) reasonable evidence that the Offer is a *bona fide* offer and that the Offeror has the present and projected ability to pay the price pursuant to the Offer. The Selling Member shall also provide the Company and the Other Members with a copy of the Offer.

27

      (b)    <u>Right of First Refusal</u>. The Other Members shall have the first right and option to purchase all of the Offered Interests (proportionate to each Other Members' Percentage Interests), or at their election, all of the Selling Member's Interests (if the Offered Interests are less than 100% of the Selling Member's Interests), at the same price per Percentage Interest and on the same terms and conditions as set forth in the Notice of Proposed Sale. This first right and option shall be exercisable by the Other Members by written notice to the Selling Member and Offeror within thirty (30) days following the Other Members' receipt of the Notice of Proposed Sale ("<u>Option Period</u>").

      (c)    <u>Drag-Along Right</u>. If the Offered Interests comprise all of the Selling Member's Interests, and the Other Members do not elect to purchase the Offered Interests during the Option Period, and the Offeror's purchase price is greater than the difference between the Other Members' Capital Contributions less the aggregate distributions previously made to the Other Members, then, the Selling Member shall have the right, by giving written notice to the Other Member within five business days after the end of the Option Period, to require that the Other Members sell all of the Interests then owned by the Other Members to the Offeror, at the same price per Percentage Interest and on substantially the same terms and conditions as set forth in the Notice of Proposed Sale ("<u>Drag-along Sale</u>"); *provided, however,* that the Other Members shall not be required to participate in a Drag-along Sale if the consideration for the Drag-along Sale is other than cash or registered securities listed on an established U.S. or foreign securities exchange or traded on the NASDAQ Stock Market or foreign established over-the-counter trading system.

      (d)    <u>Tag-Along Right</u>. If the Offered Interests comprise all of the Selling Member's Interests, and if the Other Members do not elect to purchase the Offered Interests during the Option Period, then, the Other Members shall have the right, by giving written notice to the Selling Members and to the Offeror within five business days after the end of the Option Period, to require that the Offeror purchase all of the Interests of the Company, including the Other Members' Interests, at the same price per Percentage Interest and on substantially the same terms and conditions as set forth in the Notice of Proposed Sale ("<u>Tag-along Sale</u>").

      (e)    <u>Drag-along or Tag-along Provisions</u>. Each Member shall take all actions as may be reasonably necessary to consummate a Drag-along Sale or Tag-along Sale. The Members shall make or provide the same (or comparable, as tailored to each Member) representations, warranties, covenants and indemnities; provided that representations, warranties, covenants and indemnities will (unless otherwise agreed by the Members) be made or given by the Members severally and not jointly. Transactional fees and expenses will be shared equally.

      (f)    <u>Consummation of Proposed Sale to Offeror</u>. If the Other Members do not elect to purchase Offered Interests, or to require a Drag-along Sale or a Tag-along Sale, the Selling Member shall be allowed to sell the Offered Interests, but only to the Offeror and only at the same price and upon the same terms and conditions as set forth in the Notice of Proposed Sale; provided, however, that such sale is completed within six (6) months from the expiration of the Option Period and the Offeror complies with the transfer and Joinder provisions hereof. If the Offered Interests are not transferred to the Offeror within six (6) months from the expiration of the Option Period, and if the third-party offer is still in effect, the Selling Member shall be

7742056-9

required to renotify the Other Members in the manner provided for in this Section, in which case the Other Members will have the same options, renewed, as set forth in this Section.

9.8    Involuntary Transfers; Option Rights. If (a) a petition in bankruptcy is filed by or against a Member, or if a Member admits in writing his or her inability to pay debts as they become due, or if a Member makes an assignment for the benefit of its creditors; or (b) a creditor seeks to levy or attach Interests owned by a Member then, in each such instance (each, a "First Refusal Event"), the other Members shall have the first right and option ("First Right") to purchase all (or any portion) of the Interests owned by the Member whose Interests are affected by the First Refusal Event, for a purchase price equal to equal to (i) the fair market value of the affected Member's Interest in the Company, as determined by agreement among all Members or, absent such agreement, by an independent valuation firm as of the date of the First Refusal Event ("FMV"), less (ii) any damages or indebtedness owing by the affected Member to the Company or the other Member(s) pursuant to this Agreement (the "Net FMV Price"). The First Right shall be exercisable by the other Members by written notice to the affected Member within thirty (30) days following the date the other Members first become aware of the First Refusal Event. The failure of the other Members to exercise First Rights, or their failure to purchase Interests pursuant thereto, will not alter or waive the prohibitions against Involuntary Transfers otherwise provided for herein. The Class B Members acknowledge that FMV for Class B Interests are and will be affected by the non-voting and minority percentage attributes of Class B Interests.

9.9    Capital Transaction. If the Company receives a *bona fide* offer from a third party offeror to purchase the Company applicable (a "Capital Transaction Offer"), the Company will provide a Notice of Proposed Sale to the Members, similar to that described in Section 9.7 (a). The Members will meet within 10 Business Days to authorize or reject the Capital Transaction Offer.

(a)    If the Managers recommends approval and one Class A Member but not both approve the recommended sale, then, a Deadlock will be deemed to have arisen on account of the rejected Capital Transaction Offer. In such event, the Class A Member approving the Capital Transaction Offer ("Approving Member") shall have an irrevocable "call" option to purchase the Interests of the Class A Member rejecting the Capital Transaction ("Rejecting Member"), for a Net FMV Price as defined in Section 9.8, calculated based on the Rejecting Member's percentage Interest (expressed as a fraction) multiplied by the Net FMV Price (net of reasonable and customary closing costs attributable to a seller).

(b)    Alternatively, if the Rejecting Member elects, such Member may purchase the Approving Members' Interests for Net FMV price determined in the same manner as described above; provided that the Rejecting Member electing to acquire such Interests must post a cash deposit within three Business Days of its rejection of the Capital Transaction Offer, and close and pay the purchase price in full to the Approving Member on a Business Day which is not more than ten calendar days after the Member vote rejecting the Capital Transaction Offer. If the Rejecting Member fail to timely close, its "call" right with respect to the Approving Member's Interests will lapse and be null and void, the Approving Member may consummate the call right as provided in subsection (a) above, and the Rejecting Members will reasonably cooperate in consummating such sale.

29

(c)    Under the circumstances described in this Section 9.9, an Approving Member may elect to consummate the Capital Transaction Offer, and use the sale proceeds to pay the Net FMV Price to the Rejecting Member at the closing. Subject to its right to receive the Net FMV Price at such closing in immediately available funds, the Rejecting Member hereby authorizes the Manager and the Approving Member to consummate the sale represented by the Capital Transaction Offer that the Approving Member approved, and the Rejecting Member hereby agrees to execute and deliver closing certificates and authorizations consistent with this section; it being acknowledged and agreed that this section will be self-effectuating and that the Manager is authorized to refer to this section as evidence of the Rejecting Member's authorization and written consent to any such sale, without the need for further action or documentation.

9.10    Offset of Purchase Price by Indebtedness Owed to Purchaser. The purchase price for any Interests otherwise payable in connection with a Transfer under this Agreement shall be reduced, on a dollar-for-dollar basis (but not below zero), by the amount of any actual outstanding indebtedness, if any, owed by the Member selling Interests (or his Permitted Transferee or estate) to the Company or to the other Member or to the third-party purchaser. Said indebtedness shall be deemed paid to the extent of such reduction applied against the indebtedness.

9.11    Tax Disclosure. Each Member acknowledges that a Transfer may have federal and state income tax consequences to each Member and to the Company, and that each Member has been advised to obtain their own independent tax counsel. If a Transfer occurs, the Members will cooperate in filing appropriate documentation to terminate the tax year of the Company as of the closing date, and the Company's taxable items for the year in which the closing occurs shall be allocated among the Members in accordance with the number of days in the year preceding and following the closing date. Upon consummation of any Transfer, the remaining Members will be responsible to account for and pay any income or capital gains taxes of the Company following closing.

9.12    Joinder.  If (a) any Member shall Transfer Interests in compliance with the provisions of this Agreement to any person or entity who is not then a Member and a signatory either to this Agreement or a Joinder to this Agreement, or (b) the Company shall issue any additional Interests or any other security, option, warrant or right to acquire any such Interests to any person or entity who is not then a Member and a signatory to either this Agreement or a Joinder to this Agreement, then, in either such instance and as a material condition precedent to the Transfer of Interests or issuance of securities, the person or entity to whom Interests or other securities are to be transferred or issued shall agree in writing (for and on behalf of such person or entity and his, her or its legal or personal representatives, heirs, transferees, successors and assigns), to be bound by all of the provisions of this Agreement as a party hereto by executing and delivering to the Company and all Members a Joinder to Operating Agreement in form and substance acceptable to the Company and each existing Member ("Joinder"). The failure or refusal of any such person or entity so acquiring securities of the Company to execute and

deliver to the Company such a Joinder shall not limit the applicability of this Agreement to such person or entity and the securities transferred or issued or purported to be transferred or issued.

9.13    Right to Partition. No Member shall have the right to partition any assets of the Company or any interest therein, nor shall a Member make application or institute proceedings for a partition thereof.

9.14    Deadlock; "Shotgun" Buy-Sell Provisions.

(a)    If Deadlock occurs and is not resolved by consensual agreement of the Class A Members within one year, and if a Class A Member is dissatisfied with the cause or resolution of the Deadlock, then, within thirty (30) days after the one-year anniversary of the Deadlock (the "Shotgun Period"), either Class A Member shall have the right to invoke the "shotgun" buy/sell provisions set forth in this Section (collectively, the "Shotgun Provisions").

(b)    To initiate the Shotgun Provisions, within the Shotgun Period the Class A Member invoking the Shotgun Provisions ("Initiating Member") shall deliver a written notice ("Buy/Sell Offering Notice") to the other Class A Member ("Responding Member"). For purposes of this Agreement, a "Buy/Sell Offering Notice" shall mean a written notice, executed and delivered by the Initiating Member to the Responding Member that constitutes an irrevocable offer by the Initiating Member either to (A) purchase all, but not less than all, of the Interests owned by the Responding Member and its Permitted Transferees for a net purchase price offered by the Initiating Member ("Stipulated Price"), or (B) at the option of the Responding Member, sell to the Responding Member all, but not less than all, of the Interests owned by the Initiating Member and its Permitted Transferees for the Stipulated Price, in either case, in accordance with the Shotgun Provisions.

(c)    Simultaneously with the delivery of a Buy/Sell Offering Notice, the Initiating Member shall execute and deliver an earnest money deposit in the amount of $50,000 ("Buy/Sell Deposit") into escrow to be held by the Company's legal counsel or other Florida counsel selected by the Initiating Member. The Buy/Sell Deposit shall be in the form of immediately available funds, in escrow.

(d)    If simultaneously with delivering the Buy/Sell Offering Notice, the Initiating Member fails to post the required Buy/Sell Deposit in escrow, accompanied by written evidence of the escrow agreement with the selected escrow agent, then, the Responding Members may elect, at their option, either to treat the offer as null and void upon providing the Initiating Member with written notice of such election, or elect to deliver a Responsive Notice (as hereinafter defined) and either sell their Interests to the Initiating Member or purchase the Initiating Member's Interests, for the Stipulated Price.

(e)    A Buy/Sell Offering Notice shall be without qualification or condition other than the Shotgun Provisions set forth herein. No Buy/Sell Offering Notice or Responsive Notice may be rescinded or amended once given without the written consent of all Members. A Buy/Sell Offering Notice must indicate the time and date on which it is delivered to the Responding Members and the manner by which delivery is effectuated. Delivery must be

7742056-9

effectuated in the manner prescribed for notice in this Agreement.

(f)     In the event more than one Member delivers a Buy/Sell Offering Notice on the same date, then, the Buy/Sell Deposit delivered to the escrow agent first in time on such date shall be deemed to be the applicable Buy/Sell Offering Notice and such other Buy/Sell Offering Notice shall be ineffective and have no force or effect in any respect.

(g)     The Initiating Member's implementation of the Buy/Sell Provisions does not give rise to either a "put" or "call" right, but merely confers upon the Responding Members the option either to sell or purchase Interests.

(h)     Not later than twenty (20) Business Days following the date of receipt of the Buy/Sell Offering Notice (the "Buy/Sell Response Deadline Date"), the Responding Member shall deliver to the Initiating Member a written notice (the "Responsive Notice"), without qualification or condition other than the Shotgun Provisions set forth herein, irrevocably electing either to (i) sell its Interests to the Initiating Member for the Stipulated Price; or (ii) alternatively, at the election of the Responding Member, purchase the Initiating Member's Interests at the same price. The failure of the Responding Member to give a Responsive Notice (without qualification or condition) by the Buy/Sell Response Deadline Date shall be deemed notice of an election by the Responding Member to sell all its Interests to the Initiating Member. The date that the Responding Member gives notice of its election (or is deemed to have made an election by failing to respond) shall be the "Buy/Sell Election Date".

(i)     If the Responding Member elects to buy the Initiating Member's Interests, then, by no later than the Buy/Sell Election Date, the Responding Member will execute and deliver to the other Member a properly completed escrow agreement and post the required Buy/Sell Deposit. If the Responding Member fails to post the Escrow Deposit as provided above simultaneously with delivering the Responsive Notice pursuant to which Responding Member elects to be the buyer, then, the Initiating Member may elect, at its option, either to treat the Responsive Notice offer as null and void upon providing the Responding Member with written notice of such election, or elect to deliver its own Responsive Notice in accordance with the terms of subsection (h), and purchase the Responding Member's Interests for the Stipulated Price.

(j)     If the Shotgun Provisions are invoked, each Class A Member agrees to use commercially reasonable efforts to take or cause to be taken all actions, and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the closing on the offer, including entering into agreements and delivering certificates and instruments and procuring necessary waivers, consents, releases and approvals from governmental authorities, lenders, limited partners and other Persons whose consent, authorization or release is required in order to consummate a sale transaction.

(k)     The closing on the sale pursuant to the Shotgun Provisions shall occur within thirty days of the Buy/Sell Election Date; time being of the essence. The Stipulated Price will be paid in immediately available funds at the closing, and the selling Member(s) shall, and

shall cause his Permitted Transferees to, deliver to the buying Member(s) the certificate or certificates representing the seller's Interests, accompanied by transfer powers and assignments.

(l)  While the Shotgun Provisions are in effect and pending closing, the Members shall conduct the Company's business, operations and financial affairs in the ordinary course and consistent with the prior practices in accordance with this Agreement.

## ARTICLE X
## BOOKS OF ACCOUNT, FINANCIAL REPORTS, RECORDS, FISCAL YEAR, BANKING AND ACCOUNTING DECISIONS

10.1  Books of Account. The Company shall keep adequate books and records of the Company wherein shall be recorded and reflected all of the Capital Contributions of the Members to the Company and all of the income, expenses and transactions of the Company. The books and records shall be kept at the principal place and business of the Company, and each Member and such Member's authorized representative shall have, at reasonable times during normal business hours, free access to and the right to inspect and, at such Member's expense, copy such books and records of the Company, including a list of the names and addresses and interests owned of each of the Members.

10.2  Bank Accounts, Funds and Assets. The funds of the Company shall be deposited in such bank or banks as shall be deemed appropriate by the Manager. Such funds shall be withdrawn only by such authorized persons as may be designated by the Manager.

10.3  Tax Returns and Reports. Appropriate tax returns and reports for the Company shall be prepared and timely filed with the proper authorities. The Company shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, all reports, required to be filed with such entities under then current applicable laws, rules and regulations. Any Member shall be provided with a copy of any such report upon request without expense to the Member.

10.4  Reports and Financial Statements. The Company shall provide the reports and financial statements to the Members as determined by the Managers.

10.5  Fiscal Year. Unless otherwise determined pursuant to the Code, the fiscal year of the Company for both reporting and federal income tax purposes shall begin with the 1st day of January and end on the 31st day of December in each calendar year.

## ARTICLE XI
## DISSOLUTION AND TERMINATION

11.1  Dissolution of Company. The term of the Company shall begin on the Effective Date and shall be dissolved and its business shall terminate upon the earliest occurrence of any of the following events:

(a)  delivery to the Managers of a written agreement in which each Class A Member

7742056-9

or a Super Majority approve of the dissolution of the Company;

    (b)    the sale, exchange, forfeiture or other disposition of all or substantially all the properties of the Company, unless the Class A Members or a Super Majority agree otherwise; or

    (c)    any event described in Section 605.0701 of the Act (or successor provision of the Act) for a limited liability company with perpetual life.

The Company shall continue to exist after the happening of any of the foregoing events solely for the purpose of winding up its affairs in accordance with the Act.

11.2    <u>Procedure on Liquidation</u>. Unless the business of the Company is continued pursuant to the provisions of this Agreement, upon the dissolution of the Company, the person or persons required by law to wind up the Company's affairs shall liquidate the assets of the Company and apply the proceeds of liquidation in the order of priority provided in Section 11.3 for the fiscal year of liquidation. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of its liabilities to minimize losses that might otherwise occur in connection with the liquidation. The Company shall follow the procedures contained in the Act in connection with the liquidation of the Company. Upon liquidation and winding up of the Company, unsold Company property shall be valued to determine the gain or loss that would have resulted if the property were sold. Upon completion of the liquidation of the Company and distribution of the proceeds, the person supervising the liquidation shall file certificate of dissolution with the Secretary of State.

11.3  <u>Liquidation Proceeds</u>. The proceeds from the liquidation of the assets of the Company (including any proceeds from the collection of the receivables of the Company) and the assets distributed in kind shall be distributed in the following order of priority:

    (a)    first, to the payment of debts and liabilities of the Company which are due and owing (including Member Loans), except that expenses or debts that may be deferred in accordance with an agreement providing for deferral may be deferred to the extent that the Company expects to receive proceeds that can be used to satisfy the expenses and debts;

    (b)    second, to the setting up and disbursement of reserves for payment of contingent liabilities or obligations of the Company, and, at the expiration of the reserve period, the balance of the reserves, if any, shall be distributed as liquidating proceeds received at the end of the reserve period; and

    (c)    third, to the Members, Pro Rata; provided that the liquidating proceeds attributable to the Class B Members shall be limited to such proceeds (or Capital Proceeds) deriving from the dissolution, liquidation and wind-up of any or all Class B Entities only (and no other Controlled Entities or the Company itself).

All distributions pursuant to clause (c) shall be made no later than the end of the Company's fiscal year during which the liquidation of the Company occurs (or, if later, within 90 days after the date of the liquidation.) With respect to the Class B Members, liquidation proceeds may be

7742056-9

subject to employment tax withholding, if required by the Code.

## ARTICLE XII
## INDEMNIFICATION OF MEMBERS

12.1.  <u>Right to Indemnification</u>. Each person (including the heirs, executors, administrators, and estate to each person) (1) who is or was a Member, (2) who is or was a Manager and/or officer of the Company, or (3) who is or was serving at the request of the Company in the position of a director, officer, trustee, partner, agent, or employee of another corporation, partnership, joint venture, trust or other enterprise and as to whom the Company has agreed to grant an indemnity hereunder, shall be indemnified by the Company as of right to the fullest extent permitted or authorized by the Act or future legislation or by current or future judicial or administrative decision (but, in the case of future legislation or decision, only to the extent that it permits the Company to provide broader indemnification rights than permitted prior to the legislation or decision), against all fines, liabilities, settlements, losses, damages, costs and expenses, including attorneys' fees, asserted against him or incurred by him in his capacity as a Member, Manager, officer, director, officer, trustee, partner, agent or employee, or arising out of his status as a Member, Manager, officer, director, officer, trustee, partner, agent or employee. The foregoing right of indemnification shall not be exclusive of other rights to which those seeking indemnification may be entitled. The Company may maintain insurance, at its expense, to protect itself and the indemnified persons against all fines, liabilities, costs and expenses, including attorneys' fees, whether or not the Company would have the legal power to indemnify him directly against such liability.

12.2. <u>Advances</u>. Costs, charges and expenses (including attorneys' fees) incurred by a person referred to in Section 12.1 of this Article in defending a civil or criminal suit, action or proceeding shall be paid by the Company in advance of the final disposition thereof upon receipt of an undertaking to repay all amounts advanced if it is ultimately determined that the person is not entitled to be indemnified by the Company as authorized by this Article and upon satisfaction of other conditions established from time to time by the Manager or as required by current or future legislation (but, with respect to future legislation, only to the extent that it provides conditions less burdensome than those previously provided).

## ARTICLE XIII
## INVESTMENT REPRESENTATIONS AND WARRANTIES

In addition to the representations contained in Section 1.7, each Member represents and warrants as follows:

13.1   Each Member has been furnished with all additional documents and information about the Company which the Member has requested and has had access to full and fair disclosure of all material information concerning the Company.

13.2   In determining to purchase an ownership interest in the Company, each Member has relied only on the foregoing information and the documents reviewed during such Member's due diligence investigation of the Company and (except as otherwise provided in any

35

7742056-9

subscription agreement between the Company and the Member) has not relied on any representations of the Company or its agents other than those contained in this Agreement.

13.3    Each Member is acquiring an ownership interest in the Company for the Member's own account and not on behalf of other persons and the Member is acquiring such interest for investment purposes only and not with a view to the resale or distribution thereof; the Member does not have any contract, agreement or arrangement with any person or entity to sell, transfer, or pledge to such person or entity such interest which the Member is acquiring and the Member does not have any present plan to enter into any such contract, agreement or arrangement.

13.4    Each Member recognizes that the information furnished by the Company or its agents does not constitute investment, accounting, legal or tax advice. Each Member is relying on such Member's own professional advisors for such advice.

13.5    Each Member has adequate means for providing for the Member's current needs and contingencies, has no need for liquidity in this investment and is able to stand a complete loss of the Member's investment.

13.6    Each Member has knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of investing in the Company.

## ARTICLE XIV
## MISCELLANEOUS

14.1    Notices. All notices, payments, demands and communications required or permitted to be given by this Agreement shall be in writing and shall be deemed to have been delivered and given for all purposes (a) if delivered personally to the party or to an officer of the party to whom the same is directed or (b) whether or not the same is actually received, if sent by registered or certified mail, postage and charges prepaid, addressed to the addresses set forth on the signature page of this Agreement or to such other address as the Member from time to time specifies by written notice to the Company. Any notice shall be deemed to have been given as of the date delivered if delivered personally, or three days after the date on which it was deposited in a regularly maintained receptacle for the deposit of. United States mail, addressed and sent as aforesaid. Any notice may be waived by the person entitled to receive the notice.

14.2    Section Captions. Section and other captions contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit, the scope, extent or intent of any part of this Agreement.

14.3    Severability. Every provision of this Agreement is intended to be severable. If any term or provision is illegal or invalid for any reason whatsoever, the illegality or invalidity shall not affect the validity of the remainder of this Agreement.

14.4    Amendments. The Members may amend this Agreement only by the approval of the Class A Members; provided that any amendment to, or modification of, this Agreement that

would create obligations or liabilities to be imposed on a Class B Member under this Agreement shall require the written approval of such Class B Member.

14.5    Governing Law, Jurisdiction and Venue. This Agreement and the rights of the Members shall be governed by and construed and enforced in accordance with the laws of the State of Florida, and the Act as now in effect or as amended in the future shall govern and supersede any provision of this Agreement which would otherwise be in violation of the Act. Exclusive venue for any dispute arising out of or related to this Agreement shall be the appropriate state court in Broward County, Florida or federal court for the Southern District of Florida and the parties hereto submit to the jurisdiction of such courts.

14.6    Counterpart Execution, This Agreement may be executed in any number of counterparts with the same effect as if all parties had signed the same document. All counterparts shall be construed together and shall constitute one Agreement.

14.7    Parties in Interest. Subject to the provisions contained in Article IX, every covenant, term, provision and agreement in this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties.

14.8    Integrated Agreement. This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter, and there are no agreements, understandings, restrictions, representations or warranties among the parties other than those set forth in this Agreement.

14.9    Executory Agreement. The parties agree that this Agreement constitutes an executory agreement with respect to all Membership Interests in the Company and shall be governed by 11 U.S.C. §365 in connection with the bankruptcy of the Company or of any Member because, among other provisions and obligations, this Agreement imposes on each Member the following affirmative duties (each of which constitutes a material unperformed, future obligation): (a) the duty and obligation not to transfer his, her or its Membership Interest in the Company except in accordance with Article 9; and (b) the duty and obligation not to bring any action for partition under Section 9.11. Accordingly, any trustee in bankruptcy with rights in and to any Membership Interest in the Company shall be required to comply with the terms of this Agreement and Florida law governing this Agreement, including, without limitation, the restrictions of the rights of a creditor of a Member or transferee.

14.10    Number and Gender. Where the context so indicates, the masculine shall include the feminine and neuter, the singular shall include the plural and "person" shall include a corporation and other entities.

14.11    No Presumption. The fact that the first (or later) draft of this Agreement was prepared by counsel for either party shall create no presumptions and specifically shall not cause any ambiguities to be construed against the other party.

14.12    Litigation. If any party hereto is required to engage in litigation against any other party hereto, either as plaintiff or as defendant, in order to enforce or defend any of its or

37

his rights under this Agreement, and such litigation results in a final judgment in favor of such party ("Prevailing Party"), then the party or parties against whom said final judgment is obtained shall reimburse the Prevailing Party for all direct, indirect or incidental expenses incurred by the Prevailing Party in so enforcing or defending its or his rights hereunder, including, but not limited to, all attorneys' fees and court costs and other expenses incurred throughout all negotiations, trials or appeals undertaken in order to enforce the Prevailing Party's rights hereunder.

14.13    Remedies.  Each party hereto recognizes and agrees that the violation of any term, provision or condition of this Agreement may cause irreparable damage to the other parties which may be difficult to ascertain, and that the award of any sum of damages may not be adequate relief to such parties.  Each party, therefore, agrees that, in addition to other remedies available in the event of a breach of this Agreement, any other party shall have a right to equitable relief, including, but not limited to, the remedy of specific performance.

14.14    No Third Party Rights.  None of the provisions contained in this Agreement shall be for the benefit of or enforceable by any third parties, including creditors of the Company.

14.15    Rights and Remedies Cumulative.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right not to use any or all other remedies.  Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

14.16  Waiver of Jury Trial.   EACH PARTY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

14.17  Attorneys' Representation. The parties all acknowledge that Berger Singerman LLP has prepared this Agreement on behalf of and in the course of their representation of the Company, and that:

(a)    THE PARTIES HAVE BEEN ADVISED BY BERGER SINGERMAN LLP THAT THE INTEREST OF THE COMPANY REPRESENTED BY BERGER SINGERMAN LLP MAY BE ADVERSE TO THE INTEREST OF THE OTHER PARTIES;

(b)    THE PARTIES HAVE BEEN ADVISED BY BERGER SINGERMAN LLP TO SEEK THE ADVICE OF INDEPENDENT COUNSEL TO REPRESENT THEM IN CONNECTION WITH THE REVIEW AND NEGOTIATION OF THIS AGREEMENT; AND

(c)    THE PARTIES HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT COUNSEL.

IN WITNESS WHEREOF, this Second Amended and Restated Operating Agreement has been executed and made effective as of May 1, 2017.

CLASS A MEMBERS:

By: _____
     Claudia Wechter

By: _____
     Gary R. Loffredo

CLASS B MEMBERS:

By: _____
     Bryan Solomon

By: _____
     Brett Feldman

6/22/2017

39

7742056-9

EXHIBIT A

The Membership Interest classifications and Percentage Interests of each Member as of the Effective Date of May 1, 2017 shall be as set forth below:

<u>CLASS A MEMBERS:</u>

| Name | Percentage Interest |
|------|---------------------|
| Claudia Wechter | 45% |
| Gary R. Loffredo | 45% |
| Total | 90% |

<u>CLASS B MEMBERS</u>

| | |
|------|------|
| Bryan Solomon | 2.5% |
| Brett Feldman | 2.5% |
| Issued by Reserved (in treasury, as of the Effective Date): | 5% |
| Total | 10% |

40

*Final 6/23/2017*

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into effective as of May 1, 2017 ("Effective Date"), by and between CWGL Holdings, LLC, a Florida limited liability company (the "Company") and Bryan Solomon ("Employee").

### Preliminary Statement

A.    The Company is in the business of owning, managing and performing administrative services in support of various senior assisted living service providers owned and operated by the Company or Affiliates (the "Business"). The Company conducts the Business mainly from its principal place of business in Fort Lauderdale, Florida.

B.    Employee possesses substantial experience and expertise in connection with marketing, sales, sales training, customer account and human resource management and general business matters, with a background and focus relevant to the Business. Employee has worked with the Company on an at-will basis. The Company, seeking to expand its Business and grow profitability, wishes now to expand Employee's role and responsibilities by appointing him as a Vice President for sales ("VP"). Employee desires to accept such position with the Company pursuant to the terms and conditions of this Agreement.

C.    Through its years in business, the Company and its Affiliates have developed confidential information and valuable trade secrets, and an established customer base, and a proprietary information systems and risk management platform, and related know-how, as well as substantial goodwill. In his employment with the Company, Employee has become familiar, and as VP Employee will become familiar, with the highly proprietary methodology and systems of the Company and its Affiliates as well as other confidential information and trade secrets that have contributed to the success and growth of and prospects for the Company and Business.

NOW, THEREFORE, in consideration of the foregoing recitals, and the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Company and Employee, each intending legally to be bound, agree as follows:

1.    Recitals. The foregoing recitals are true and correct in every respect and are incorporated by reference herein.

2.    Employment. The Company hereby employs the Employee as a Vice President with primary responsibility for sales and marketing. Employee hereby accepts such employment with the Company, upon the terms and conditions set forth in this Agreement.

3.    Term. The term of Executive's employment with the Company under this Agreement shall commence effective as of May 1, 2017 and shall continue for a five year term ending April 30, 2022 ("Initial Term"). The Initial Term shall automatically renew for successive one year extension terms (each, a "Renewal Term"), unless either party elects to terminate the Agreement by providing the other party with written notice of such election at least one hundred twenty days prior to the end

of the end of the then-current Term.  As used herein, the "Term" refers to the five-year Initial Term and each one-year Renewal Term.

4.    Duties and Devotion of Efforts.

(a)    Duties.  As VP, Employee shall be primarily responsible for marketing and sales responsibilities for the Company and for training, supervising and leading a team of sales account representatives identified from time to time by the Managers and Employee as Employee's direct reporting sales team (as identified from time to time, "Employee's Sales Team").  Without limiting the foregoing, Employee shall be responsible for designing, supervising, implementing and achieving sales strategies as approved by the Managers, taking into account Manager-approved budgets, staffing decisions and objectives, as communicated by the Managers quarterly or otherwise in their reasonable discretion. In furtherance of the foregoing, Employee shall perform such specific duties, focusing on such specific objectives, as are identified quarterly or from time to time by the Managers, and otherwise as are commensurate with such position.  Employee shall abide by and perform in accordance with any and all lawful managerial directives given by the Managers from time to time.  Employee shall also be responsible for servicing existing accounts of the Company as well as accounts of the Company established and maintained through his own efforts as well as the efforts of Employee's Sales Team. Employee acknowledges that the Managers as of the Effective Date are Gary R. Loffredo and Claudia Wechter.

(b)    Devotion of Effort.  Employee agrees to devote his best full-time efforts and attention to the Company's business and affairs in a manner which will further the business interests of the Company. Employee shall diligently perform his duties hereunder and all services as may be reasonably assigned to him by the Managers. Employee agrees that he shall not during the Term devote his time, attention and energies to any other business activities that would substantially impede his discharge of responsibilities to the Company, without the prior written consent of the Managers, although the Employee shall be allowed to engage in charitable activities and community or business affairs unrelated to the Company and its Business, and manage his personal investments and affairs; provided that such activities do not materially interfere with the proper performance of his duties and responsibilities hereunder.  Employee agrees to faithfully observe and abide by all rules, policies, procedures and regulations of the Company which are in force from time to time.

5.    Compensation and Benefits.

(a)    Base Salary.  During the Initial Term, Employee shall receive a base salary of $65,000 per annum ("Base Salary"); subject to increase (but not decrease) year-by-year, in the same percentage as the CPI increases over base year 2017.  As used herein, "CPI" means the unadjusted Consumer Price Index for all Urban Consumers, All Items (1982-84 = 100) published by the Bureau of Labor Statistics of the United States Department of Labor. The Base Salary shall be paid to Executive, net of applicable withholdings and payroll taxes in accordance with the Company's normal payroll practices. The Base Salary for any Renewal Term shall be equal to the Base Salary as in effect at the end of the immediately preceding annual period, unless otherwise agreed by the Managers and Employee.  Base Salary as in effect from time to time will be subject to the CPI-based annual increases during Renewal Terms, unless the Managers determine otherwise. Notwithstanding CPI and CPI-based annual increases in Base Salary, if applicable in a given year, after the Initial

Term the Managers retain discretion to limit Employee's Base Salary to result in reasonably equivalent salary levels among the Company's executive officers, including Employee.

(b)    Monthly Incentive Compensation – Senior Nannies. During the Term, Employee shall be entitled to incentive compensation calculated on a monthly basis (each, a "Measurement Month") and payable within the following month in accordance with the Company's regular payroll practices, based on the gross revenues derived from the Senior Nannies private duty business in each Measurement Month (beginning May 2017), multiplied by (i) 5% if the Sales Margin for such month is less than 32.9%, or (ii) 6% if the Sales Margin for such month is equal to or greater than 32.9%. As used herein, "Sales Margin" shall mean the average hourly charge attributed to Senior Nannies' customers in the measurement month, minus the average hourly rate paid to Senior Nannies' aides in such month, with the result divided by the average hourly charge used in calculating Sales Margin.

(c)    Monthly Incentive Compensation - Senior Advantages. During the Term, Employee shall be entitled to additional incentive compensation, calculated on a monthly basis for each Measurement Month and payable within the following month in accordance with the Company's regular payroll practices, based on forty-five percent (45%) of new Senior Advantage placement revenues deriving from new sales booked as such by the Company in each Measurement Month, generated in each Measurement Month by Employee himself (and not by Employee's Sales Team).

(d)    Monthly Override. During the Term, Employee shall be entitled to additional incentive compensation, calculated on a monthly basis for each Measurement Month and payable in the following month pursuant to the Company's regular payroll practices, based on two percent (2%) of that portion of monthly revenues booked in each Measurement Month (beginning May 2017), based on new Senior Nannies private duty revenues (i.e. new sales) generated in such Measurement Month by Employee's Sales Team (excluding Employee).

(e)    Annual Bonus. During the Term, Employee shall be entitled to earn additional incentive compensation, calculated and payable annually within 60 days after each calendar year end, based on year-by-year growth in self-generated revenues, if in the calendar year just ended (the "Measurement Year") the Company's annual revenues from new sales originated by Employee himself, and not by Employee's Sales Team or others (i.e., self-generated revenue) exceeded by at least twelve percent (12%) the Company's annual revenues originated by Employee himself in the year immediately preceding the Measurement Year ("Comparison Year"). Such annual growth of at least twelve percent (12%) in self-generated revenues by Employee himself, comparing the Comparison Year to the Measurement Year, is referred to as the "Revenue Growth Benchmark" for the Measurement Year. For each Measurement Year beginning with year-end 2017 in which the Revenue Growth Benchmark is satisfied, Employee will be entitled to additional annual incentive compensation equal to one percent (1%) of the portion of the Company's annual revenues booked as such for the Measurement Year that were originated by Employee himself. If for any Measurement Year, the Revenue Growth Benchmark is not satisfied, then no such annual incentive compensation will be earned for such Measurement Year.

(f)    Attributions of Revenue Origination; Calculations. Revenues based on new

sales or otherwise attributed by the Company as self-generated by Employee, or as generated by Employee's Sales Team, or as generated by others, will be booked, accounted for and calculated by the Company consistent with its regular accounting and employee benefits practices, and absent manifest error, the Company's regular accounting treatment will be definitive.

(g)     Incentive Compensation Generally; Adjustments. The incentive compensation entitlements provided for above, if earned by Employee, shall be paid to Employee net of applicable withholdings and payroll taxes in accordance with the Company's normal payroll practices, within thirty days after each month-end (for monthly compensation) or within sixty days after each year-end (for annual compensation). Employee acknowledges that the Company may account for revenues in its books on an accrual basis. The incentive compensation provided for herein will be calculated on the basis of revenue assumptions for purposes of timing of payments, but Employee's actual entitlement to all such incentive compensation will be adjusted to reflect actual collections, taking into account write-offs, write-downs or other uncollectible amounts; recognizing that collected revenues lag booked sales and corresponding revenue book entries. Employee acknowledges that all incentive compensation calculated as provided above will be paid to him as provided herein initially assuming full collection of all revenues booked as such when new sales are booked, and that the Company will be entitled to offset and reduce later-month compensation payments based on actual as opposed to collected revenue assumptions. Within 120 days of each fiscal year end, the Company will provide Employee with a "true-up" report, summarizing all incentive compensation payments made during the preceding year, the sales and revenue assumptions on which such payments were calculated and made, and actual earnings posted to date in respect of such sales, and offsets and adjustments made or needed to be made to correlate incentive compensation to actual cash receipts.

(h)     Other Benefit Plans. During the Term, Employee shall be entitled to participate in all other benefit plans or programs maintained from time to time by the Company for the benefit of its senior employees in accordance with the eligibility provisions and other terms thereof, including medical and health benefits, dependent care coverage, and retirement plans as in effect for senior level employees from time to time.

(i)     Vacation.  In addition to holidays established by the Managers as Company holidays, during the Term, Employee shall be entitled to receive four weeks' vacation annually, or additional vacation time (if applicable) as the Company affords, if at all, to its senior executives. Unused vacation time will not accrue from year to year.

(j)     Business Expenses. During the Term, the Company shall reimburse Employee for (or, in the Company's sole discretion, shall pay directly) all reasonable business expenses incurred by Employee in the course of performing his duties and responsibilities under this Agreement which are consistent with the Company's policies in effect from time to time with respect to car allowance, travel, entertainment and other business expenses; provided that such expenses shall have been approved by the Company, and are supported by adequate documentation.

(k)     Automobile Allowance.  The Company will pay Employee an automobile allowance of Eight Hundred Fifty Dollars ($850) per month for each month Employee is employed by the Company pursuant to this Agreement.

6.      <u>Withholding</u>. All payments required to be made by the Company hereunder to Employee shall be subject to the withholding of such amounts relating to taxes and other governmental assessments as the Company may reasonably determine it should withhold pursuant to any applicable law, rule or regulation.

7.      <u>Class B Equity; Vesting</u>. As partial further consideration for Employee's services to the Company, as of the Effective Date, the Company has granted and issued to Employee, as of the Effective Date, a 2.5% Class B membership interest in the Company, and the Company has further granted to Employee the right to acquire up to an additional 2.5% Class B membership interest in the Company, subject to the following conditions ("<u>Employee's Class B Interest</u>"). Employee's Class B Interest over and above the initial 2.5% grant shall vest and be issued to Employee at the rate of .5% on December 31 each year beginning December 31, 2018 and ending on December 31, 2022.

(a)     Each issuance of Employee's Class B Interest (including the initial grant effective as of the Effective Date) shall be subject to satisfaction of the following conditions precedent, as determined by the Managers: (i) Employee shall have signed a counterpart of the Company's operating agreement as then in effect, in form and substance prescribed by the Managers ("<u>Operating Agreement</u>"); (ii) the Operating Agreement and execution formalities shall be reasonably acceptable to the Managers; (iii) Employee will execute and deliver an investor questionnaire and letter agreement, among other things acknowledging income tax effects of the issuance of the Class B interests in respect of which he becomes vested (if any) and providing for payment of any tax withholding obligation relating thereto; (iv) Employee will be employed by the Company at each vesting anniversary, in good standing at the time of each vesting; and (v) no cause shall then exist for termination of this Agreement.

(b)     Each incremental grant and vesting shall comprise Class B member interests of the Company representing the then current vesting percentage on a fully-diluted basis. The rights, privileges and limitations associated with Class B interests are described in the Operating Agreement. Each grant and vesting shall, subject to satisfaction of each of the conditions precedent expressed above, be effectuated for no additional consideration; it being acknowledged that Executive's performance hereunder is recognized by the Company and its Managers (the Class A members) as constituting reasonably equivalent value to the Company for the issuance of the specific Class B member interests becoming vested pursuant hereto (if any). Effective immediately if Employee is no longer employed, all Class B interest vesting rights not previously vested and granted will automatically lapse and become null and void.

(c)     Employee acknowledges that Class B member interests, and issuance of any and all Class B interests to Employee, have not been and will not be registered under any applicable federal or state securities laws, and that the vesting and issuance of Class B interests are and will be made in reliance upon exemptions therefrom, which exemptions depend upon, among other things, the bona fide nature of the investment intent of Employee and accuracy of certain of the Executive's statements, representations and warranties as expressed herein and in the questionnaire to be completed by Executive. Employee represents that he is an "accredited investor," as that term is defined in Section 2(15) of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and in Rule 501 of Regulation D promulgated thereunder. As a condition to the issuance of Class B interests, Employee must complete the investor questionnaire in the form provided by the Company



and represent that the information contained therein as to Employee is true, correct and complete as of the date of issuance of all member interests granted pursuant hereto.

(d)     Employee agrees that the vesting rights are personal as to Employee and are not assignable.  Employee acknowledges and agrees that the rights and obligations of all owners of the Company, including relative to transfers of membership interests, are governed by the Operating Agreement.

(e)     Employee represents and warrants that he has determined to accept the member interests issued pursuant hereto based on his own independent investigation, and not in reliance upon any representation, warranty or statement of the Company or its owners, or the Managers or any of their affiliates.

(f)     Employee agrees that the vesting rights hereunder are for his own account (and not as a nominee or agent for another person or entity), for investment purposes and not with a view to distribute or sell any member interests issued in connection herewith, and Employee has no present intention of selling or otherwise distributing any member interests issued in connection herewith.  Employee has such knowledge and experience in financial, business and private, illiquid investment matters that he is capable of evaluating the merits and risks of an investment in the Company.

(g)     Employee acknowledges and understands that, subject to the provisions of the Operating Agreement relating to permitted transfers of membership interests: (i) Class B interests must be held and not sold until member interests in the Company are registered under the federal securities laws and any applicable securities laws of any state or other jurisdiction, unless an exemption from such registration is proven to the Managers' satisfaction to be available; (ii) the Company is under no obligation to so register any member interests, has no plan or intention to register any member interests, and Employee may be required to hold the member interests granted to him indefinitely; (iii) if a certificate evidencing member interests is issued by the Company, the certificate may in the sole discretion of the Company include an imprinted legend describing the foregoing limitations and/or as provided in the Operating Agreement or under applicable law regarding restrictions on the resale, encumbrance and/or transferability of equity interests or options; and (iv) there is not now any public or other market for equity interests or options and no such market is expected to develop or be or become available; and Employee has no right to withdraw from the Company or have his member interests redeemed or repurchased by the Company except as provided in the Operating Agreement; and accordingly, it may not be possible for Employee to sell or liquidate his investment in the Company.

(h)     Employee has been advised that he should consult with his own legal, tax, accounting, investment and financial advisors in connection with the acquisition of any of the Class B membership interests.  Employee has relied on his own advisors, and in particular, but without limiting the generality of the foregoing, his own investment, legal and tax advisors, and he is not relying on the Company, its Owners, the Board, Company counsel, or any agents, for information about the legal, tax, accounting, investment and economic considerations of or relating to an investment in the Company.



8.      Change in Control; Compliance with Securities Laws. Notwithstanding any other provision of this Agreement to the contrary, if a "Change of Control" affecting the Company occurs during the Term in which the seller(s)' consideration includes shares of stock, membership interests, or any other equity interests or securities of the third-party buyer or otherwise (collectively, "Securities"), the same shall be included in the benefits payable or distributable to Employee only if the Company and the third-party buyer determine, in their sole discretion, that the transfer or distribution of Securities to Employee is in full compliance with all applicable federal and state securities laws. Employee hereby covenants and agrees to cooperate in good faith, at the Company's request and expense, as may be necessary or convenient in evaluating such compliance. As used herein, "Change of Control" with regard to the Company shall mean (a) the sale by the Company of all or substantially all of its assets and business to a person or entity other than an Affiliate; (b) the sale of fifty-one percent (51%) or more of the capital stock interests of the Company to a person or entity other than an Affiliate; (c) the occurrence of any event (whether in one or more transactions) that results in a transfer of control of the Company to Persons other than Claudia Wechter or Gary R. Loffredo; or (d) the liquidation of the Company. For purposes of this definition, "control of the Company" shall mean the power, direct or indirect, (x) to vote 50% or more of the equity interests having ordinary voting power for the election of Managers or (y) to direct or cause the direction of the management and policies of the Company by contract or otherwise.

9.      Termination of Employment.

(a)     Termination by the Company "For Cause." Employee's employment with the Company may be terminated immediately by the Company "for cause" upon written notification to Employee, upon the occurrence of any of the following events, as determined by the Managers:

(i)     Employee materially breaches any provision(s) of this Agreement, or otherwise fails to perform any provision(s) of this Agreement, and such breach or failure continues uncured (but only if such breach or failure is reasonably capable of being cured) for a period of ten (10) business days after written notice specifying the nature of the alleged breach or failure thereof is given by the Company to Employee; or

(ii)    Employee engages in any act of fraud, gross negligence, embezzlement or willful misconduct with respect to the Company or that adversely affects the Company's or its Affiliates' reputation, business or assets or the ability of the Employee to perform his responsibilities; or

(iii)   Employee is convicted of, or pleads guilty or no contest to, any crime punishable as a felony or any other crime involving moral turpitude; or

(iv)    Employee's reporting to work under the influence of alcohol, illegal drugs or unauthorized prescription drugs; or his use of or testing positive for such substances while at work or scheduled to be at work; or his possession, sale or distribution of illegal drugs or unauthorized prescription drugs (whether or not at the workplace); or

(v)     Employee's appropriation for himself or his family members or any of their respective affiliates, of a corporate opportunity of the Company or any of its Affiliates without

the prior written consent of the Board (which consent may be withheld by the Board in its sole and absolute discretion); or

(vi)     Employee becomes insolvent in the absence of a reasonably demonstrated plan for rehabilitation or recovery; or

(vii)    Employee engages in conduct relating to the Company or its business (or the business of its subsidiaries) which is not authorized, approved or ratified by the Managers, or which is contrary to the Manager's expressed directions, and which adversely affects or would reasonably be likely to adversely affect the Company, its business or other members, including, without limitation, if a governmental action, investigation or sanctions are imposed on the Company or subsidiary or any member; or

(viii)   Employee violates any of the restrictive covenants set forth in Section 10 of this Agreement.

(b)     <u>Termination of Employment "Without Cause."</u>   The Company may terminate Employee's employment hereunder at any time "without cause" by giving written notice to Employee at least ninety (90) days prior to the proposed date of termination.

(c)     <u>Voluntary Termination of Employment by Executive.</u>   Employee may voluntarily terminate his employment with the Company hereunder at any time by giving written notice to the Company at least ninety (90) days prior to the proposed date of termination.

(d)     <u>Death or Disability</u>.   The employment relationship between the Company and Employee shall automatically terminate upon his death or disability (disability, for this purpose, being deemed to result in the Company's discretion, if as a result of mental or physical incapacity or illness Employee fails to perform his duties and responsibilities provided for herein for a consecutive period of more than one hundred twenty (120) days in any 12-month period).

(e)     <u>Effect of Termination of Employment; Severance Pay</u>.   Upon termination of the Employee's employment with the Company for any reason at any time, Employee shall be entitled to receive any accrued but unpaid Base Salary payable to him through the date of termination of his employment with the Company in accordance with the Company's normal payroll practices and procedures.  In addition, in the event of a termination of the Employee's employment by the Company "without cause" pursuant to Section 9(b) hereof, or on account of death or disability, Employee (or his estate) shall be entitled to his accrued monthly and annual (if not previously paid) incentive compensation payable to Employee prorated thorough the effective date of termination, and Employee will be entitled to  severance pay ("<u>Severance Pay</u>") in an amount equal to (i) the portion of his Base Salary correlating to 90 days beginning on the day on which his separation becomes effective (prorated based on a year of 365 days); plus (ii) the incentive compensation amount deriving from Senior Nannies' monthly revenues that would have been payable to Employee under Section 5 (b) or Section 5 (d), whichever is greater for the month in which termination occurs and for the following two months. No such Severance Pay will be payable if Employee terminates his employment voluntarily, as provided under Section 9 (c).



(f)    Payments upon Termination. Payments to Employee under this Section following termination (other than Severance Pay), shall be payable within 30 business days after Employee's termination becomes effective. Severance Pay will be paid in installments each month in which such a payment becomes due, in accordance with the Company's regular payroll practices. In all cases, applicable withholding and payroll taxes will be withheld. Employee shall also be entitled to receive payment for any unused vacation within the year in which termination occurs (based on Base Salary and prorated through the date of termination). If termination of employment hereunder occurs for any reason, in addition to the prorated Base Salary and incentive compensation specified above, and Severance Pay as specified above, and prorated compensation for unused vacation time, Employee will be entitled to health insurance and unemployment benefits provided for under law, and no others.

10.    Restrictive Covenants.

(a)    Proprietary and Confidential Information. Employee hereby acknowledges that as a result of his employment relationship with, Employee has been provided access to, and has become familiar with, certain trade secrets and other proprietary and confidential information of the Company and its Affiliates, including, without limitation, business and corporate strategies, business plans, product strategies, unique methodology and systems, product cost and pricing information, customer lists, vendor lists, lead lists, lead conversion, lead formation sales reports, operating plans, marketing strategies and plans, methods, financial information, contracts, agreements, computer programs, manuals, and any other confidential information pertaining to the financial condition, business affairs or business prospects of the Company or any Affiliates (collectively, the "Confidential Trade Secret Information"). The Confidential Trade Secret Information has great value to the Company and significantly affects the successful conduct of its Business and goodwill. Employee hereby further acknowledges that the Company has expended substantial time, money and effort to develop and maintain this Confidential Trade Secret Information and that the Company will continue to develop and maintain this Confidential Trade Secret Information in connection with the successful conduct of its Business. Accordingly, Employee shall not use, reveal, report, publish, copy, transcribe, transfer or otherwise disclose or make available to any person, corporation or other entity any of the Confidential Trade Secret Information, directly or indirectly, during the term of this Agreement or thereafter, except as required in the course of employment with the Company or as may be required by law.  All Confidential Trade Secret Information relating to the Company's Business, whether prepared by Employee or otherwise, coming into Executive's possession, whether or not contributed or developed in whole or in part by Executive, shall remain the exclusive property of the Company and shall not be removed from the Company's premises under any circumstances without the prior written consent of the Board, and then, under restrictions as the Board may impose.

(b)    Non-Competition Agreement. During Employee's employment with the Company during the Initial Term, and, if Employee is terminated prior to the end of the Initial Term for cause or by Employee voluntarily, of his own volition, for six months' after the end of the Initial Term ("Non-Competition Period"), Employee will not directly or indirectly own a majority interest in, operate, manage, consult with, control, participate in the management or control of, be employed by, be associated with or maintain or continue any interest whatsoever in any person or entity engaged in business substantially similar to the Company's Business within the Counties in Florida within which Employee was, during his employment, actively working.  This subsection will be null



and void if Employee remains employed by the Company during the entire Initial Term, or if Employee is terminated by the Company during the Initial Term without cause.

6/21/2017

(c)    Non-Solicitation of Customers and Accounts. During Employee's employment with the Company and for two (2) years thereafter ("Non-Solicitation Period"), Employee will not directly or indirectly or in concert with others, call upon, solicit, service, or sell any of the services that comprise the Business to any customers of the Company or an affiliate, on Employee's own behalf, on behalf of a Company customer or on behalf of a competitor of the Company. This restriction shall apply to any customer of the Company or an affiliate that was a customer at any time during Employee's last two (2) years of employment with the Company as well as any prospective customer of the Company with whom Employee had any contact during Executive's last year of employment with the Company. "Solicit" shall mean to call upon, or lend any assistance in any way to, any person or entity for the purpose of encouraging, enticing, or persuading any person or entity to do business with any person or entity in competition with the Company. Solicitation shall also include a general or specific advertisement wherein Employee is advertising in any way the fact that Employee is engaged in direct or indirect competition with the Company. This prohibition expressly precludes Employee, during the Non-Solicitation Period, from conducting business similar to the Company's Business with any customer of the Company, even if the customer first contacts Executive.

(d)    Non-Interference With Other Executives or Representatives. During Employee's employment with the Company and for two years' thereafter ("Non-Interference Period"), Employee will not, either directly or indirectly or in concert with others, seek to influence any employees, agents or representatives of the Company to leave the Company. "Seek to influence" includes discussion with an employee, agent or representative, about the possibility of the employee, agent or representative leaving the Company, even when the issue of leaving the Company is first raised by the Company employee, agent or representative.

(e)    Return of Documents. Employee acknowledges that all files, records, documents, notes, memoranda, costing and account information, and other similar items which Employee prepares, uses, or comes into contact with during Employee's employment with the Company, are and shall remain the sole and exclusive property of the Company, whether in hard copy or electronic format.  Employee agrees not to remove from the Company's premises the original or any reproduction of any such information, nor the information contained therein, including any computers or software programs without the prior consent of the Company. All such material information and property in Employee's possession or control shall be immediately turned over to the Company at its corporate headquarters, currently located at 3313 West Commercial Boulevard, Fort Lauderdale, Florida.

(f)    Legitimate Business Interests. Employee acknowledges that the restrictive covenants set forth in this Section 10, including the Non-Competition Period, Non-Solicitation Period and Non-Interference Period ("Restrictive Covenants"), and the Restricted Areas, are reasonable in time and scope and are necessary to protect the legitimate business interests of the Company; including but not limited to, the protection of trade secrets and valuable confidential business information of the Company, and substantial relationships with specific prospective and



existing customers of the Company, and goodwill associated with the Company, and the extraordinary and specialized training that Employee will receive or has received from the Company.

       (g)   <u>Right to Injunction</u>. Employee agrees that any violation or breach of the Restrictive Covenants set forth in this Section 10 would cause irreparable harm to the Company and that such harm cannot be adequately compensated by money damages. Accordingly, any such violation or breach may be enjoined by any court of competent jurisdiction, without causing or affecting claims for damages incurred by the Company in connection with such violation or breach. In no event shall a delay by the Company of its right to seek immediate relief under this Agreement constitute a waiver of any rights set forth herein, and in no case shall a waiver by the Company of its right to seek relief under this Agreement constitute a waiver of any other or further violation of this Agreement. The parties hereto agree and confirm that all restrictions in this Agreement are reasonable and valid. In addition, in the event of an alleged breach or violation of any Restrictive Covenant, the applicable restrictive period (i.e., the Non-Competition Period, Non-Solicitation Period or Non-Interference Period) shall be tolled until such breach or violation has been duly cured.

       (h)   <u>Third-Party Beneficiary</u>. All members and affiliates of the Company (including without limitation affiliates and/or subsidiaries as identified in the Operating Agreement) are third-party beneficiaries of this Agreement, and the restrictive covenants set forth in this Section 10 and the remedies hereunder inuring to the Company are intended to benefit all such members and Affiliates and may be enforced by all such members and affiliates or subsidiaries.

       (i)   <u>Severability</u>. In the event a court of competent jurisdiction determines any portion of the Restrictive Covenants to be unreasonable so as to make such portion unenforceable, then in such instance, the unenforceable portion or portions shall be deleted herefrom and the court shall substitute such terms as it deems reasonable, consistent with the intent hereof, so as to make the provisions hereof as fully enforceable as if the substituted terms had been incorporated in full.

       (j)   <u>Survival After Termination or Expiration of Agreement; Assignment</u>. Notwithstanding anything to the contrary in this Agreement, the Restrictive Covenants shall survive the termination or expiration of this Agreement. It is the express intention of the parties hereto that upon the expiration or other termination of this Agreement for any reason, the following shall apply: (i) if Employee fails to continue to provide employment services for and on behalf of the Company following the expiration or termination of this Agreement, the applicable restrictive period (i.e., the Confidentiality Period, Non-Competition Period, Non-Solicitation Period or Non-Interference Period) referred to in Sections 10(a), (b), (c) or (d), above, shall commence immediately following said expiration or termination of this Agreement; and (ii) if the employment services of the Employee are retained by the Company (i.e., the Employee continues to provide employment services for and on behalf of the Company) after the expiration or termination of this Agreement, without formal contract, it is hereby mutually agreed that the terms of this Section 10 shall continue to govern the relations between the Company and Employee, in which case the applicable restrictive period (i.e., the Confidentiality Period, Non-Competition Period, Non-Solicitation Period or Non-Interference Period) referred to in Sections 11(a), (b), (c) or (d), above, shall commence immediately following the cessation of Employee's employment services to the Company. In the event this Agreement is assigned or otherwise transferred by the Company to its assignee or successor, the

11



assignee or successor shall be expressly authorized to enforce all restrictions set forth in this Section 10.

11.     Determinations of the Managers Deemed Conclusive.  All determinations which under this Agreement are required or permitted to be made by the Managers shall be deemed conclusive as to Employee and his heirs or beneficiaries, unless clear and convincing evidence can be shown so as to make the Manager's determinations wholly arbitrary and capricious. All benefit of doubt shall be resolved in favor of sustaining the determinations of the Managers.

12.     Non-Disparagement. During Employee's employment with the Company, whether or not under this Agreement, Employee will not, directly or indirectly, make any disparaging statements or other negative remarks, written or oral, about the Company, its members and Managers, its subsidiaries or any of their respective practices, Affiliates, directors, officers, employees, owners, managers, members, partners, agents, attorneys or representatives that would be reasonably likely to cast disrepute on or damage the Company or its Managers or their respective Affiliates, or for the hoped-for competitive advantage of Employee or a third person or the competitive disadvantage of the Company or its Affiliates. This Section 12 shall not, however, prohibit Employee from testifying truthfully as a witness in any court proceeding or governmental investigation.

13.     Miscellaneous Provisions.

(a)     Florida Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without regard to conflicts of law or principles thereof.

(b)     Exclusive Venue.  The Parties agree that (i) any claim of whatever character arising under or in any way relating to this Agreement shall be brought exclusively in a federal or state court of competent jurisdiction in Broward County in the State of Florida and (ii) that any claim described in the foregoing clause that is filed in any other court shall be conclusively deemed as violating the expressed intent of the parties in this mandatory forum selection clause. Employee hereby expressly waives, to the fullest extent permitted by law, any objection that Employee may now or hereafter have to the laying of venue of any such litigation brought in any such court referred to above, including, without limitation, (a) any defense claiming lack of jurisdiction in any action brought in such court, and (b) any claim that any such litigation has been brought in an inconvenient forum.

(c)     Representation; No Presumption.  The Parties recognize and understand that this Agreement has been prepared by Berger Singerman LLP, as counsel for the Company, as a result of negotiations between the Company and Employee. Employee hereby recognizes and confirms that he was given every opportunity to have this Agreement reviewed by his own counsel.  No presumption shall be made as to the interpretation of any provision hereof on account of this Agreement having been prepared by counsel for the Company. The Parties have been advised that inherent or possible conflicts of interest based on competing interests or concerns may exist between or among the Company and its Managers, and Employee, and that the Parties and the Company's Managers have been advised to, and have had full opportunity to, seek advice of their own

independent counsel. Employee further acknowledges and agrees that nothing contained in or implied from this Agreement, nor the fact that this Agreement was prepared by Berger Singerman, LLP, shall in any manner prevent such counsel, and any partner or attorney associated with such counsel, from ever representing the Company or either of its Managers, or another Affiliate, or any person, in any dispute, matter or transaction whatsoever.

(d)     Headings. The Section headings contained herein are for reference purposes only and shall not in any way affect the meaning and interpretation of this Agreement.

(e)     Binding Effect. This Agreement shall be legally binding upon and shall operate for the benefit of the respective Parties, their respective heirs, personal and legal representatives, transferees, successors and assigns.

(f)     Entire Agreement. This Agreement contains the entire agreement of the parties hereto with respect to the subject matter addressed herein, and all prior understandings and agreements, whether written or oral, between and among the parties hereto relating to the subject matter of this Agreement are merged in this Agreement. Each party specifically acknowledges, represents and warrants that they have not been induced to sign this Agreement by any belief that the other will waive or modify the provisions of this Agreement in the future.

(g)     Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

(h)     Counterparts. This Agreement may be signed and executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

(i)     Transferability. Employee hereby agrees and consents that the rights and obligations of the Company hereunder may be transferred or assigned and will be binding on the Company's successors and assigns. Employee may not transfer or assign his rights or obligations under this Agreement without the express written consent of the Managers.

(j)     Modification. This Agreement may only be modified in writing and signed by each of the parties hereto.

(k)     Plural and Gender. Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

(l)     Survival. All representations and other relevant provisions herein, including but not limited to the provisions set forth in Sections 8, 9, 10, 11, 12 and 13, and this Section 14, of this Agreement, shall survive in accordance with their respective terms, and thereby continue in full force and effect pursuant to their respective terms, upon termination of this Agreement.

(m)     No Waiver of Breach. The waiver or inaction by either party hereto of a breach of any condition of this Agreement by the other party shall not be construed as a waiver of

any subsequent breach by such party, nor shall it constitute a waiver of that party's rights, actual or inherent. The failure of any party hereto in any instance to insist upon a strict performance of the terms of this Agreement or to exercise any option herein shall not be construed as a waiver or a relinquishment in the future of such term or option, but that the same shall continue in full force and effect.

(n)    Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (i) when personally delivered or sent by telecopy or electronic mail (with hard copy to follow) or (ii) one day after being sent by reputable overnight express courier (charges prepaid), or (iii) five days following mailing by certified or registered mail, postage prepaid and return receipt requested. Unless another address is specified in writing, notices, demands and communications to be the parties shall be sent to the addresses indicated in Schedule 1 hereto.

(o)    Successors and Assigns.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and Employee and his heirs, personal representatives, successors and assigns, except that Employee may not assign his rights or delegate his duties or obligations hereunder without the prior written consent of the Company.

(p)    Dispute Resolution; Waiver of Jury Trial. If a dispute arises and the Managers and Employee are unable to reach agreement consensually within 20 days despite good faith efforts to do so, the dispute may be submitted to mediation if requested in writing by any party. The mediation shall take place in a mutually agreed location, and absent agreement, in Broward County, Florida. The mediation shall be conducted before a single mediator who shall be agreed upon by the parties. If the parties cannot agree on a mediator, Employee and the Managers shall each select a mediator and such mediators together shall select a neutral third mediator, who shall conduct the mediation. The parties shall equally bear the fees and expenses of the mediator. The mediation process shall consist of at least two sessions, conducted in good faith. If as a result of the mediation process, the parties cannot resolve the dispute, any party may pursue dispute resolution procedures under law. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS OR EVENTS CONTEMPLATED HEREBY OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO. THE PARTIES HERETO EACH AGREE THAT ANY AND ALL SUCH CLAIMS AND CAUSES OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. EACH OF THE PARTIES HERETO FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY SUCH LEGAL PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.

(q)    Attorneys' Fees and Costs.  Should it become necessary for either Party to institute any legal action to enforce any of the provisions of this Agreement, the prevailing Party shall be entitled to an award of reasonable attorneys' fees and costs through all appellate levels.



(r)     Offset. The Company shall have the right to set-off (reduce), on a dollar-for-dollar basis, against any and all compensation payments due to Employee hereunder for any overpayments based on assumed revenues as adjusted to take into account actual collections, and based on damages, liabilities or costs incurred by the Company as a result of Employee's breach of any of the restrictive covenants herein, in addition to any other remedies that may be available to the Company at law or in equity.  Nothing herein, including acceptance of a payment with an offset, shall not constitute a waiver of any defense that Employee may have in connection with such offset.

IN WITNESS WHEREOF, the Company and Employee, respectively, have executed and delivered this Agreement as of the date first above written.

CWGL HOLDINGS, LLC

By: _____
        Gary R. Loffredo, co-Manager

By: _____
        Claudia Wechter, co-Manager

_____
Bryan Solomon

Date: 6/22/2017

*Final 6/23/2017*

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered into effective as of May 1, 2017 ("Effective Date"), by and between (a) CWGL Holdings, LLC, a Florida limited liability company (the "Company"), and the Company's wholly-owned operating subsidiaries identified in Exhibit A hereto (collectively, the "Subsidiaries"), and (b) Brett Feldman ("Employee").

### Preliminary Statement

A.     The Company is in the business of owning, managing and performing administrative services in support of various senior assisted living service providers owned and operated by the Company or Affiliates (the "Business"). The Company conducts the Business (and directs the related businesses conducted by the Subsidiaries) mainly from its principal place of business in Fort Lauderdale, Florida.  As used herein, the Company's "Affiliates" shall mean each of the Subsidiaries, and all other entities in which the Company or any of its members (individually or collectively) own more than a majority ownership interest.

B.     Employee possesses substantial experience and expertise in connection with marketing, sales, sales training, customer account and human resource management and general business matters, with a background and focus relevant to the Business. Employee has worked with the Company on an at-will basis. The Company, seeking to expand its Business and grow profitability, wishes now to expand Employee's role and responsibilities by appointing him as a Vice President for business development ("VP") for the Company and each Subsidiary. Employee desires to accept such position with the Company and each Subsidiary pursuant to the terms and conditions of this Agreement.

C.     Through its years in business, the Company and its Affiliates (including without limitation the Subsidiaries) have developed confidential information and valuable trade secrets, and an established customer base, and a proprietary information systems and risk management platform, and related know-how, as well as substantial goodwill. In his employment with the Company, Employee has become familiar, and as VP Employee will become familiar, with the highly proprietary methodology and systems of the Company and its Affiliates as well as other confidential information and trade secrets that have contributed to the success and growth of and prospects for the Company and Business.

NOW, THEREFORE, in consideration of the foregoing recitals, and the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Company and Employee, each intending legally to be bound, agree as follows:

1.     Recitals. The foregoing recitals are true and correct in every respect and are incorporated by reference herein.

2.     Employment. The Company hereby employs the Employee as a Vice President of the Company and the Subsidiaries, with primary responsibility for sales and marketing. Employee hereby accepts such employment with the Company and the Subsidiaries, upon the terms and

1

**EXHIBIT D**

conditions set forth in this Agreement. This Agreement shall be deemed Employee's employment agreement for the Company and each Subsidiary, and shall be identified and treated as such for all purposes in the books and records of the Company and each Subsidiary. Unless otherwise specified herein, references to the Company shall mean the Company and each Subsidiary, respectively.

3.    Term. The term of Executive's employment with the Company under this Agreement shall commence effective as of May 1, 2017 and shall continue for a five year term ending December 31, 2022 ("Initial Term"). The Initial Term shall automatically renew for successive one year extension terms (each, a "Renewal Term"), unless either party elects to terminate the Agreement by providing the other party with written notice of such election at least one hundred twenty days prior to the end of the end of the then-current Term. As used herein, the "Term" refers to the five-year Initial Term and each one-year Renewal Term.

4.    Duties and Devotion of Efforts.

(a)    Duties. As VP, Employee shall be primarily responsible for business development, marketing and sales for the Company, and for identifying strategic growth opportunities for the Company. Without limiting the foregoing, Employee shall be responsible for identifying potential customers, solidifying the Company's presence in new markets, designing, supervising, implementing and achieving sales strategies, and for training and supervising the Company's sales force, all subject to direction from the Managers, as communicated by the Managers quarterly or otherwise in their reasonable discretion. In furtherance of the foregoing, Employee shall perform such specific duties, focusing on such specific objectives, as are identified quarterly or from time to time by the Managers, and otherwise as are commensurate with such position. Employee shall abide by and perform in accordance with any and all lawful managerial directives given by the Managers from time to time. Employee acknowledges that the Managers as of the Effective Date are Gary R. Loffredo and Claudia Wechter.

(b)    Devotion of Effort. Employee agrees to devote his best full-time efforts and attention to the Company's business and affairs in a manner which will further the business interests of the Company. Employee shall diligently perform his duties hereunder and all services as may be reasonably assigned to him by the Managers. Employee agrees that he shall not during the Term devote his time, attention and energies to any other business activities that would substantially impede his discharge of responsibilities to the Company, without the prior written consent of the Managers, although the Employee shall be allowed to engage in charitable activities and community or business affairs unrelated to the Company and its Business, and manage his personal investments and affairs; provided that such activities do not materially interfere with the proper performance of his duties and responsibilities hereunder. Employee agrees to faithfully observe and abide by all rules, policies, procedures and regulations of the Company which are in force from time to time.

5.    Compensation and Benefits.

(a)    Base Salary. During the Initial Term, Employee shall receive a base salary of $110,000.00 per annum ("Base Salary"); subject to increase (but not decrease) year-by-year, in the same percentage as the CPI increases over base year 2017. As used herein, "CPI" means the unadjusted Consumer Price Index for all Urban Consumers, All Items (1982-84 = 100) published by

the Bureau of Labor Statistics of the United States Department of Labor. The Base Salary shall be paid to Executive, net of applicable withholdings and payroll taxes in accordance with the Company's normal payroll practices. The Base Salary for any Renewal Term shall be equal to the Base Salary as in effect at the end of the immediately preceding annual period, unless otherwise agreed by the Managers and Employee. Base Salary as in effect from time to tome will be subject to the CPI-based annual increases during Renewal Terms, unless the Managers determine otherwise. Notwithstanding CPI and CPI-based annual increases in Base Salary, if applicable in a given year, after the Initial Term the Manager retain discretion to limit Employee's Base Salary to result in reasonably equivalent salary levels among the Company's executive officers, including Employee.

(b)     Monthly Incentive Compensation. During the Term, Employee shall be entitled to incentive compensation calculated on a monthly basis beginning May 1, 2017 (each, a "Measurement Month") and payable within the following month in accordance with the Company's regular payroll practices, equal to an amount for each Measurement Month based on 1% of the gross revenues derived in such Measurement Month solely from the Company's and its Subsidiaries' workers' compensation-funded and group health businesses; such gross revenues to be calculated by the Company for each Measurement Month in accordance with the Company's regular accounting methodologies and functions.

(c)     Annual Incentive Compensation. During the Term, Employee shall be entitled to earn additional incentive compensation ("Annual Bonus"), calculated and payable annually within 60 days after each calendar year end, based on year-by-year growth in the Company's and Subsidiaries' annual revenues attributable to the workers' compensation and group health business lines ("Subject Revenues"), if, in the calendar year just ended (the "Measurement Year"), the Company's and Subsidiaries' annual Subject Revenues exceeded the Subject Revenues in the preceding calendar year ("Comparison Year") by at least 15%. The Annual Bonus for any Measurement Year will be based on a percentage of the annual growth in Subject Revenues, comparing the Measurement Year to the Comparison Year ("Annual Growth"); provided that such Annual Growth as measured by Subject Revenues in the Measurement Year is at least 15% in excess of the Subject Revenues for the Comparison Year.  Assuming such Annual Growth, the Annual Bonus will be calculated as follows:

(i)     If the Annual Growth is at least 15% but less than 20%, the Annual Bonus will be 1.5% of the Subject Revenues in the Measurement Year;

(ii)     If the Annual Growth is at least 20% but less than 25%, the Annual Bonus will be 2% of the Subject Revenues in the Measurement Year;

(iii)     If the Annual Growth is at least 25% but less than 30%, the Annual Bonus will be 2.5% of the Subject Revenues in the Measurement Year;

(iv)     If the Annual Growth is at least 30% but less than 35%, the Annual Bonus will be 3% of the Subject Revenues in the Measurement Year;

(v)     If the Annual Growth is at least 35% but less than 40%, the Annual Bonus will be 3.5% of the Subject Revenues in the Measurement Year; or



      (vi)     If the Annual Growth is 40% or greater, the Annual Bonus will be 4% of the Subject Revenues in the Measurement Year.

      (d)    <u>Attributions of Revenues; Calculations</u>.  Revenues deriving from the Company's or Subsidiaries' workers' compensation and/or group health business lines will be booked, accounted for and calculated by the Company consistent with its regular accounting and employee benefits practices, and absent manifest error, the Company's regular accounting treatment will be definitive.

      (e)    <u>Incentive Compensation Generally; Adjustments</u>. The incentive compensation entitlements provided for above, if earned by Employee, shall be paid to Employee net of applicable withholdings and payroll taxes in accordance with the Company's normal payroll practices, within thirty days after each month-end (for monthly compensation) or within sixty days after each year-end (for annual compensation). Employee acknowledges that the Company may account for revenues in its books on an accrual basis. The incentive compensation provided for herein will be calculated on the basis of revenue assumptions for purposes of timing of payments, but Employee's actual entitlement to all such incentive compensation will be adjusted to reflect actual collections, taking into account write-offs, write-downs or other uncollectible amounts; recognizing that collected revenues lag booked sales and corresponding revenue book entries. Employee acknowledges that all incentive compensation calculated as provided above will be paid to him as provided herein initially assuming full collection of all revenues booked as such when new sales are booked, and that the Company will be entitled to offset and reduce later-month compensation payments based on actual as opposed to collected revenue assumptions.  Within 120 days of each fiscal year end, the Company will provide Employee with a "true-up" report, summarizing all incentive compensation payments made during the preceding year, the sales and revenue assumptions on which such payments were calculated and made, and actual earnings posted to date in respect of such sales, and offsets and adjustments made or needed to be made to correlate incentive compensation to actual cash receipts.

      (f)    <u>Other Benefit Plans</u>. During the Term, Employee shall be entitled to participate in all other benefit plans or programs maintained from time to time by the Company for the benefit of its senior employees in accordance with the eligibility provisions and other terms thereof, including medical and health benefits, dependent care coverage, and retirement plans as in effect for senior level employees from time to time.

      (g)    <u>Vacation</u>.  In addition to holidays established by the Managers as Company holidays, during the Term, Employee shall be entitled to receive three weeks' vacation annually, or additional vacation time (if applicable) as the Company affords, if at all, to its senior executives pursuant to the Company's regular benefits policies as in effect from time to time. Unused vacation time will not accrue from year to year.

      (h)    <u>Business Expenses</u>. During the Term, the Company shall reimburse Employee for (or, in the Company's sole discretion, shall pay directly) all reasonable business expenses incurred by Employee in the course of performing his duties and responsibilities under this Agreement which are consistent with the Company's policies in effect from time to time with respect



to car allowance, travel, entertainment and other business expenses; provided that such expenses shall have been approved by the Company, and are supported by adequate documentation.

(i)     Automobile Allowance.  The Company will pay Employee an automobile allowance of Five Hundred Dollars ($500) per month for each month Employee is employed by the Company pursuant to this Agreement.

6.     Withholding.  All payments required to be made by the Company hereunder to Employee shall be subject to the withholding of such amounts relating to taxes and other governmental assessments as the Company may reasonably determine it should withhold pursuant to any applicable law, rule or regulation.

7.     Class B Equity; Vesting.  As partial further consideration for Employee's services to the Company, as of the Effective Date, the Company has granted and issued to Employee, as of the Effective Date, a 2.5% Class B membership interest in the Company, and the Company has further granted to Employee the right to acquire up to an additional 2.5% Class B membership interest in the Company, subject to the following conditions ("Employee's Class B Interest").  Employee's Class B Interest over and above the initial 2.5% grant shall vest and be issued to Employee at the rate of .5% on December 31 each year beginning December 31, 2018 and ending on December 31, 2022. Employee must be employed by the Company on December 31 of each such year in order to achieve the annual incremental vesting set forth above. Any unvested entitlements will lapse and become null and void when Employee's employment with the Company ends. *If employee is terminated w/o cause after July 1 during term the .5% for given year will be considered Vested.*

(a)     Each issuance of Employee's Class B Interest (including the initial grant effective as of the Effective Date) shall be subject to satisfaction of the following conditions precedent, as determined by the Managers: (i) Employee shall have signed a counterpart of the Company's operating agreement as then in effect, in form and substance prescribed by the Managers ("Operating Agreement"); (ii) the Operating Agreement and execution formalities shall be reasonably acceptable to the Managers; (iii) Employee will execute and deliver an investor questionnaire and letter agreement, among other things acknowledging income tax effects of the issuance of the Class B interests in respect of which he becomes vested (if any) and providing for payment of any tax withholding obligation relating thereto; (iv) Employee will be employed by the Company at each vesting anniversary, in good standing at the time of each vesting; and (v) no cause shall then exist for termination of this Agreement.

(b)     Each incremental grant and vesting shall comprise Class B member interests of the Company representing the then current vesting percentage on a fully-diluted basis. The rights, privileges and limitations associated with Class B interests are described in the Operating Agreement. Each grant and vesting shall, subject to satisfaction of each of the conditions precedent expressed above, be effectuated for no additional consideration; it being acknowledged that Executive's performance hereunder is recognized by the Company and its Managers (the Class A members) as constituting reasonably equivalent value to the Company for the issuance of the specific Class B member interests becoming vested pursuant hereto (if any). Effective immediately if Employee is no longer employed, all Class B interest vesting rights not previously vested and granted will automatically lapse and become null and void.

(c)      Employee acknowledges that Class B member interests, and issuance of any and all Class B interests to Employee, have not been and will not be registered under any applicable federal or state securities laws, and that the vesting and issuance of Class B interests are and will be made in reliance upon exemptions therefrom, which exemptions depend upon, among other things, the bona fide nature of the investment intent of Employee and accuracy of certain of the Executive's statements, representations and warranties as expressed herein and in the questionnaire to be completed by Executive. Employee represents that he is an "accredited investor," as that term is defined in Section 2(15) of the Securities Act of 1933, as amended (the "Securities Act"), and in Rule 501 of Regulation D promulgated thereunder. As a condition to the issuance of Class B interests, Employee must complete the investor questionnaire in the form provided by the Company and represent that the information contained therein as to Employee is true, correct and complete as of the date of issuance of all member interests granted pursuant hereto.

(d)      Employee agrees that the vesting rights are personal as to Employee and are not assignable.  Employee acknowledges and agrees that the rights and obligations of all owners of the Company, including relative to transfers of membership interests, are governed by the Operating Agreement.

(e)      Employee represents and warrants that he has determined to accept the Class B interests issued pursuant hereto based on his own independent investigation, and not in reliance upon any representation, warranty or statement of the Company or its owners, or the Managers or any of their affiliates.

(f)      Employee agrees that the vesting rights hereunder are for his own account (and not as a nominee or agent for another person or entity), for investment purposes and not with a view to distribute or sell any member interests issued in connection herewith, and Employee has no present intention of selling or otherwise distributing any member interests issued in connection herewith. Employee has such knowledge and experience in financial, business and private, illiquid investment matters that he is capable of evaluating the merits and risks of an investment in the Company.

(g)      Employee acknowledges and understands that, subject to the provisions of the Operating Agreement relating to permitted transfers of membership interests: (i) Class B interests must be held and not sold until member interests in the Company are registered under the federal securities laws and any applicable securities laws of any state or other jurisdiction, unless an exemption from such registration is proven to the Managers' satisfaction to be available; (ii) the Company is under no obligation to so register any member interests, has no plan or intention to register any member interests, and Employee may be required to hold the member interests granted to him indefinitely; (iii) if a certificate evidencing member interests is issued by the Company, the certificate may in the sole discretion of the Company include an imprinted legend describing the foregoing limitations and/or as provided in the Operating Agreement or under applicable law regarding restrictions on the resale, encumbrance and/or transferability of equity interests or options; and (iv) there is not now any public or other market for equity interests or options and no such market is expected to develop or be or become available; and Employee has no right to withdraw from the Company or have his member interests redeemed or repurchased by the Company except as



provided in the Operating Agreement; and accordingly, it may not be possible for Employee to sell or liquidate his investment in the Company.

(h)    Employee has been advised that he should consult with his own legal, tax, accounting, investment and financial advisors in connection with the acquisition of any of the Class B membership interests. Employee has relied on his own advisors, and in particular, but without limiting the generality of the foregoing, his own investment, legal and tax advisors, and he is not relying on the Company, its Owners, the Board, Company counsel, or any agents, for information about the legal, tax, accounting, investment and economic considerations of or relating to an investment in the Company.

8.    Change in Control; Compliance with Securities Laws. Notwithstanding any other provision of this Agreement to the contrary, if a "Change of Control" affecting the Company occurs during the Term in which the seller(s)' consideration includes shares of stock, membership interests, or any other equity interests or securities of the third-party buyer or otherwise (collectively, "Securities"), the same shall be included in the benefits payable or distributable to Employee only if the Company and the third-party buyer determine, in their sole discretion, that the transfer or distribution of Securities to Employee is in full compliance with all applicable federal and state securities laws. Employee hereby covenants and agrees to cooperate in good faith, at the Company's request and expense, as may be necessary or convenient in evaluating such compliance. As used herein, "Change of Control" with regard to the Company shall mean  (a) the sale by the Company of all or substantially all of its assets and business to a person or entity other than an Affiliate; (b) the sale of fifty-one percent (51%) or more of the capital stock interests of the Company to a person or entity other than an Affiliate; (c) the occurrence of any event (whether in one or more transactions) that results in a transfer of control of the Company to Persons other than Claudia Wechter or Gary R. Loffredo; or (d) the liquidation of the Company.  For purposes of this definition, "control of the Company" shall mean the power, direct or indirect, (x) to vote 50% or more of the equity interests having ordinary voting power for the election of Managers or (y) to direct or cause the direction of the management and policies of the Company by contract or otherwise.

9.    Termination of Employment.

(a)    Termination by the Company "For Cause." Employee's employment with the Company may be terminated immediately by the Company "for cause" upon written notification to Employee, upon the occurrence of any of the following events, as determined by the Managers:

(i)    Employee materially breaches any provision(s) of this Agreement, or otherwise fails to perform any provision(s) of this Agreement, and such breach or failure continues uncured (but only if such breach or failure is reasonably capable of being cured) for a period of ten (10) business days after written notice specifying the nature of the alleged breach or failure thereof is given by the Company to Employee; or

(ii)    Employee engages in any act of fraud, misappropriation, self-dealing, discrimination, gross negligence, embezzlement or willful misconduct with respect to the Company, including without limitation, the intentional misappropriation of funds or property (including intellectual property) of the Company, or conduct that adversely affects the Company's or its



Members' or Affiliates' reputation, business or assets or the ability of the Employee to perform his responsibilities; or

(iii)    Employee is convicted of, or pleads guilty or no contest to, any crime punishable as a felony or any act in violation of the Company human resource standards as in effect from time to time; or

(iv)    Employee's reporting to work or attending work functions impaired by alcohol use, use of illegal drugs or unauthorized prescription drugs (it being understood that work-related functions sometimes involve social drinking in moderation); or his use of or testing positive for such substances while at work or scheduled to be at work; or his possession, sale or distribution of illegal drugs or unauthorized prescription drugs (whether or not at the workplace); or

(v)    Employee's appropriation for himself or his family members or any of their respective affiliates, of a corporate opportunity of the Company or any of its Affiliates without the prior written consent of the Board (which consent may be withheld by the Board in its sole and absolute discretion); or

(vi)    Employee becomes insolvent in the absence of a reasonably demonstrated plan for rehabilitation or recovery; or

(vii)    Employee engages in conduct relating to the Company or its business (or the business of its subsidiaries) which is not authorized, approved or ratified by the Managers, or which is contrary to the Manager's expressed directions, and which adversely affects or would reasonably be likely to adversely affect the Company, its business or other members, including, without limitation, if a governmental action, investigation or sanctions are imposed on the Company or subsidiary or any member; or

(viii)    Employee violates any of the restrictive covenants set forth in Section 10 of this Agreement.

(b)    Termination of Employment "Without Cause." The Company may terminate Employee's employment hereunder at any time "without cause" by giving written notice to Employee at least sixty (60) days prior to the proposed date of termination.

(c)    Voluntary Termination of Employment by Executive. Employee may voluntarily terminate his employment with the Company hereunder at any time by giving written notice to the Company at least sixty (60) days prior to the proposed date of termination.

(d)    Death or Disability. The employment relationship between the Company and Employee shall automatically terminate upon his death or disability (disability, for this purpose, being deemed to result in the Company's discretion, if as a result of mental or physical incapacity or illness Employee fails to perform his duties and responsibilities provided for herein for a consecutive period of more than ninety (90) days in any 12-month period).



(e)    Effect of Termination of Employment.  Upon termination of the Employee's employment with the Company for any reason at any time, Employee shall be entitled to receive any accrued but unpaid Base Salary payable to him through the date of termination of his employment with the Company in accordance with the Company's normal payroll practices and procedures.  In addition, in the event of a termination of the Employee's employment by the Company "without cause" pursuant to Section 9(b) hereof, or on account of death or disability, Employee (or his estate) shall be entitled to severance pay ("Severance Pay") in an amount equal to the portion of his Base Salary correlating to 60 days beginning on the day on which his separation becomes effective (prorated based on a year of 365 days). No such Severance Pay will be payable if Employee terminates his employment voluntarily, as provided under Section 9 (c).

(f)    Payments upon Termination.  Payments to Employee under this Section following termination (other than Severance Pay), shall be payable within 30 business days after Employee's termination becomes effective. Severance Pay will be paid in accordance with the Company's regular payroll practices.  In all cases, applicable withholding and payroll taxes will be withheld. Employee shall also be entitled to receive payment for any unused vacation within the year in which termination occurs (based on Base Salary and prorated through the date of termination). If termination of employment hereunder occurs for any reason, in addition to the prorated Base Salary and Severance Pay as specified above, and prorated compensation for unused vacation time, Employee will be entitled to health insurance and unemployment benefits provided for under law, and no others.

10.    Restrictive Covenants.

(a)    Proprietary and Confidential Information. Employee hereby acknowledges that as a result of his employment relationship with, Employee has been provided access to, and has become familiar with, certain trade secrets and other proprietary and confidential information of the Company and its Affiliates, including, without limitation, business and corporate strategies, business plans, product strategies, unique methodology and systems, product cost and pricing information, customer lists, vendor lists, lead lists, lead conversion, lead formation sales reports, operating plans, marketing strategies and plans, methods, financial information, contracts, agreements, computer programs, manuals, and any other confidential information pertaining to the financial condition, business affairs or business prospects of the Company or any Affiliates (collectively, the "Confidential Trade Secret Information"). The Confidential Trade Secret Information has great value to the Company and significantly affects the successful conduct of its Business and goodwill. Employee hereby further acknowledges that the Company has expended substantial time, money and effort to develop and maintain this Confidential Trade Secret Information and that the Company will continue to develop and maintain this Confidential Trade Secret Information in connection with the successful conduct of its Business. Accordingly, Employee shall not use, reveal, report, publish, copy, transcribe, transfer or otherwise disclose or make available to any person, corporation or other entity any of the Confidential Trade Secret Information, directly or indirectly, during the term of this Agreement or thereafter, except as required in the course of employment with the Company or as may be required by law.  All Confidential Trade Secret Information relating to the Company's Business, whether prepared by Employee or otherwise, coming into Executive's possession, whether or not contributed or developed in whole or in part by Executive, shall remain the exclusive property



of the Company and shall not be removed from the Company's premises under any circumstances without the prior written consent of the Board, and then, under restrictions as the Board may impose.

(b)    <u>Non-Competition Agreement</u>. During Employee's employment with the Company during the Initial Term, and, if Employee is terminated prior to the end of the Initial Term for cause or by Employee voluntarily, of his own volition, for one year after the end of the Initial Term ("<u>Non-Competition Period</u>"), Employee will not directly or indirectly own a majority interest in, operate, manage, consult with, control, participate in the management or control of, be employed by, be associated with or maintain or continue any interest whatsoever in any person or entity engaged in business substantially similar to the Company's Business within the Counties in Florida within which Employee was, during his employment, actively working. This subsection will be null and void if Employee remains employed by the Company during the entire Initial Term, or if Employee is terminated by the Company during the Initial Term without cause.

(c)    <u>Non-Solicitation of Customers and Accounts</u>. During Employee's employment with the Company and for one (1) year thereafter ("<u>Non-Solicitation Period</u>"), Employee will not directly or indirectly or in concert with others, call upon, solicit, service, or sell any of the services that comprise the Business to any customers of the Company or an affiliate, on Employee's own behalf, on behalf of a Company customer or on behalf of a competitor of the Company. This restriction shall apply to any customer of the Company or an affiliate that was a customer at any time during Employee's last two (2) years of employment with the Company as well as any prospective customer of the Company with whom Employee had any contact during Executive's last year of employment with the Company. "Solicit" shall mean to call upon, or lend any assistance in any way to, any person or entity for the purpose of encouraging, enticing, or persuading any person or entity to do business with any person or entity in competition with the Company. Solicitation shall also include a general or specific advertisement wherein Employee is advertising in any way the fact that Employee is engaged in direct or indirect competition with the Company. This prohibition expressly precludes Employee, during the Non-Solicitation Period, from conducting business similar to the Company's Business with any customer of the Company, even if the customer first contacts Executive.

(d)    <u>Non-Interference With Other Executives or Representatives</u>. During Employee's employment with the Company and for two years thereafter ("<u>Non-Interference Period</u>"), Employee will not, either directly or indirectly or in concert with others, seek to influence any employees, agents or representatives of the Company to leave the Company. "Seek to influence" includes discussion with an employee, agent or representative, about the possibility of the employee, agent or representative leaving the Company, even when the issue of leaving the Company is first raised by the Company employee, agent or representative.

(e)    <u>Return of Documents</u>. Employee acknowledges that all files, records, documents, notes, memoranda, costing and account information, and other similar items which Employee prepares, uses, or comes into contact with during Employee's employment with the Company, are and shall remain the sole and exclusive property of the Company, whether in hard copy or electronic format. Employee agrees not to remove from the Company's premises the original or any reproduction of any such information, nor the information contained therein, including any computers or software programs without the prior consent of the Company. All such



material information and property in Employee's possession or control shall be immediately turned over to the Company at its corporate headquarters, currently located at 3313 West Commercial Boulevard, Fort Lauderdale, Florida.

(f)     Legitimate Business Interests.  Employee acknowledges that the restrictive covenants set forth in this Section 10, including the Non-Competition Period, Non-Solicitation Period and Non-Interference Period ("Restrictive Covenants"), and the Restricted Areas, are reasonable in time and scope and are necessary to protect the legitimate business interests of the Company; including but not limited to, the protection of trade secrets and valuable confidential business information of the Company, and substantial relationships with specific prospective and existing customers of the Company, and goodwill associated with the Company, and the extraordinary and specialized training that Employee will receive or has received from the Company.

(g)     Right to Injunction.  Employee agrees that any violation or breach of the Restrictive Covenants set forth in this Section 10 would cause irreparable harm to the Company and that such harm cannot be adequately compensated by money damages.  Accordingly, any such violation or breach may be enjoined by any court of competent jurisdiction, without causing or affecting claims for damages incurred by the Company in connection with such violation or breach. In no event shall a delay by the Company of its right to seek immediate relief under this Agreement constitute a waiver of any rights set forth herein, and in no case shall a waiver by the Company of its right to seek relief under this Agreement constitute a waiver of any other or further violation of this Agreement. The parties hereto agree and confirm that all restrictions in this Agreement are reasonable and valid. In addition, in the event of an alleged breach or violation of any Restrictive Covenant, the applicable restrictive period (i.e., the Non-Competition Period, Non-Solicitation Period or Non-Interference Period) shall be tolled until such breach or violation has been duly cured.

(h)     Third-Party Beneficiary.  All members and affiliates of the Company (including without limitation affiliates and/or subsidiaries as identified in the Operating Agreement) are third-party beneficiaries of this Agreement, and the restrictive covenants set forth in this Section 10 and the remedies hereunder inuring to the Company are intended to benefit all such members and Affiliates and may be enforced by all such members and affiliates or subsidiaries.

(i)     Severability.  In the event a court of competent jurisdiction determines any portion of the Restrictive Covenants to be unreasonable so as to make such portion unenforceable, then in such instance, the unenforceable portion or portions shall be deleted herefrom and the court shall substitute such terms as it deems reasonable, consistent with the intent hereof, so as to make the provisions hereof as fully enforceable as if the substituted terms had been incorporated in full.

(j)     Survival After Termination or Expiration of Agreement; Assignment. Notwithstanding anything to the contrary in this Agreement, the Restrictive Covenants shall survive the termination or expiration of this Agreement. It is the express intention of the parties hereto that upon the expiration or other termination of this Agreement for any reason, the following shall apply: (i) if Employee fails to continue to provide employment services for and on behalf of the Company following the expiration or termination of this Agreement, the applicable restrictive period (i.e., the Confidentiality Period, Non-Competition Period, Non-Solicitation Period or Non-Interference Period) referred to in Sections 10(a), (b), (c) or (d), above, shall commence immediately following



said expiration or termination of this Agreement; and (ii) if the employment services of the Employee are retained by the Company (i.e., the Employee continues to provide employment services for and on behalf of the Company) after the expiration or termination of this Agreement, without formal contract, it is hereby mutually agreed that the terms of this Section 10 shall continue to govern the relations between the Company and Employee, in which case the applicable restrictive period (i.e., the Confidentiality Period, Non-Competition Period, Non-Solicitation Period or Non-Interference Period) referred to in Sections 11(a), (b), (c) or (d), above, shall commence immediately following the cessation of Employee's employment services to the Company. In the event this Agreement is assigned or otherwise transferred by the Company to its assignee or successor, the assignee or successor shall be expressly authorized to enforce all restrictions set forth in this Section 10.

11.     Determinations of the Managers Deemed Conclusive.   All determinations which under this Agreement are required or permitted to be made by the Managers shall be deemed conclusive as to Employee and his heirs or beneficiaries, unless clear and convincing evidence can be shown so as to make the Manager's determinations wholly arbitrary and capricious. All benefit of doubt shall be resolved in favor of sustaining the determinations of the Managers.

12.     Non-Disparagement. During Employee's employment with the Company, whether or not under this Agreement, and thereafter, Employee will not, directly or indirectly, make any disparaging statements or other negative remarks, written or oral, about the Company, its members and Managers, its subsidiaries or any of their respective practices, Affiliates, directors, officers, employees, owners, managers, members, partners, agents, attorneys or representatives that would be reasonably likely to cast disrepute on or damage the Company or its Managers or their respective Affiliates, or for the hoped-for competitive advantage of Employee or a third person or the competitive disadvantage of the Company or its Affiliates. This Section 12 shall not, however, prohibit Employee from testifying truthfully as a witness in any court proceeding or governmental investigation.

13.     Miscellaneous Provisions.

(a)     Florida Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without regard to conflicts of law or principles thereof.

(b)     Exclusive Venue.  The Parties agree that (i) any claim of whatever character arising under or in any way relating to this Agreement shall be brought exclusively in a federal or state court of competent jurisdiction in Broward County in the State of Florida and (ii) that any claim described in the foregoing clause that is filed in any other court shall be conclusively deemed as violating the expressed intent of the parties in this mandatory forum selection clause. Employee hereby expressly waives, to the fullest extent permitted by law, any objection that Employee may now or hereafter have to the laying of venue of any such litigation brought in any such court referred to above, including, without limitation, (a) any defense claiming lack of jurisdiction in any action brought in such court, and (b) any claim that any such litigation has been brought in an inconvenient forum.

7831067-5
6/23/17 11:57 AM

12



(c)    Representation; No Presumption.  The Parties recognize and understand that this Agreement has been prepared by Berger Singerman LLP, as counsel for the Company, as a result of negotiations between the Company and Employee.  Employee hereby recognizes and confirms that he was given every opportunity to have this Agreement reviewed by his own counsel.  No presumption shall be made as to the interpretation of any provision hereof on account of this Agreement having been prepared by counsel for the Company. The Parties have been advised that inherent or possible conflicts of interest based on competing interests or concerns may exist between or among the Company and its Managers, and Employee, and that the Parties and the Company's Managers have been advised to, and have had full opportunity to, seek advice of their own independent counsel.  Employee further acknowledges and agrees that nothing contained in or implied from this Agreement, nor the fact that this Agreement was prepared by Berger Singerman, LLP, shall in any manner prevent such counsel, and any partner or attorney associated with such counsel, from ever representing the Company or either of its Managers, or another Affiliate, or any person, in any dispute, matter or transaction whatsoever.

(d)    Headings.  The Section headings contained herein are for reference purposes only and shall not in any way affect the meaning and interpretation of this Agreement.

(e)    Binding Effect.  This Agreement shall be legally binding upon and shall operate for the benefit of the respective Parties, their respective heirs, personal and legal representatives, transferees, successors and assigns.

(f)    Entire Agreement.  This Agreement contains the entire agreement of the parties hereto with respect to the subject matter addressed herein, and all prior understandings and agreements, whether written or oral, between and among the parties hereto relating to the subject matter of this Agreement are merged in this Agreement.  Each party specifically acknowledges, represents and warrants that they have not been induced to sign this Agreement by any belief that the other will waive or modify the provisions of this Agreement in the future.

(g)    Severability.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

(h)    Counterparts.  This Agreement may be signed and executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one agreement.

(i)    Transferability.  Employee hereby agrees and consents that the rights and obligations of the Company hereunder may be transferred or assigned and will be binding on the Company's successors and assigns.  Employee may not transfer or assign his rights or obligations under this Agreement without the express written consent of the Managers.

(j)    Modification.  This Agreement may only be modified in writing and signed by each of the parties hereto.

(k)  <u>Plural and Gender</u>.  Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

(l)  <u>Survival</u>.  All representations and other relevant provisions herein, including but not limited to the provisions set forth in Sections 8, 9, 10, 11, 12 and 13, and this Section 14, of this Agreement, shall survive in accordance with their respective terms, and thereby continue in full force and effect pursuant to their respective terms, upon termination of this Agreement.

(m)  <u>No Waiver of Breach</u>.  The waiver or inaction by either party hereto of a breach of any condition of this Agreement by the other party shall not be construed as a waiver of any subsequent breach by such party, nor shall it constitute a waiver of that party's rights, actual or inherent.  The failure of any party hereto in any instance to insist upon a strict performance of the terms of this Agreement or to exercise any option herein shall not be construed as a waiver or a relinquishment in the future of such term or option, but that the same shall continue in full force and effect.

(n)  <u>Notices</u>.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (i) when personally delivered or sent by telecopy or electronic mail (with hard copy to follow) or (ii) one day after being sent by reputable overnight express courier (charges prepaid), or (iii) five days following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, demands and communications to be the parties shall be sent to the addresses indicated in Schedule 1 hereto.

(o)  <u>Successors and Assigns</u>.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Company and its successors and assigns and Employee and his heirs, personal representatives, successors and assigns, except that Employee may not assign his rights or delegate his duties or obligations hereunder without the prior written consent of the Company.

(p)  <u>Dispute Resolution; Waiver of Jury Trial</u>. If a dispute arises and the Managers and Employee are unable to reach agreement consensually within 20 days despite good faith efforts to do so, the dispute may be submitted to mediation if requested in writing by any party.  The mediation shall take place in a mutually agreed location, and absent agreement, in Broward County, Florida. The mediation shall be conducted before a single mediator who shall be agreed upon by the parties. If the parties cannot agree on a mediator, Employee and the Managers shall each select a mediator and such mediators together shall select a neutral third mediator, who shall conduct the mediation. The parties shall equally bear the fees and expenses of the mediator. The mediation process shall consist of at least two sessions, conducted in good faith. If as a result of the mediation process, the parties cannot resolve the dispute, any party may pursue dispute resolution procedures under law. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS OR EVENTS CONTEMPLATED HEREBY OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO. THE PARTIES HERETO EACH AGREE THAT ANY



AND ALL SUCH CLAIMS AND CAUSES OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. EACH OF THE PARTIES HERETO FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY SUCH LEGAL PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.

      (q)   <u>Attorneys' Fees and Costs</u>. Should it become necessary for either Party to institute any legal action to enforce any of the provisions of this Agreement, the prevailing Party shall be entitled to an award of reasonable attorneys' fees and costs through all appellate levels.

      (r)   <u>Offset</u>. The Company shall have the right to set-off (reduce), on a dollar-for-dollar basis, against any and all compensation payments due to Employee hereunder for any overpayments based on assumed revenues as adjusted to take into account actual collections, and based on damages, liabilities or costs incurred by the Company as a result of Employee's breach of any of the restrictive covenants herein, in addition to any other remedies that may be available to the Company at law or in equity. Nothing herein, including acceptance of a payment with an offset, shall not constitute a waiver of any defense that Employee may have in connection with such offset.

      IN WITNESS WHEREOF, the Company and Employee, respectively, have executed and delivered this Agreement as of the date first above written.

CWGL HOLDINGS, LLC

By: _____
    Gary R. Loffredo, co-Manager

By: _____
    Claudia Wechter, co-Manager

_____
Brett Feldman

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L20000123174
FILED 8:00 AM
May 04, 2020
Sec. Of State
msimmons

## Article I

The name of the Limited Liability Company is:

#1 DME LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

6247 GRAND CYPRESS CIRCLE
LAKE WORTH, FL. US  33463

The mailing address of the Limited Liability Company is:

6247 GRAND CYPRESS CIRCLE
LAKE WORTH, FL. US  33463

## Article III

The name and Florida street address of the registered agent is:

BRYAN J SOLOMON
6247 GRAND CYPRESS CIRCLE
LAKE WORTH, FL.  33463

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   BRYAN J SOLOMON

# EXHIBIT E

## Article IV

The name and address of person(s) authorized to manage LLC:

L20000123174
FILED 8:00 AM
May 04, 2020
Sec. Of State
msimmons

Title:   CEO
BRYAN J SOLOMON
62
LAKE WORTH, FL.   33463  US

## Article V

The effective date for this Limited Liability Company shall be:

04/29/2020

Signature of member or an authorized representative

Electronic Signature: BRYAN J SOLOMON

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L22000209056
FILED 8:00 AM
May 03, 2022
Sec. Of State
vherring

## Article I

The name of the Limited Liability Company is:

#1 PLACEMENT SERVICES LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

1200 N FEDERAL HIGHWAY
SUITE 200
BOCA RATON, FL.  33432

The mailing address of the Limited Liability Company is:

1200 N FEDERAL HIGHWAY
SUITE 200
BOCA RATON, FL.  33432

## Article III

The name and Florida street address of the registered agent is:

BRYAN J SOLOMON
1200 N FEDERAL HIGHWAY
SUITE 200
BOCA RATON, FL.  33432

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   BRYAN J SOLOMON

**EXHIBIT F**

## Article IV

The name and address of person(s) authorized to manage LLC:

Title:  CEO
BRYAN J SOLOMON
1200 N FEDERAL HIGHWAY, SUITE 200
BOCA RATON, FL.  33432

L22000209056
FILED 8:00 AM
May 03, 2022
Sec. Of State
vherring

## Article V

The effective date for this Limited Liability Company shall be:

05/01/2022

Signature of member or an authorized representative

Electronic Signature: BRYAN SOLOMON

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L22000269993
FILED 8:00 AM
June 13, 2022
Sec. Of State
tllemieux

## Article I

The name of the Limited Liability Company is:

#1 CARE SERVICES, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

811 SE 8TH AVENUE
SUITE 104
DEERFIELD BEACH, FL. 33441

The mailing address of the Limited Liability Company is:

811 SE 8TH AVENUE
SUITE 104
DEERFIELD BEACH, FL. 33441

## Article III

The name and Florida street address of the registered agent is:

LORIUM PLLC
197 SOUTH FEDERAL HIGHWAY
SUITE 200
BOCA RATON, FL. 33432

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature: GREGORY MITCHELL, ESQUIRE

# EXHIBIT G

# Article IV

The name and address of person(s) authorized to manage LLC:

L22000269993
**FILED 8:00 AM**
**June 13, 2022**
**Sec. Of State**
tllemieux

Title:  MGR
BRYAN  SOLOMON
811 SE 8TH AVENUE, SUITE 104
DEERFIELD BEACH, FL.  33441

Title:  MGR
BRETT  FELDMAN
811 SE 8TH AVENUE, SUITE 104
DEERFIELD BEACH, FL.  33441

## Signature of member or an authorized representative

Electronic Signature: GREGORY MITCHELL, ESQUIRE

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

IN THE CIRCUIT COURT OF THE 17th JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FLORIDA

Case No. CACE 22-013915

BRETT FELDMAN and
BRYAN SOLOMON,

      Plaintiffs,

vs.

CWGL HOLDINGS, LLC, CLAUDIA WECHTER, and GARY LOFFREDO,

      Defendants.

_____/

CWGL HOLDINGS, LLC,

      Counter-Plaintiff,

vs.

BRETT FELDMAN and
BRYAN SOLOMON,

      Counter-Defendants.

_____/

**COUNTER-DEFENDANTS' ANSWER AND
AFFIRMATIVE DEFENSES TO COUNTERCLAIM**

Plaintiffs/Counter-Defendants, Brett Feldman and Bryan Solomon (collectively the "Counter-Defendants") by and through undersigned counsel, hereby file their Answer and Affirmative Defenses to Defendant/Counter-Plaintiff, CWGL Holdings, LLC's ("CWGL") Counterclaim, and state as follows:

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

## NATURE OF THE ACTION

1.     Counter-Defendants admit the allegations contained in paragraph 1 of CWGL's Counterclaim for jurisdictional purposes only, otherwise denied.

2.     Counter-Defendants deny the allegations contained in paragraph 1 of CWGL's Counterclaim.

## PARTIES

1.     Counter-Defendants admit the allegations contained in paragraph 1 of CWGL's Counterclaim.

2.     Counter-Defendants admit the allegations contained in paragraph 2 of CWGL's Counterclaim.

3.     Counter-Defendants admit the allegations contained in paragraph 3 of CWGL's Counterclaim.

## JURISDICTION AND VENUE

4.     Counter-Defendants admit the allegations contained in paragraph 4 of CWGL's Counterclaim.

5.     Counter-Defendants admit the allegations contained in paragraph 5 of CWGL's Counterclaim.

## FACTUAL ALLEGATIONS

### Pre-Suit Mediation Demand

6.     Counter-Defendants admit the allegations contained in paragraph 6 of CWGL's Counterclaim.

7.     Counter-Defendants deny the allegations contained in paragraph 7 of CWGL's Counterclaim.

_**Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.**_
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

8.    Counter-Defendants deny the allegations contained in paragraph 8 of CWGL's Counterclaim.

### CWGL Background and Counter-Defendants' Employment

9.    Counter-Defendants admits that CWGL is a Florida limited liability company formed in 2014 but denies the remaining allegations contained in paragraph 9 of CWGL's Counterclaim.

10.    Counter-Defendants admit the allegations contained in paragraph 10 of CWGL's Counterclaim.

11.    Counter-Defendants deny the allegations contained in paragraph 11 of CWGL's Counterclaim.

12.    Counter-Defendants admit the allegations contained in paragraph 12 of CWGL's Counterclaim.

13.    Counter-Defendants admit the allegations contained in paragraph 13 of CWGL's Counterclaim.

14.    Counter-Defendants admit the allegations contained in paragraph 14 of CWGL's Counterclaim.

15.    Counter-Defendants admit that Feldman's agreement became effective on May 1, 2017 but deny the remaining allegations contained in paragraph 15 of CWGL's Counterclaim.

16.    Counter-Defendants deny the allegations contained in paragraph 16 of CWGL's Counterclaim, in that any documents or amendments speak for themselves.

17.    Counter-Defendants deny the allegations contained in paragraph 17 of CWGL's Counterclaim.

3

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

18.     Counter-Defendants deny the allegations contained in paragraph 18 of CWGL's Counterclaim, in that the document speaks for itself.

19.     Counter-Defendants deny the allegations contained in paragraph 19 of CWGL's Counterclaim.

20.     Counter-Defendants deny the allegations contained in paragraph 20 of CWGL's Counterclaim.

## Solomon Establishes Direct Rival to CWGL During His Employment and Begins Diverting CWGL Customers to Rivals

21.     Counter-Defendants deny the allegations contained in paragraph 21 of CWGL's Counterclaim.

22.     Counter-Defendants deny the allegations contained in paragraph 22 of CWGL's Counterclaim.

23.     Counter-Defendants deny the allegations contained in paragraph 23 of CWGL's Counterclaim.

24.     Counter-Defendants deny the allegations contained in paragraph 24 of CWGL's Counterclaim.

25.     Counter-Defendants deny the allegations contained in paragraph 25 of CWGL's Counterclaim.

26.     Counter-Defendants are without knowledge of the allegations contained in paragraph 26 of CWGL's Counterclaim.

27.     Counter-Defendants deny the allegations contained in paragraph 27 of CWGL's Counterclaim.

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

28.     Counter-Defendants are without knowledge of the allegations contained in paragraph 28 of CWGL's Counterclaim.

29.     Counter-Defendants admit the allegations contained in paragraph 29 of CWGL's Counterclaim.

30.     Counter-Defendants admit to sending an email but deny the remaining allegations contained in paragraph 30 of CWGL's Counterclaim.

31.     Counter-Defendants deny the allegations contained in paragraph 31 of CWGL's Counterclaim.

32.     Counter-Defendants deny the allegations contained in paragraph 32 of CWGL's Counterclaim.

33.     Counter-Defendants deny the allegations contained in paragraph 33 of CWGL's Counterclaim.

34.     Counter-Defendants are without knowledge of the allegations contained in paragraph 34 of CWGL's Counterclaim.

35.     Counter-Defendants deny the allegations contained in paragraph 35 of CWGL's Counterclaim.

### Counter-Defendants Establish Rival Businesses to CWGL, Seek to Solicit its Customers and Employees, and Disparage the Company

36.     Counter-Defendants deny the allegations contained in paragraph 36 of CWGL's Counterclaim.

37.     Counter-Defendants deny the allegations contained in paragraph 37 of CWGL's Counterclaim.

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

38.    Counter-Defendants deny the allegations contained in paragraph 38 of CWGL's Counterclaim.

39.    Counter-Defendants deny the allegations contained in paragraph 39 of CWGL's Counterclaim.

40.    Counter-Defendants deny the allegations contained in paragraph 40 of CWGL's Counterclaim.

41.    Counter-Defendants deny the allegations contained in paragraph 41 of CWGL's Counterclaim.

## COUNT I – BREACH OF CONTRACT (FELDMAN)

42.    Counter-Defendant reallege their responses to Paragraphs 1 through 41 above.

43.    Defendant admits the allegations contained in paragraph 43 of Plaintiff's Complaint for jurisdictional purposes only, otherwise denied.

44.    Counter-Defendants admit the allegations contained in paragraph 44 of CWGL's Counterclaim.

45.    Counter-Defendants deny the allegations contained in paragraph 45 of CWGL's Counterclaim.

46.    Counter-Defendants deny the allegations contained in paragraph 46 of CWGL's Counterclaim.

47.    Counter-Defendants deny the allegations contained in paragraph 47 of CWGL's Counterclaim.

48.    Counter-Defendants deny the allegations contained in paragraph 48 of CWGL's Counterclaim.

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

49.     Counter-Defendants deny the allegations contained in paragraph 49 of CWGL's Counterclaim.

50.     Counter-Defendants deny the allegations contained in paragraph 50 of CWGL's Counterclaim, in that the document speaks for itself.

51.     Counter-Defendants deny the allegations contained in paragraph 51 of CWGL's Counterclaim.

52.     Counter-Defendants deny the allegations contained in paragraph 52 of CWGL's Counterclaim, in that the document speaks for itself.

53.     Counter-Defendants deny the allegations contained in paragraph 53 of CWGL's Counterclaim.

54.     Counter-Defendants deny the allegations contained in paragraph 54 of CWGL's Counterclaim, in that the document speaks for itself.

55.     Counter-Defendants deny the allegations contained in paragraph 55 of CWGL's Counterclaim.

56.     Counter-Defendants deny the allegations contained in paragraph 56 of CWGL's Counterclaim.

57.     Counter-Defendants deny the allegations contained in paragraph 57 of CWGL's Counterclaim.

58.     Counter-Defendants deny the allegations contained in paragraph 58 of CWGL's Counterclaim.

59.     Counter-Defendants deny the allegations contained in paragraph 59 of CWGL's Counterclaim.

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

60.    Counter-Defendants deny the allegations contained in paragraph 60 of CWGL's Counterclaim.

61.    Counter-Defendants deny the allegations contained in paragraph 61 of CWGL's Counterclaim.

## COUNT II – BREACH OF CONTRACT (SOLOMON)

62.    Counter-Defendant reallege their responses to Paragraphs 1 through 41 above.

63.    Defendant admits the allegations contained in paragraph 63 of Plaintiff's Complaint for jurisdictional purposes only, otherwise denied.

64.    Counter-Defendants admit the allegations contained in paragraph 64 of CWGL's Counterclaim.

65.    Counter-Defendants deny the allegations contained in paragraph 65 of CWGL's Counterclaim.

66.    Counter-Defendants deny the allegations contained in paragraph 66 of CWGL's Counterclaim.

67.    Counter-Defendants deny the allegations contained in paragraph 67 of CWGL's Counterclaim, in that the document speaks for itself.

68.    Counter-Defendants deny the allegations contained in paragraph 68 of CWGL's Counterclaim.

69.    Counter-Defendants deny the allegations contained in paragraph 69 of CWGL's Counterclaim.

70.    Counter-Defendants deny the allegations contained in paragraph 70 of CWGL's Counterclaim, in that the document speaks for itself.

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

71.    Counter-Defendants deny the allegations contained in paragraph 71 of CWGL's Counterclaim.

72.    Counter-Defendants deny the allegations contained in paragraph 72 of CWGL's Counterclaim, in that the document speaks for itself.

73.    Counter-Defendants deny the allegations contained in paragraph 73 of CWGL's Counterclaim.

74.    Counter-Defendants deny the allegations contained in paragraph 74 of CWGL's Counterclaim, in that the document speaks for itself.

75.    Counter-Defendants deny the allegations contained in paragraph 75 of CWGL's Counterclaim.

76.    Counter-Defendants deny the allegations contained in paragraph 76 of CWGL's Counterclaim.

77.    Counter-Defendants deny the allegations contained in paragraph 77 of CWGL's Counterclaim.

78.    Counter-Defendants deny the allegations contained in paragraph 78 of CWGL's Counterclaim.

79.    Counter-Defendants deny the allegations contained in paragraph 79 of CWGL's Counterclaim.

80.    Counter-Defendants deny the allegations contained in paragraph 80 of CWGL's Counterclaim.

81.    Counter-Defendants deny the allegations contained in paragraph 81 of CWGL's Counterclaim.

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

## COUNT III – BREACH OF FIDUCIARY DUTY (FELDMAN)

82.     Counter-Defendant reallege their responses to Paragraphs 1 through 41 above.

83.     Counter-Defendants admit the allegations contained in paragraph 83 of CWGL's Counterclaim.

84.     Counter-Defendants admit the allegations contained in paragraph 84 of CWGL's Counterclaim.

85.     Counter-Defendants deny the allegations contained in paragraph 85 of CWGL's Counterclaim.

86.     Counter-Defendants deny the allegations contained in paragraph 86 of CWGL's Counterclaim.

87.     Counter-Defendants deny the allegations contained in paragraph 87 of CWGL's Counterclaim.

88.     Counter-Defendants admit the allegations contained in paragraph 88 of CWGL's Counterclaim.

89.     Counter-Defendants admit the allegations contained in paragraph 89 of CWGL's Counterclaim.

90.     Counter-Defendants deny the allegations contained in paragraph 90 of CWGL's Counterclaim.

91.     Counter-Defendants deny the allegations contained in paragraph 91 of CWGL's Counterclaim.

## AFFIRMATIVE DEFENSES

As for their Affirmative Defenses to CWGL's Counterclaim, Counter-Defendants would show this Court the following:

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

### FIRST AFFIRMATIVE DEFENSE

CWGL has failed to comply with all of its contractual obligations due and owing under both the Agreements and Second Amended Operating Agreements.

### SECOND AFFIRMATIVE DEFENSE

CWGL committed wrongful acts or threats against Counter-Defendants, causing Counter-Defendants financial distress and lacking a reasonable course of action.

### THIRD AFFIRMATIVE DEFENSE

CWGL claims are barred, in whole or in party, by the doctrine of unclean hands.

### FOURTH AFFIRMATIVE DEFENSE

By virtue of CWGL's own conduct and statements, CWGL is estopped from recovering for the claims alleged in its Counterclaim.

### FIFTH AFFIRMATIVE DEFENSE

CWGL is barred from recovery on the Counterclaim, in whole or in part, by the doctrines of waiver, estoppel and/or laches.

### SIXTH AFFIRMATIVE DEFENSE

CWGL's claims are barred to the extent they have failed to mitigate damages.

### SEVENTH AFFIRMATIVE DEFENSE

CWGL is barred from recovery on the Complaint, in whole or in part, because the Complaint fails to state any claim upon which relief can be granted. The Counterclaim contains opinions of the pleader, conclusions of law, and "unwarranted conclusions of fact[,]" *Esposito v. Horning*, 416 So. 2d 896, 898 (Fla. 4th DCA 1982); *Ellison v. City of Fort Lauderdale*, 175 So. 2d 198, 200 (Fla. 1965), and "[a] court will not 'by inference on inference or speculation supply essential averments that are lacking.'" *Alvarez v. E & A Produce Corp*, 708 So. 2d 997, 1000

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

(Fla. 3d DCA 1998); *see also Conley v. Shutts & Bowen, P.A.*, 616 So. 2d 523, 524-25 (Fla. 3d

DCA 1993).

## SEVENTH AFFIRMATIVE DEFENSE

CWGL is barred from recovery on Count III of the Complaint for "breach of fiduciary

duty" against Plaintiffs, by the doctrine and privilege of lawful competition. *See ISS Cleaning*

*Services Group, Inc. v. Cosby*, 745 So. 2d 460, 462 (Fla. 4th DCA 1999), *Greenberg v. Mount*

*Sinai Medical Center*, 629 So. 2d 252, 255 (Fla. 3d DCA 1993). *Accord, Harllee v. Professional*

*Service Industries, Inc.*, 619 So. 2d 298, 299 (Fla. 3d DCA 1992), *rev. denied*, 629 So. 2d 134

(Fla. 1993); *Unistar Corp. v. Child*, 415 So. 2d 733, 734 (Fla. 3d DCA 1982); *Jay v. Mobley*, 783

So. 2d 297, 299 (Fla. 4th DCA 2001), *rev. denied*, 800 So. 2d 614 (Fla. 2001); *Heavener, Ogier*

*Services, Inc. v. R. W. Florida Region, Inc.*, 418 So. 2d 1074, 1076 (Fla. 5th DCA 1982).

At all relevant times, Plaintiffs' acts were without malice and were coupled with

legitimate competitive economic interests. *Paparone v. Bankers Life & Casualty Company*, 496

So. 2d 865, 868 (Fla. 2d DCA 1986); *Greenberg*, 629 So. 2d at 255; *Perez v. Rivero*, 534 So. 2d

914, 916 (Fla. 3d DCA 1988); *Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 658 (Fla. 4th DCA

1980), *petition for rev. denied*, 411 So. 2d 383 (Fla. 1981).

WHEREFORE, Plaintiffs/Counter-Defendants, Brett Feldman and Bryan Solomon,

respectfully request that judgment be entered against Defendant/Counter-Plaintiff, CWGL

Holding, LLC, and in favor of Counter-Defendants, including but not limited to an award of

attorneys' fees and costs, and for any other relief the Court deems just and proper.

*Brett Feldman and Bryan Solomon v. CWGL Holdings, LLC, et al.*
Case No. CACE 22-013915
Counter-Defendants' Answer and Affirmative Defenses to Counterclaim

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via e-mail to: **Patrick McCardle, Esquire**, Cole, Scott & Kissane, P.A., 110 SE 6th Street, Suite 2700, Fort Lauderdale, FL 33301, patrick.mccardle@csklegal.com; cody.german@csklegal.com; kristie.carroll@csklegal.com; nicolle.quant@csklegal.com, on this 18th day of January, 2023.

Respectfully submitted,

**LORIUM PLLC**
*Counsel for Plaintiffs*
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: 561.361.1000
Facsimile: 561.672.7581
Email: jgrant@loriumlaw.com

By: ___/s/ Joe M. Grant_____
JOE M. GRANT
Florida Bar No. 137758

13